**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

THE LISINSKI LAW FIRM, LLC,

      Plaintiff,

v.                                                                    Case No. 2:26-CV-00704-SDM-KAJ

CAMILA OVERMYER a/k/a
CAMELIA GUAD MAGANA MADRIGAL,
JAMES BETZOLD,
ROBERT ALVAREZ,
INNA SIMAKOVSKY,
BETZOLD LAW, PLC d/b/a VISA FELIZ,
AVANTI LAW GROUP, PLLC,
SIMAKOVSKY LAW GROUP, LLC, and
JOHN DOES 1–6,

      Defendants.

---

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff The Lisinski Law Firm, LLC ("LLF"), by and through its undersigned counsel, brings this action against Defendants Camila Overmyer, also known as Camelia Guad Magana Madrigal ("Overmyer"), James Betzold ("Betzold"), Robert Alvarez ("Alvarez"), Inna Simakovsky ("Simakovsky"), Betzold Law, PLC d/b/a Visa Feliz ("Betzold Law"), Avanti Law Group, PLLC ("Avanti Law Group"), Simakovsky Law Group, LLC ("Simakovsky Law") (collectively, "Defendants"), and John Does 1 through 6 (collectively, "Doe Defendants") and alleges as follows:

### INTRODUCTION

1.     This action arises from Defendants' coordinated, sustained campaign to cause fear and panic in the undocumented immigrant community by spreading lies and defamatory statements

about competing immigration firms – including LLF – to turnc clients against their counsel and drive business instead to Defendants.

2.      The Defendants are two Michigan-licensed attorneys (Betzold and Alvarez) and their Michigan-based law firms (Betzold Law and Avanti Law Group, respectively), an Ohio-based attorney licensed in Washington (Simakovsky) and her Ohio-based law firm (Simakovsky Law), an aspiring TikTok personality who also sells personal care items on social media (Overmyer), and the Doe Defendants, to-be-identified individuals engaged in slanderous social media campaigns and in some cases breaching non-disclosure agreements with LLF (Does 1–6).

3.      Defendants' scheme, as detailed below with respect to each Defendants' individual conduct, works as follows. First, Defendants use social media to attack well-recognized immigration firms with strong social media followings, capitalizing on those firms' hard-earned reputations to generate exposure Defendants could never achieve on their own and directing the bulk of their attacks at LLF. The attacks range from outright accusations of fraud and criminal conduct to accusations of causing clients to get deported to casting disturbing and crass epithets – all deliberately calibrated to feed algorithms that reward outrageous controversy and maximize views.

4.      Having caught viewers' attention through these false attacks on LLF, Defendants exploit the fear already gripping the undocumented community by telling them that routine aspects of immigration cases amount to fraud and thereby convince them that their attorneys are criminals. They reinforce this false narrative by claiming that LLF's founding attorney will soon "be in an orange jumpsuit" for a litany of invented crimes. They then warn LLF's clients that remaining with LLF puts the clients themselves at risk – threatening that these clients will lose their legal status, be deported, or be imprisoned for up to 15 years.

2

5. After priming LLF's clients to fear for their liberty and convincing them that standard, routine aspects of their immigration cases amount to fraud, Defendants then manufacture urgency, warning clients they must act immediately or it will be too late.

6. With clients sufficiently frightened and convinced they have no time to spare, Defendants position themselves as the only salvation. They tell clients that all they must do to avoid this parade of horribles is walk into Defendants' arms for a "free second opinion" and join baseless lawsuits against LLF, which – as a sweetener – may even qualify them for an alternate path to legal status through an S-Visa or a U-Visa. It will not. Those promises are illusory, and Defendants know it. Never mind that accepting Defendants' offer requires LLF's clients to renounce their valid immigration claims and effectively confess to USCIS that they signed  a fraudulent document that does not exist.

7. Sadly, this scheme is working. Unsuspecting LLF clients are abandoning what may be  their only path to legal status, turning on their counsel, and joining civil lawsuits, namely *Ortega v. The Lisinski Law Firm, LLC*, *et al.,* No. 2:26-cv-00644-SDM-KAJ (S.D. Ohio May 28, 2026) (the "Class Action") (in which Alvarez serves as counsel, as does Simakovsky's firm) designed solely to benefit the Defendants – at the immigrant community's grave expense.

8. LLF respectfully seeks relief putting an end to this anti-competitive campaign, for the sake of the immigrant community it has spent years serving.

A. **The Backdrop.**

9. Due to recent shifts in immigration enforcement, the undocumented immigrant community is living in a state of profound fear and anxiety, making them vulnerable to manipulation. Desperate for reliable immigration information, LLF's clients and prospective

3

clients, like so many in their community, turn to any available source they can find for answers, including social media platforms like TikTok, YouTube, Reddit, and Facebook.

10. Social media is a vital platform for the immigrant community, not just to maintain social relationships and keep abreast of news and public interest stories, but also as a primary source for immigrants to find, and advertise their own, goods and services.

11. Defendants exploit immigrants' reliance on unregulated and difficult-to-monitor social media platforms for their own personal benefit, generating anti-competitive and false advertisements primarily in the form of TikTok videos and livestreams designed to scare immigrants into firing their attorneys and instead seeking services from Betzold, Alvarez, and Simakovsky.

**B.      Overmyer Targets LLF to Increase Her Social Media Views.**

12. Defendant Overmyer, an aspiring TikTok personality who had long peddled shampoos, perfumes, and the like to a small following on her platform with minimal success, began branding herself as an immigration expert – despite, on information and belief, having no legal training or experience whatsoever.

13. Although Overmyer states that she is "not an attorney," she is understood to be a "certified document preparer," as reflected in repeated comments on her social media posts from individuals she has hosted. These comments appear in connection with videos that also include Overmyer's contact information. In the immigrant community, such a document preparer is colloquially referred to as a "notario": an unlicensed individual who charges immigrants to prepare their immigration cases with no qualifications, no training, and no accountability.

14. Armed with this self-proclaimed expertise, in or around March 2025, Overmyer began publicly criticizing LLF's legal positions on social media, stumbling upon a way to generate more attention than she had ever seen before: by attacking LLF.

15. Founded by Angelyne Lisinski ("Lisinski"), LLF is one of the largest and most well-respected immigration law firms in the country dedicated to helping the Spanish-speaking undocumented community. Focused predominantly on humanitarian-based immigration relief, LLF has grown to become a trusted name in the immigrant community – amassing a combined nearly 1 million social media followers across platforms. LLF has proudly built its reputation through years of cultivation to become one of the most experienced immigration law firms in the country.

16. Overmyer began her attacks on LLF by targeting Lisinski's position that a client may qualify for humanitarian immigration relief even where a sworn personal declaration is their only evidence of the mistreatment or abuse they suffered. Despite, on information and belief, having no legal training or experience, Overmyer declared that position false and began broadcasting it to her viewers. In publicly contradicting and generating controversy against well-known LLF, Overmyer finally garnered the social media attention she so desperately craved.

17. Overmyer's statements regarding evidentiary issues are wrong. USCIS policy explicitly recognizes a personal declaration as primary evidence in support of a humanitarian immigration application, and LLF has successfully assisted many of its clients in achieving the relief sought in their humanitarian petitions under these circumstances.

18. The truth, however, did not matter to Overmyer – views did. And, seeing the engagement she could generate by openly challenging a firm as widely recognized as LLF, she began to escalate her attacks.

19. No longer content with merely contradicting licensed attorneys, Overmyer began dispensing outright legal advice to her growing audience, advice she has no license or qualification to give, in violation of Indiana's unauthorized practice of law statute, Indiana Code § 33-43-2-1.

20. For example, on or about November 4, 2025, a commenter on Overmyer's TikTok livestream asked, "Can my resident husband file for me if I came across the border and wasn't caught[?]" Live video hosted by Camila Overmyer (@camilaovermyer87), TikTok (Nov. 4, 2025). Reading this question aloud, Overmyer then advised, "Of course, your resident husband can file for you." *Id.*[1]

### C.     **Betzold and Alvarez See an Opportunity to Profit.**

21. Overmyer's attacks did not go unnoticed. Smaller immigration firms – long resentful of the large, high-volume national players like LLF that have begun to affect their businesses – began seizing on Overmyer's platform and false narratives as cover to wage their own attacks on LLF. Betzold and Alvarez were among them.

22. Upon information and belief, in early December 2025, Betzold came across Overmyer's TikTok content attacking LLF and, seeing an opportunity, proactively reached out to Overmyer suggesting a collaboration. Alvarez, who is, upon information and belief, Betzold's longtime friend and former law partner, soon followed suit.

23. Betzold and Alvarez were not content to simply pile on – instead, they looked for an opportunity to monetize the chaos Overmyer started and began plotting how to turn LLF's clients into revenue streams for themselves and their law firms, with no regard whatsoever for what that might mean for those clients or their pending immigration cases.

---

[1] Overmyer's videos and posts are in Spanish. Quotes from the videos and posts contained herein reflect English translations of the Spanish-language videos and posts.

24.     As Overmyer continued her near-daily, multi-hour social media livestreams attacking LLF and other large immigration law firms, Betzold and Alvarez began regularly appearing as attorney guests on her livestreams – lending an air of legitimacy to her escalating lies and attacks against LLF. They also started hosting their own livestreams peddling the same false attacks against LLF and others.

25.     Betzold and Alvarez's goal was, and continues to be, to cause LLF's clients to fear LLF and run to Betzold and Alvarez and their respective law firms instead – all for their own personal and professional gain. The tactics this group used to do so are nothing short of shocking.

**D.      Defendants' Shocking Tactics Engender Fear and Distrust for Personal Gain.**

26.     Overmyer has actively enticed LLF's clients to call in during live social media streams and publicly disclose personal, confidential, and privileged information about their immigration cases *live on air for public consumption*, compromising the attorney-client privilege and potentially jeopardizing these vulnerable clients' immigration cases. After eliciting these disclosures, Overmyer then refers or directs those individuals to Betzold and Alvarez. In blatant disregard for the welfare of the immigrant community, Betzold and Alvarez – both licensed attorneys who know better – have participated in, facilitated, and benefited from this scheme. This conduct has compromised attorney-client confidences and privileges and may jeopardize these vulnerable clients' immigration cases.

27.     Furthermore, despite the fact that federal law and basic human decency demand that humanitarian immigration petitions be treated with confidentiality and respect, Betzold, Alvarez, and Overmyer publicly read statements from a client abuse declaration (that Alvarez also publicly filed in a complaint against a law firm) aloud on livestreams for everyone to hear, including potentially the very abuser implicated in the declaration. Indeed, the declaration read

7

aloud recounted a woman whose husband has shot off firearms near her. Upon information and belief, Ohio residents viewed these statements. Whether or not the disclosures were made with the client's consent, this sensationalist tactic designed to generate social media views and to drive more business to Alvarez, Betzold, their respective law firms, and Overmyer could place survivors in direct danger.

28.     Similarly, on or about January 21, 2026, Overmyer hosted a relative of an LLF client on her livestream, during which the relative publicly disclosed information concerning abuse suffered by her family that formed the basis of the client's humanitarian immigration petition. During that livestream, Overmyer made statements impugning LLF's intake and case-screening practices, including by asserting that Lisinski "says yes to all clients" and files T visa applications for all clients regardless of the underlying facts or legal merit.

29.     Overmyer further stated that she intended to make an "incognito" appointment with LLF. On information and belief, this statement reflected an effort to investigate, entrap, or otherwise deceptively gather information about LLF under false pretenses, further advancing Overmyer's campaign to undermine LLF's reputation and interfere with its client relationships.

30.     Also during that livestream, Overmyer suggested to an LLF client that the client's declaration did not constitute evidence and cast doubt on the legitimacy of the client's immigration claim. In doing so, Overmyer asked, in substance, "if one's word was enough evidence, do you think there would be any illegal migrants?" By making such statements, Overmyer sought to induce clients to question the adequacy of their filings, distrust the legal advice they may have received from LLF, and seek assistance instead from Alvarez, Betzold, and/or Simakovsky.

31.     Overmyer, Betzold, and Alvarez also took routine immigration delays, typical USCIS practices, and garden-variety customer service issues and twisted them into sinister

accusations of fraud. In one telling example, Overmyer warned her audience that if a client is unable to locate their humanitarian case status online using their receipt number, this is a sign of fraud – when in fact no humanitarian immigration case is ever discoverable online because USCIS specifically protects the confidentiality of such petitions by making them unsearchable.

32. Indeed, Overmyer has outright accused LLF of forging fake receipt notices and giving them to clients. In January 2026, Overmyer publicly broadcast the story of an alleged LLF client and asserted that the "word attorney,"[2] code for Lisinski, had provided the client with a fake USCIS receipt number, while also describing LLF as "rotten" and "disgusting." Overmyer has repeated these allegations many times on her platform, with, upon information and belief, full knowledge and awareness of Betzold and Alvarez who purport to be knowledgeable immigration lawyers who should know these claims are false.

33. Overmyer likewise began actively encouraging viewers to surreptitiously record their privileged conversations with their attorney's office – without the law firm's knowledge or consent – potentially in violation of state wiretap statutes.

34. Clients listened. An LLF client even discussed secretly recording her privileged conversation with an LLF attorney without LLF or the recorded attorney's knowledge or consent. This was done in complete disregard for the legal jeopardy such exposure could create for the client.

35. Encouraging clients to secretly record their attorneys not only jeopardizes the attorney-client privilege and pending immigration cases – it could also expose the client to criminal liability. *See, e.g.*, Fla. Stat. § 934.03(4). That Defendants prioritize sensationalism and social

---

[2] This is a translation from "la abogada de la palabra". Overmyer's use of the feminine neuter further confirms that she is referring to Lisinski.

media views over the safety and wellbeing of the immigrant population demonstrates where their priorities lie.

36.     Further, Simakovsky, an attorney who, like Betzold and Alvarez, practices immigration law and owns her own law firm, has worked with, at least, Alvarez to pressure at least one former LLF attorney to speak with Alvarez, in violation of non-disclosure agreements between the former attorney and LLF. Indeed, in what can only be viewed as a deliberate harassment tactic, Simakovsky copied the former attorney's new employer on that communication – apparently to pressure or embarrass the former attorney into cooperating with Simakovsky and Alvarez.

37.     Simakovsky has waged other attacks against LLF to support this coordinated anti-competitive scheme, including saying publicly that LLF is "the biggest [A.S.S.] mill" and that "for years she has seen clients from [LLF] and it is truly horrific." Simakovsky has even specifically disparaged LLF and Lisinski to current LLF clients in an effort to siphon off LLF's clients for Simakovsky and her firm's own gain.

38.     Overmyer has publicly boasted on her livestreams that she has sources with insider knowledge of LLF feeding her confidential information about the firm and its business practices – brazenly declaring that LLF will never identify who they are.

39.     Alvarez and Overmyer have both publicly acknowledged that LLF's current and former team members are bound by non-disclosure agreements, as is common in any business, but particularly critical in one where client confidentiality is paramount. Rather than respect those agreements, Alvarez and Overmyer have openly encouraged LLF's current and former team members to violate them, inviting staff to contact them directly and divulge confidential information about LLF's practices and other information.[3]

---

[3] *See* https://vt.tiktok.com/ZSxDC9f5H (last accessed June 19, 2026).

40. Overmyer has publicly disseminated information, via livestream, that she allegedly elicited from at least one former LLF team member concerning that team member's work at LLF, and at least one other former LLF team member has come forward regarding direct contact by Alvarez – a licensed attorney – pressuring her to breach her non-disclosure agreement by disclosing additional information.

41. On or about June 2, 2026, Betzold and/or Alvarez also had direct communication in violation of a non-disclosure agreement, which they knew existed, with another former-LLF team member based in Dublin, Ohio.

42. Defendants have also created a WhatsApp group to coordinate their campaign against LLF, using it to recruit current and former LLF team members, elicit conduct in violation of their non-disclosure agreement obligations, and manufacture negative sentiment among former staff to drive further recruitment into their scheme. On information and belief, Overmyer administers this group, and all seven named Defendants use it as a tool to systematically expand their coordinated effort to destroy LLF's reputation and convince LLF's clients that LLF is engaged in fraud.

**E.** **Defendants Seek to Convince the Public that LLF Commits Fraud To Enrich Themselves.**

43. Upon enticing LLF's clients and other members of the immigrant community to call into their livestreams and put themselves at risk by disclosing privileged information about their immigration status and cases, Defendants seized that opportunity to exploit the fear and confusion gripping this community by making additional false and defamatory statements designed to blame LLF for bad outcomes that were in fact the direct result of the current sweeping immigration enforcement environment.

44.    For example, in addition to suggesting that receipt delays and increased application denials could be indicia of fraud by LLF, Overmyer also suggested to LLF's clients that LLF was responsible for the arrest or deportation of certain immigrants, weaponizing this community's most profound and pervasive fear for her own ends. These arrests and deportations were not the fault of LLF: they are the direct result of the current enforcement environment, which has affected thousands of undocumented immigrants across the country regardless of their legal representation.

45.    Defendants' false accusations of fraud did not stop there. Overmyer, Betzold, and Alvarez also told this community and LLF's clients that an attorney charging what they characterize to be a high legal fee could be indicia of fraud.

46.    Alvarez further stated that the routine practice of requesting a FOIA request for background records for its immigration clients – a practice most competent immigration attorneys employ for every client – was a sign of something sinister, stating: "I believe they are buying time with the FOIA, they are buying time, it's a way to bill additionally."

47.    In January 2026, Overmyer similarly accused LLF of engaging in a "scheme" in which the firm charges clients an initial fee to file applications allegedly supported by insufficient evidence, supposedly knowing that those applications will be denied or will trigger a Request for Evidence from the government. According to Overmyer, LLF then advises clients to pursue an appeal in order solely to collect additional fees.

48.    To further advance their narrative of fraud, Overmyer, Betzold, and Alvarez grossly mischaracterize LLF's well-established legal position that victims of abuse do not need to have suffered severe physical violence or possess a police report to qualify for humanitarian immigration relief. Betzold and Alvarez misleadingly suggest to their audience that LLF claims nothing more than "stress in [a] marriage" is enough to qualify for relief under the Violence

Against Women Act ("VAWA"), which is a malicious distortion of LLF's legal position and is designed to mislead the community into believing LLF files fraudulent and baseless petitions.[4]

49.     At the same time, Overmyer, Betzold, and Alvarez have made statements exaggerating the severity of abuse or trafficking one must suffer, and the evidence one must present, to succeed on a humanitarian immigration petition. This too was by design: discredit LLF, frighten its clients into believing their cases were fraudulent, and drive them straight to Defendants instead.

50.     To further advance the fraud narrative, Betzold created visafraud.law, a website specifically designed to intercept LLF's frightened clients and funnel them into his scheme. The website's very name was deliberate, and its content doubles down on the same false narrative, promoting frivolous litigation filed against LLF and other firms to scare clients into seeking Betzold and Alvarez's assistance. On the website, Betzold and Alvarez reframe routine legal opinions as indicia of fraud. For example, the website frames clients' statements that they were told to "file a T-Visa because it was quicker and easier than a family petition," and information that a client paid $14,000 in legal fees suggests fraud or wrongdoing.[5] Of course, that a lawyer recommends a faster and easier filing is hardly indicative of fraud, nor is paying a $14,000 legal fee. The absurdity of these statements is easy to explain given Alvarez's own admission in a Facebook comment that he knows little about VAWA and T-Visas.

51.     Indeed, in many of her widely-viewed social media posts, Overmyer and Alvarez make blatant accusations of fraud and criminal conduct. Alvarez has stated publicly: "It's a big

---

[4] *See* https://visafraud.law/ (last accessed June 8, 2026).

[5] *See* https://visafraud.law/ (last accessed June 8, 2026).

surprise that they put at risk not only their licenses, but also their freedom." Overmyer has stated, "All of this is called fraud, period."

52. Overmyer's attacks have been not just unprofessional, but also deeply personal and vicious, with Overmyer repeatedly calling Lisinski a "rat," a "thief," "rotten," "disgusting," "corrupt," "old," "big forehead," and a "fraud," threatening that she will "end up in an orange jumpsuit," and subjecting her to a torrent of profanity and other personal attacks. As part of these personal and derogatory attacks, Overmyer has even resorted to suggesting that Lisinski has the "face of an embittered woman" because she "needs" a female sexual product. Consistent with that campaign, even when Overmyer does not identify LLF or Lisinski by name, she continues – most recently as of June 4, 2026 – to promote the narrative that the attorneys, reasonably understood to include Lisinski, belong in jail.[6] Overmyer has gone so far as to depict what reasonable viewers would understand to be Lisinski as a rat in an orange prison jumpsuit headed to jail, while referring to her as a "wicked rat."[7]

53. In addition, Betzold and Overmyer repeatedly refer to LLF clients as "victims" of LLF in an effort to cause the community to view LLF negatively and associate LLF with harm. Overmyer has also accused Lisinski of not "giv[ing] a damn" about her clients' deportations. Ohio residents have also viewed these statements.

54. To stoke doubt among clients, Betzold has stated that it is "suspicious" if an attorney works with a client to update their declaration. Betzold has advised that clients should refuse to sign the updated declaration and talk to Betzold instead. As Betzold must know, though,

---

[6] *See* https://www.tiktok.com/@camilaovermyer41/video/7647958541390630157 (last accessed June 19, 2026).

[7] *See* https://www.tiktok.com/@camilaovermyer41/video/7637290406832639246 (last accessed June 19, 2026).

routine declaration updates are normal throughout an immigration case, for example to respond to governmental requests for additional evidence, or to provide supplemental information prior to an interview with USCIS, among other legitimate reasons.

### F.       Defendants' Scheme to Benefit from the Fear They Created.

55.       Having spent months saturating LLF's clients and the broader immigrant community with false accusations of fraud, Defendants put the next phase of their scheme into action: Betzold and Alvarez – having primed LLF clients to believe that routine immigration advice or typical casework  steps constitute fraud – next cause LLF clients to believe that they, too, will be in trouble for fraud if they remain clients of LLF.

56.       In video after video, Betzold, Alvarez, and Overmyer stoke this fear into the community. In one video, Betzold states: "[T]hey are going to investigate all the cases involving all the attorneys suspected" of fraud – which Betzold and Alvarez had previously stated many times includes LLF.[8] For example, and without limitation:

   a. In a separate livestream, Betzold reiterated these threats: "Immigration is being very strict, and if they find out that you committed fraud, they are not going to want to show you mercy."

   b. Alvarez further states that clients of lawyers who commit fraud "could also face criminal charges for having signed [] documents" in the case, and used alarming language stating that "thousands and thousands" of another former lawyer's clients "are in danger."[9] Betzold has claimed that if a client gets entangled in these matters,

---

[8] *See* https://www.tiktok.com/@betzoldlaw/video/7642415047565724941 (last accessed June 19, 2026).

[9] *See* https://www.tiktok.com/@betzoldlaw/video/7642055057608822029 (last accessed June 19, 2026).

enforcement authorities "are not going to want to show you mercy."[10] He has further asserted that, if a client "timely retract[s]" the case and stops using the attorney's allegedly fraudulent services, the client will have a better chance of obtaining lawful status.[11]

c. Alvarez has further stoked fear by saying: "You can be sure that immigration is reviewing every page, every signature, every allegation made in those declarations to determine whether there was any fraud."[12]

d. Alvarez even suggests that clients who have already won their immigration cases and achieved legal status are not safe: "Any benefit that you obtain as an immigrant is subject to being taken away due to fraud."[13]

e. And to drive things home, Overmyer has warned that "the consequences can be up to 15 years in prison," an order of deportation, and "a fine of up to 250,000," all designed to scare LLF clients into turning on LLF for Betzold, Alvarez, and Overmyer's personal and professional gain.

57. After causing LLF's clients to believe LLF commits fraud and scaring them into thinking they too will be in trouble for fraud if they remain with LLF, Defendants then put in motion the next part of their scheme: siphoning off LLF's clients for their own benefit.

58. Overmyer, whose sensationalized videos garner more views and thus more financial opportunities for Overmyer, creates urgency through guest speakers, such as attorney

---

[10] *See* https://www.tiktok.com/@betzoldlaw/video/7637908122622889230 (last accessed June 19, 2026).

[11] *Id.*

[12] *See* https://www.tiktok.com/@betzoldlaw/video/7642055057608822029 (last accessed June 19, 2026).

[13] *Id.*

Lilliana Jones, who told viewers on February 12, 2026: "You have to act fast. . . . Because if you wait for immigration to send you a request for evidence, it may be too late or they will call you for an interview, it may be too late." Capitalizing on this fear, Alvarez repeatedly replies to commentators on Overmyer's videos—which include LLF's current and prospective clients—to contact him.

59.     Betzold and Alvarez, positioning themselves as the honest alternative to supposedly corrupt firms like LLF, then offer a free "second opinion" on pending immigration cases. The offer was irresistible by design: an undocumented immigrant, already frightened by months of livestream warnings that their attorney may have defrauded them, would almost never turn down a free evaluation by an immigration lawyer; there is nothing more important to them than their immigration status, particularly in the current enforcement climate.

60.     Having already created the fear necessary to drive action, Overmyer, Betzold, and Alvarez continue to encourage immigrants to disclose confidential details regarding their applications, even where doing so may place their existing work permits or other immigration status at risk, by stoking fear and telling them that they stand to lose such status in any event if their applications were allegedly fraudulent.

61.     Overmyer, Betzold, and Alvarez sweetened the pot by making false promises that persons who came forward might qualify for a U-Visa or S-Visa as an alternative path to legal status, neither of which is a remotely likely outcome,[14] and both of which Betzold and Alvarez

---

[14] Between 2020 and 2024, *less than 1,000* U-Visas were granted, and *no* S-Visas were granted. *See* Nonimmigrant Visas Issued by Classification, available here: *https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2024AnnualReport/Table %20XVB.pdf*.

knew or should have known were illusory promises designed solely to lure desperate immigrants into their trap for their own financial gain.

62.     The "free second opinion" Betzold and Alvarez promised was no second opinion at all. Betzold had current and former LLF clients execute something called a Limited Scope Representation Agreement with Betzold Law, which reveals what he is actually doing with LLF's clients: coaxing them to authorize the release of their client file to Betzold so Betzold could review it and determine, in his sole discretion, whether to file a ***bar grievance*** against counsel – that is, LLF.

63.     Indeed, Betzold's representation is "strictly limited" to Betzold deciding, again, in his sole discretion, whether to file a bar grievance, and even makes clear that his engagement terminates upon "the filing of a grievance (if [Betzold] deems it appropriate)."

64.     Nowhere in the Limited Scope Representation Agreement does Betzold explain to the client the potential impact that filing a grievance (over which ***he*** maintains sole and exclusive control) can have on LLF's continued representation of these clients, the potential impact it could have on the status of their legal proceedings, or the potential need to engage new counsel regarding their immigration matter.

65.     On information and belief, the next step of the scheme is for Betzold and Betzold Law to refer LLF's clients to Alvarez and Avanti Law Group, where the group then attempts to convince them to abandon their legitimate immigration cases and file a lawsuit in Ohio against LLF instead. Already, LLF has confirmed that Betzold and Alvarez directly contacted no fewer than four of its current clients and encouraged them to join this lawsuit. On information and belief, all seven Defendants stand to personally and professionally benefit from any favorable outcome of a lawsuit. On information and belief, Simakovsky and Alvarez and their respective law firms,

18

as counsel in the Class Action against LLF, will share fees if that Class Action succeeds and, based on Betzold's prominence on the visafraud.law website, he and Betzold Law, too, will share in any fees. Betzold's own Limited Scope Representation Agreement supports that this is the arrangement, stating that "[a]ttorney may also obtain services of outside attorneys or counsel to assist . . . ," which, upon information and belief, refers to his arrangement with Alvarez and Avanti Law Group. Likewise, on information and belief based on Overmyer's promotion of Betzold and Alvarez on her social media videos, Overmyer benefits from the scheme via increased social media engagement and thus increased profits from that engagement and *pro bono* representation from Alvarez in *Meneses Law, PLLC v. Overmyer*, Case No. 4:26-cv-00552 (S.D. Tex.) (*see* ECF No. 9).

66. The most cynical aspect of the entire scheme is that Overmyer, Betzold, and Alvarez are persuading undocumented immigrants — people whose single greatest priority is obtaining legal status – to abandon what may be their only realistic path to that status in order to join a civil lawsuit (i.e., the Class Action) filed not for the clients' interests but for Defendants' own personal gain. Overmyer has represented that, although she initially began taking calls from clients purportedly to unite groups of alleged victims, after aligning herself with Betzold and Alvarez, her role became to inform clients about their so-called "justice" movement and direct or channel their inquiries to Betzold and Alvarez for purposes of filing the Class Action.[15]

67. That personal and professional gain – not justice, not client protection, not advocacy for the immigrant community – drives this entire scheme, made plain by Alvarez and Simakovsky's attempt to concoct a class action lawsuit out of manufactured grievances, a legal

---

[15] *See* https://www.tiktok.com/@camilaovermyer41/video/7641976172540185869 (last accessed June 19, 2026).

strategy designed to maximize Defendants' financial reward.[16] That lawsuit remains pending in this Court, and represents Defendants' ultimate ambition: to convert their months-long coordinated campaign of lies, manipulation, and exploitation into a financial windfall – at the undocumented community's grave expense.

### G.      Defendants Have Caused Damage to LLF and the Immigrant Community.

68.      The damage caused by this coordinated campaign cannot be overstated. Defendants, motivated solely by financial gain, have caused fear, panic, and confusion in the immigrant community, generated improper business advantage, engaged in false advertising through their fictitious "free second opinion" scheme and their misleading visafraud.law website, improperly solicited LLF's clients, conspired to defame LLF, and interfered with its business and contractual relationships. All seven Defendants acted with one thing in mind: profit – at the expense of the immigrant community.

69.      The harm to LLF, while subordinate to the harm inflicted on the immigrant community itself, has been severe. LLF has suffered and continues to suffer significant reputational damage and significant financial harm as clients have left LLF, directly citing Defendants' conduct as their reason for doing so, and countless more were driven away from engaging with LLF in the first instance.

70.      While LLF will seek full redress of every dollar in damages Defendants' scheme has caused, it files this lawsuit first and foremost to protect the immigrant community from further harm at the hands of these predators.

---

[16] Simakovsky's partner, and not Simakovsky, appears on the complaint (discussed *infra*), likely because Simakovsky is not licensed to practice law in Ohio.

## PARTIES, JURISDICTION, AND VENUE

71.     LLF is an Ohio limited liability company whose sole member is Lisinski, who is domiciled in Florida. LLF, then, is domiciled in Florida.

72.     Betzold is an attorney and, on information and belief, domiciled in Michigan.

73.     Betzold Law is a Michigan professional limited liability company and, on information and belief, domiciled in Michigan.

74.     Alvarez is an attorney and, on information and belief, domiciled in Michigan.

75.     Avanti Law Group is a Michigan professional limited liability company and, on information and belief, domiciled in Michigan.

76.     Overmyer is an individual who is domiciled in Indiana.

77.     Simakovsky is a Washington-licensed attorney who is domiciled in Ohio.

78.     Simakovsky Law is an Ohio limited liability company, on information and belief, domiciled in Ohio.

79.     Doe 1, who uses the Reddit username "Affectionate_Kick313," is, upon information and belief, a former team member of LLF. Upon information and belief, Doe 1 is a citizen of the United States. Doe 1's true identity is presently unknown, and LLF will seek to substitute Doe 1 with the individual's actual name when ascertained through discovery or other means.

80.     Doe 2, who uses the Reddit username "Moonbliss88," is, upon information and belief, an individual and citizen of the United States. Doe 2's true identity is presently unknown, and LLF will seek to substitute Doe 2 with the individual's actual name when ascertained through discovery or other means.

81.     Doe 3, who uses the Reddit username "rocherjunkie," is, upon information and belief, an individual and citizen of the United States. Doe 3's true identity is presently unknown, and LLF will seek to substitute Doe 3 with the individual's actual name when ascertained through discovery or other means.

82.     Doe 4, who uses the Reddit username "Massive_Flower_6586," is, upon information and belief, an individual and a citizen of the United States. Doe 4's true identity is presently unknown, and LLF will seek to substitute Doe 4 with the individual's actual name when ascertained through discovery or other means.

83.     Doe 5, who uses the Reddit username "Interesting-Back-348," is, upon information and belief, an individual and a citizen of the United States. Doe 5's true identity is presently unknown, and LLF will seek to substitute Doe 5 with the individual's actual name when ascertained through discovery or other means.

84.     Doe 6, who uses the Reddit username "t_3_s," is, upon information and belief, an individual and a citizen of the United States. Doe 6's true identity is presently unknown, and LLF will seek to substitute Doe 6 with the individual's actual name when ascertained through discovery or other means.

85.     Upon information and belief, each of the Doe Defendants is domiciled in a state other than Florida.

86.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (a) there is complete diversity of citizenship between the parties; and (b) the amount in controversy exceeds $75,000.

87.     This Court has personal jurisdiction over Simakovsky and Simakovsky Law, as an Ohio residents, and specific personal jurisdiction over Betzold, Alvarez, Overmyer, Betzold Law,

Avanti Law Group, and Doe Defendants pursuant to Ohio's long-arm statute, Ohio Rev. Code § 2307.382(A)(3), and consistent with the due process requirements of the Fourteenth Amendment to the United States Constitution.

88.     Overmyer, Betzold, Alvarez, Simakovsky, Betzold Law, Avanti Law Group, Simakovsky Law, and Doe Defendants committed tortious acts that were directed into Ohio and that caused injury to LLF in Ohio. Overmyer, Betzold, Alvarez, Betzold Law, and Avanti Law Group specifically targeted LLF through Overmyer's videos that were watched by LLF's clients in Ohio, and Simakovsky, Simakovsky Law, and Doe Defendants' tortious acts were purposefully directed towards Ohio and caused injury in Ohio. Doe Defendants published defamatory statements on the internet whose effects were felt in Ohio.

89.     Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including but not limited to the harm to LLF's reputation and LLF's business operations in this judicial district.

## FACTUAL BACKGROUND

### A.     LLF's Background.

90.     LLF is an immigration law firm that has provided federal immigration counsel since 2020. LLF represents immigrants seeking to attain legal status in the United States.

91.     LLF was founded by Lisinski, who had a distinguished career as a litigation attorney before changing course to provide immigration counsel after her own experience helping her husband through his immigration journey.

92.     Based on Lisinski's reputation and hard work, LLF has grown to maintain offices in multiple states, including Ohio, Florida, Illinois, Georgia, North Carolina, Texas, Colorado, California, and Virginia.

23

93. Through a deep commitment to justice, LLF has helped reunite countless families and defend the rights of non-citizens seeking legal status in the United States.

**B.** **Overmyer's Background and Monetization of Her Social Media Platform.**

94. Overmyer began posting content on TikTok under the username "@CamilaOvermyer87" on or about October 2, 2024.[17] Initially, Overmyer's TikTok videos pertained primarily to general lifestyle topics, including wellness, beauty, fashion, humor, and daily life.

95. In addition to TikTok videos, Overmyer also hosted livestreams on the platform, where she interacted directly with followers. Overmyer's videos and comments are primarily in Spanish.

96. Prior to 2025, there does not appear to be much engagement with Overmyer's videos, thus it is unlikely that she was meaningfully financially profiting from her videos.

97. That changed on January 22, 2025. On that day, Overmyer announced that she would begin speaking out on issues affecting the Hispanic community.[18] Over the next three days, Overmyer's TikTok posts consisted almost entirely of immigration-related content. Overmyer's January 23, 2025 TikTok video about immigration received 14,900 views, 743 likes, and 98 comments and, at that time, it was the most popular video she had posted.[19]

98. Soon thereafter, Overmyer began posting promotional TikTok videos, allowing her to earn commissions as an affiliate creator, the first step in monetizing TikTok content.

---

[17] Overmyer's original TikTok account, @CamilaOvermyer87, was, on information and belief, suspended in or around February 2026. She now posts from the TikTok account @camilaovermyer41.

[18] This video was available on Overmyer's original TikTok account, which has been taken down.

[19] This video was available on Overmyer's original TikTok account, which has been taken down.

24

99.     On information and belief, Overmyer also generates revenue from her TikTok account by advertising her services as a certified immigration forms preparer. In one repost of a TikTok livestream, Overmyer stated that she is "certified as a preparer of doc–" before the clip abruptly ended. A screenshot of an October 26, 2025, livestream shows that commenters on Overmyer's page repeatedly posted her cell phone number and advertised that Overmyer "es preparadora certificada[,] no es abogada" ("is a certified preparer, not an attorney").



100.     Upon information and belief, Overmyer is not an attorney, has received no formal legal training, and is not qualified to provide legal advice. Nevertheless, Overmyer holds herself out to her social media followers as a certified immigration document preparer and uses that representation to induce individuals to disclose privileged or otherwise confidential information in seeking legal advice from her.

101.     Upon information and belief, Overmyer could increase her revenue from TikTok affiliate commissions, direct sales of her beauty products, and her immigration forms preparation services by increasing the number of people who view and interact with her TikTok content.

C.    **Overmyer's Defamatory Videos Targeting LLF.**

102.    Beginning in March 2025, Overmyer began developing a narrative that immigration lawyers, including LLF's attorneys, were defrauding their clients. Despite, on information and belief, having no legal training or experience with any law firm, Overmyer posted dozens of social media videos and hosted several hours-long livestreams about "corrupt" law firms and "fraudulent" attorneys.

103.    Of note, this pivot to attacking "corrupt" and "fraudulent" law firms and attorneys generated significant media attention for Overmyer. Not only did Overmyer malign others, she also enriched herself through her monetized content.

104.    For example, on March 20, 2025, Overmyer posted a TikTok video stating:

There is a lawyer – I won't say her name here, but you'll know who she is – who appears a lot on TikTok saying things like, "Oh, if you don't have evidence for the T Visa or the VAWA Visa, your testimony alone is enough." And that's not true. In fact, I've been contacted by many people who applied through that lawyer for the T Visa and their cases were denied because they didn't present any evidence . . . . So don't fall for this fraud.[20]

105.    Although Overmyer did not name Lisinski or LLF in this video, TikTok users commenting on the video quickly identified both Lisinski and LLF as the lawyer and firm to which Overmyer was referring. Overmyer made no effort to correct her followers' identification. This video received 31,600 views and 1,026 likes, which, at that time, was Overmyer's most popular TikTok video.

106.    On March 22, 2025, Overmyer posted a video explaining that she changed her formerly positive opinion of a lawyer when she heard from clients of the lawyer who "applied for a process for which they have no evidence and their petition was denied."[21] Once again, TikTok

---

[20] This video was available on Overmyer's original TikTok account, which has been taken down.

[21] This video was available on Overmyer's original TikTok account, which has been taken down.

26

users identified Lisinski in the comments as the lawyer to whom Overmyer was referring, and once again, Overmyer did not correct commenters' assumptions.

107.    Over the next several months, Overmyer continued to post content on TikTok claiming that lawyers are "taking advantage" of the Hispanic community by encouraging their undocumented clients to undertake expensive applications knowing that clients lack the evidence needed for those applications to succeed, so that the lawyers can charge clients significant fees.[22]

108.    On October 22, 2025, Overmyer posted on TikTok and Facebook a video interview with a former client of LLF named "Rosario" (aka "Rosi"). The video was captioned "Victima de la abogada Abogada Angel Lisinski," which translates to "Victim of Attorney Angel Lisinski." This video received over 112,100 views, 1,549 likes, and 21,972 shares on TikTok, as well as 67,000 views, 673 likes, and 119 comments on Facebook.[23] It was, by far, Overmyer's most popular video at the time.



---

[22] These videos were available on Overmyer's original TikTok account, which has been taken down.

[23]  *See*  https://www.facebook.com/61557651634825/videos/1109709974485719  (last  accessed June 8, 2026).

109. During this interview, Overmyer elicited and directed Rosi's statements to ensure they corroborated Overmyer's preexisting narrative about Lisinski and LLF. First, when Overmyer asked Rosi why LLF advised her to apply for a T-Visa instead of Parole in Place, Rosi stated: "They told me they didn't do Parole in Place, but that they recommended the T Visa to us."

110. Overmyer later commented on the video, asserting that Lisinski and/or LLF told Rosi not to use Parole in Place "para poderle sacar mucho mas dinero," which translates to "so they could get a lot more money out of her":



111. This statement is false. Although LLF does handle Parole in Place applications, it did not recommend that option for Rosi because it was not the strongest form of relief available to her.

112. The video also contained several additional false and defamatory statements, including (a) that LLF told Rosi that she "did not need evidence" to apply for a "T-Visa," implying that LLF encouraged applications without evidence; and (b) that Rosi's application was denied "because she had no evidence."

113. These statements were false because (a) Rosi's personal statement was, in fact, evidence, as USCIS regulations specifically recognize a personal statement as primary evidence

28

in support of a T-Visa application; and (b) neither Rosi's nor her husband's applications had been denied.[24]

114. Further, by specifically denoting Rosi as a "victim" of LLF, Overmyer communicated the factual assertion that LLF had engaged in misconduct that injured Rosi.

115. On October 23, 2025, Overmyer hosted another LLF client to share information about his case on TikTok. Overmyer identified the client as "another victim" of Lisinski and/or LLF and tagged Lisinski's TikTok account, "@AbogadaAngel." When the client initially referred to Angel only by her first name, Overmyer interrupted to add her last name, "Lisinski," thereby explicitly identifying her.



116. Again, the depiction of the client as a "victim" connoted the inaccurate factual assertion that LLF had engaged in misconduct.

---

[24] USCIS Victims of Human Trafficking: T Nonimmigrant Status, Applying for T Nonimmigrant Status (Dec. 22, 2025), https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (last accessed May 26, 2026).

117.     Also on October 23, 2025, in response to a comment on Overmyer's TikTok stating that "there are many thieves disguised as attorneys," Overmyer replied: "they take advantage because they know that Hispanics do not complain to the Bar. But that's over now":



118.     In the context of the discussion – where Overmyer had just identified a client as "another victim of @AbogadaAngel" and had expressly clarified that the client meant Angel Lisinski – her statement reasonably conveyed that Angel was among the "thieves disguised as attorneys" who, in her view, preyed on Hispanic clients.

119.     On October 24, 2025, a commenter on Overmyer's page tagged Lisinski and asked her to clarify Overmyer's accusations. Overmyer responded to the comment stating: "@AbogadaAngel isn't going to answer, she's busy recording videos promoting her ill-gotten services." Although the commenter responded to Overmyer, stating that she personally knew people who have successfully had their immigration cases handled by Lisinski, Overmyer made no effort to retract or correct her statement.



120. On October 24, 2025, Overmyer displayed Lisinski's name on screen during a video and stated that, although she did not believe Lisinski committed "abuses" in 100% of her cases, she wanted to "expose the truth," namely, that "these lawyers take advantage of their clients in the Hispanic community." Overmyer further stated that she was "doing the right thing by shedding light on irregularities by attorney Angel Lisinski."

121. On or about October 25, 2025, LLF sent Overmyer a cease-and-desist letter. Overmyer publicly responded by claiming that all she does is interview people, stating she was "not afraid" and would "not stay quiet." In her comments, Overmyer called Lisinski a "coward" and her team "unprofessional."



122. In a livestream on November 15, 2025, Overmyer hosted another LLF client, instructing her to send the declaration prepared as part of her T-Visa application to Overmyer, thereby encouraging her to disclose privileged information. In the same livestream, Overmyer had a lawyer on to talk about "fraudulent lawyers" who "swindle their clients." Overmyer also referred to "lawyers" who "tell people to apply for visas that they know the clients will not qualify for." Given that she had just hosted an LLF client, reasonable listeners would understand these references to refer to Lisinski and LLF, even where Overmyer omitted names.

123. On November 19, 2025, Overmyer posted a TikTok video in which she interviewed a former LLF client, who stated Lisinski failed to advise her of a court date and properly represent her. These statements were false. Overmyer perpetuated these false statements by stating: "The job [LLF] did was to put you in a deportation, did you hire them for that? And for that, they charged you $11,000."

124. On February 11, 2026, Overmyer again discussed "fraudulent and unethical lawyers" during a TikTok livestream. She stated: "To all employees and former employees who worked or work for these firms and your conscience doesn't let you sleep because you see the

32

garbage and atrocities they are doing to people, the way they are lying to them, and you don't want to carry that in your conscience, I call on you to contact me."

125.    In the same livestream, Overmyer stated: "Yesterday I saw a video of 'La Lisinski' saying, 'We have submitted fifty thousand cases in four years.'" Overmyer then calculated the revenue generated by those cases and claimed that this was why "these women" were troubled by Overmyer's movement, implying that Lisinski and others were motivated by financial self-interest. When a commenter asked when Overmyer intended to sue these lawyers, Overmyer responded on the livestream that the commenter was using a fake profile, thereby suggesting the commenter was associated with LLF, and that "[the commenter's] female boss would soon be in an orange jumpsuit," thereby implying that Lisinski is a criminal.

126.    On April 27, 2026, Overmyer explicitly confirmed that she would stop naming firms, stating: "On the recommendation of my lawyer, Roberto, I am omitting the names of firms on my livestreams – but that does not mean I have stopped or am afraid to expose and seek justice for the victims." However, this assurance quickly broke down, with Overmyer hosting an LLF client and referring to Lisinski and LLF in a livestream on May 4, 2026.

127.    Again, on May 17, 2026, Overmyer hosted an LLF client to talk about Lisinski, calling her "Fallen Angel" and "Angel Ratinski," highlighting comments from viewers calling Lisinski a "rat." She also stated, without specifically naming Lisinski, that VAWA is a legitimate process, but that it has been used by a bunch of "old rats to defraud people" and "sell them a lie." She further stated, defiantly: "what are they going to do, sue me?"

**D.    Overmyer Involves Betzold to Jointly Defame LLF.**

128.    Beginning in or about December 2025, Betzold began regularly appearing on Overmyer's TikTok videos in an apparent attempt to give Overmyer's claims an air of legitimacy.

33

129. During these videos, Betzold and Overmyer continued to reiterate defamatory statements against LLF. Ohio residents viewed these videos.

130. Betzold, alongside Overmyer, often characterizes certain conduct or case circumstances as "fraud" when the underlying facts do not support that characterization. Betzold has also leveraged allegations of fraud to scare immigrants, including LLF's clients, into contacting him. For example, Betzold has urged individuals to consult with him and have their cases reviewed, even if doing so could jeopardize work permits obtained through prior legal representation. He has suggested that, if those permits were procured through fraud, the individuals will lose them in any event, but that by participating in the civil action they may at least recover compensation for the harm caused by that alleged fraud.[25] Betzold stated that immigration authorities would inevitably investigate all cases at all suspected firms and that even innocent clients would lose their benefits. Alvarez has further stated that clients who signed declarations without reviewing or understanding their contents could themselves face criminal liability.[26]

131. In a video hosted by Overmyer featuring Betzold, Overmyer emphasized that anyone who had applied for a T-Visa or VAWA relief should consult with Betzold immediately so that action could be taken before the government reviewed the application and concluded that fraud had been committed. Overmyer has further asserted that any resistance by a female attorney to having Betzold and Alvarez review client files is evidence that this attorney is afraid and concealing misconduct, including fraud and malpractice.[27]

---

[25] *See* https://vt.tiktok.com/ZSxDXfLp6 (last accessed June 19, 2026).

[26] *See* https://vt.tiktok.com/ZSxD44QQq (last accessed June 19, 2026).

[27] *See* https://vt.tiktok.com/ZSxDQfma9 (last accessed June 19, 2026).

132.    These statements are calculated to instill fear in clients, erode their trust in their attorneys, and pressure them to abandon their existing counsel in favor of Defendants' services.

133.    With the addition of Betzold and Alvarez, Overmyer's videos also began targeting LLF in new ways.

134.    Principally, Betzold began soliciting Overmyer's viewers, which include LLF clients and prospective clients, to contact him for a free "second opinion" concerning their immigration applications.

135.    Rather than a second opinion on the merits of their immigration claims, clients who responded to Betzold's solicitation had their cases evaluated to see whether Betzold thought a ***bar grievance*** against counsel – LLF and/or Lisinski – was appropriate. Betzold, then, falsely advertised his services. Put plainly, Betzold advertised free second opinions of LLF's clients' immigration cases but instead provided those clients with a first-time evaluation of whether to complain to the state bar about LLF's services. This was a bait-and-switch.

136.    LLF's clients are deceived by Betzold's false advertising because they are led to believe they will receive a second opinion regarding the merits of their immigration case when, in reality, Betzold and Betzold Law simply assess whether to file a bar grievance against counsel – that is, LLF and/or Lisinski.

137.    Further, on or about May 7, 2026, on information and belief, Betzold created visafraud.law, a website dedicated to processing supposed fraud claims against LLF and other similar firms.

138.    The webpage's homepage states: "Visa Fraud and Legal Malpractice," further reinforcing the false narrative that LLF has engaged in malpractice.

139.    LLF's clients and prospective clients are deceived by Betzold's false advertising because they are led to believe LLF engages in malpractice when it does not.

140.    This false advertising harmed and continues to harm LLF because its clients and prospective clients do not want to be represented by a law firm they believe engages in "fraud" or "malpractice." LLF is further harmed when its clients believe they are receiving a second opinion on their immigration case and are left without any such evaluation (which would reveal LLF's work on the client's immigration case was appropriate) but rather, with a bar grievance against counsel (LLF and/or Lisinski), falsely implying LLF's work was improper.

141.    Betzold, Alvarez, and Overmyer's efforts came to a head on May 28, 2026, when Alvarez and Simakovsky filed a putative class action against LLF and others on behalf of a former LLF client. *See Ortega v. The Lisinski Law Firm, LLC*, No. 2:26-cv-00644-SDM-KAJ. This Class Action reveals Betzold's true motive in offering free second opinions: to identify a former LLF client willing to serve as a class representative so Betzold, Alvarez, and Simakovsky can enrich themselves through attorneys' fees awarded if the class action succeeds (it will not).

### E.    Defendants and Doe 6 Engage in Conspiracy to Defame and Profit.

142.    Defendants' conspiracy to defame LLF is simple: Defendants, acting alone and in concert, made false statements about LLF with the goal of encouraging LLF's current or prospective clients to abandon LLF and instead seek services from LLF's competitors, namely, Alvarez, Betzold, Simakovsky, and their respective law firms. Alvarez, Betzold, and Simakovsky, and their respective law firms not only unlawfully siphoned off LLF's clients' immigration cases, they created an entirely new source of work for themselves in the form of frivolous civil litigation (i.e., the Class Action) against LLF.

143.    Indeed, Overmyer explained to her audience exactly how the plan worked: "lawyer James [Betzold] reviews [their] application and, . . . if he determines there are lies, exaggerations,

false accusations, or fraud in your case, then he will pass along [their] case to lawyer Roberto [Alvarez,]," who then initiates civil litigation to enrich himself.[28]

144.    Alvarez confirmed this scheme. During one of Overmyer's TikTok livestreams, he explained, "James [Betzold] is doing the evaluation . . . I am filing these lawsuits . . . [w]ith the hope that, obviously, we will win and I will be paid for my work, because, obviously, it's a business[.]"

145.    This scheme benefits each Defendant: Overmyer gains increased social media viewership and, on information and belief, pro bono representation from Alvarez and Avanti Law Group, and Betzold, Alvarez, and Simakovsky steer LLF's current and prospective clients to themselves and their respective law firms, gaining not only attorneys' fees for immigration work but, if successful in court or in settlement, also substantial attorneys' fees.

146.    Additionally, Simakovsky specifically defamed LLF and Lisinski to LLF's current clients. On at least one occasion, Simakovsky told an LLF client who sought a second opinion regarding the client's immigration case that Lisinski and LLF were "scammers." Simakovsky made this statement unprompted and without any expressed concern by the client. She continued to characterize the client as a "victim," attempted to sow doubt about the client's case, and aggressively pressured the client to authorize the release of the client's file to Simakovsky in an effort to obtain the attorneys' fees associated with the client's immigration representation.

147.    Defendants also conspired to convince LLF's current and former team members to divulge LLF's sensitive and confidential information (some of which may include attorney-client privilege information), in breach of non-disclosure agreements the team members have with LLF,

---

[28] *See* https://www.tiktok.com/@camilaovermyer41/video/7641702199961062670 (last accessed June 19, 2026).

so that Defendants could spin such information to make further defamatory statements about LLF, which, in turn, would lead to more of LLF's current or prospective clients seeking services from Simakovsky, Betzold, Alvarez and/or their respective law firms.

148. For example, on May 24, 2026, Simakovsky, using a Simakovsky Law-issued email address, emailed a former LLF attorney, copying her new boss and Alvarez. In the email, Simakovsky explained that she wished to "introduce [the attorney] to Attorney Robert Alvarez," falsely told the former LLF attorney that LLF spread "misinformation/false promises," and said that Alvarez had "very important work" in exposing LLF.

149. Further, on or about June 4, 2026, Simakovsky also posted in a Facebook group, that her firm was "local council [*sic*] filing against the biggest [A.S.S.] mill" and claimed that "for years she has seen clients from [LLF] and it is truly horrific."



150. Put differently, Simakovsky, LLF's competitor, publicly decried LLF as "the biggest [A.S.S.] mill" and LLF's services as "truly horrific."

151. Alvarez engaged in his own defamation campaign, posting on Facebook that no "competent immigration attorney would have signed off on [LLF's] applications having been filed":

38



152.    Doe 6, who, upon information and belief, is employed by Avanti Law Group, also participated in this scheme. On May 30, 2026, Doe 6 posted to Reddit that LLF is a "scam law firm" with "scam attorneys" and encouraged viewers who have been or know someone who has "been victimized by one of these scammers" to visit visafraud.law to "get a free case evaluation to see if you have been the victim of fraud."



153.    Defendants and Doe 6's libelous and slanderous allegations reflect not just negligence or mere carelessness, but an intentional effort to disparage and defame LLF.

154. Indeed, despite receiving a cease-and-desist letter in which LLF explained that Overmyer's statements were false, Overmyer never retracted her comments; she instead continued to amplify these false statements and noted that she would not be scared and would not stay silent.

155. Overmyer subsequently sought legal advice from Alvarez and acknowledged that she should not "name" individual law firms with statements that were false. *See supra* paragraph 126.

156. Yet, despite purportedly obtaining legal advice advising her not to name individuals or individual law firms without verifying the truth of her allegations, Overmyer continued to make demonstrably false statements for her own pecuniary gain, including about LLF's compliance with USCIS regulations and guidance.

157. Alvarez and Betzold appeared on multiple TikTok videos with Overmyer, adding support and credibility to videos that they knew or should have known were false.[29]

**F.    Defendants Alvarez, Simakovsky, and Overmyer Engage in Conspiracy to Tortiously Interfere with LLF's Non-Disclosure Agreements**

158. Defendants also attempted to convince LLF's current and former team members to divulge sensitive business, confidential, and potentially privileged information about LLF in violation of their non-disclosure agreements.

159. In one of Overmyer's videos, alongside Betzold, Alvarez proclaims that the non-disclosure agreements are invalid and encourages LLF's current and former team members to contact him so he can explain why.

---

[29] *See, e.g.*, https://www.tiktok.com/@camilaovermyer41/video/7634213370387811597 (last accessed June 19, 2026) (Betzold states that attorneys will immediately seek to blame clients for the attorneys' own alleged fraud); https://www.tiktok.com/@camilaovermyer41/video/7617177662129278222 (last accessed June 19, 2026) (Alvarez states that, when clients provide an electronic signature to their attorneys, the attorneys will use that signature on other documents without the clients' knowledge).



160.    Further, in or about September 2025, Overmyer contacted a former LLF team member via WhatsApp and explained that she had access to a list of current and former LLF team members. On information and belief, Overmyer first targeted individuals whose work with LLF had recently ended in the hope that these individuals would be upset regarding the ending of their work with LLF and thus willing to speak negatively about LLF and/or violate their non-disclosure agreements with LLF.

161.    During their conversation, Overmyer asked the former LLF team member to share information about LLF's hiring practices, team member locations, office operations, client interactions, and contact information for other former LLF team members. Overmyer also asked the former LLF team member to travel to the United States to provide a statement.

162.    The former LLF team member refused.

163.    Then, in May 2026, Overmyer contacted the same former LLF team member and told her that Overmyer was working with Alvarez to prepare a lawsuit against LLF and asked whether the former LLF team member would speak with Alvarez.

164.    The former LLF team member agreed to the request and later received a call from a United States phone number. Upon information and belief, Alvarez initiated this phone call.

165.    Though the former LLF team member did not accept the phone call, upon information and belief, had she done so, Alvarez would have sought information from the former team member that, if disclosed, would have violated the former LLF team member's non-disclosure agreement with LLF.

166.    On or about May 24, 2026, Simakovsky emailed one of LLF's former attorneys, copying Alvarez and writing "Attorney Alvarez would like to speak with [the former LLF attorney] about her ethics training [at LLF] and other insight[s] she may have into [LLF]." Simakovsky also copied the former LLF attorney's new employer, evidently in an effort to embarrass the former LLF attorney into ceding to Simakovsky's request. Indeed, in a further apparent effort to pressure the former LLF attorney to comply, Simakovsky said "[s]everal lawsuits have already been filed against other" attorneys at firms like LLF, making clear that the recipient could either cooperate or be sued.

167.    The information Simakovsky sought is, on information and belief, protected from disclosure by the former LLF attorney's non-disclosure agreement with LLF. Thus, in an act of bravery, the former LLF attorney refused and was shortly thereafter named as a defendant in the putative class action filed against LLF on May 28, 2026. *See* ¶ 118, *supra.*

168. On information and belief based upon allegations contained in the putative class action filed against LLF (*see id.*) and Overmyer's public boasting that she has sources inside LLF feeding her confidential information (including about the firm and its business practices and perhaps attorney-client privileged information), Simakovsky, Alvarez, and Overmyer succeeded in interfering with LLF's non-disclosure agreements with at least one current or former LLF team member.

### G. Defendants' Conduct Has Harmed LLF's Business and Reputation.

169. Defendants' have widely disseminated false allegations, especially Overmyer's videos, reaching hundreds of thousands of viewers on TikTok and Facebook, and the harm to LLF is extensive and ongoing. Commenters, some being LLF clients, have posted on Lisinski's social media pages that, as a result of Overmyer's videos, they believe Lisinski is a fraudulent lawyer and are thus firing LLF.

170. For example, on October 24, 2025, two days after Overmyer published her first video featuring LLF client Rosi, a commenter on Lisinski's TikTok page stated that "[they are] seeing videos saying that the lawyer commits fraud and that she is not serious in her cases."



171. Another comment on Lisinski's YouTube page from October 24, 2025, reads: "Hello attorney there are a lot of videos of camilaovermyer regarding your office really bad comments [*sic*] I have a case with you and now I am very scared I don't want to continue my case thank you."



172. Another comment on Lisinski's TikTok page states that "more and more people who have been scammed by [Lisinski's] fraud keep coming forward," and tagged Overmyer.



173. The scale of the Defendants' conduct is staggering. Alvarez has indicated he alone has talked with over 200 of LLF's clients. LLF has confirmed that Alvarez contacted at least four of its current clients, encouraging them to join the lawsuit against LLF. Since October 2025, LLF has also received calls from more than 475 concerned clients referencing the Defendants' statements. Further, Alvarez has replied to countless comments left by viewers of Overmyer's livestream videos – who include LLF's current and prospective clients – and encouraged them to contact him.

174. Defendants' statements accused LLF of committing criminal acts, fraud, legal malpractice, unethical conduct, and professional misconduct. These statements relate to LLF's business.

175. As a direct result of Defendants' defamatory statements, LLF has suffered harm including loss of reputation, loss of existing and prospective clients, lost income, and other damages.

### H. Doe 1: Breach of Contract by a Former LLF Team Member.

176. Upon information and belief, Doe 1, who uses the Reddit username "Affectionate_Kick313," is a former team member of LLF.

177. Upon information and belief, Doe 1 entered into a binding non-disclosure agreement with LLF. A true and correct copy of a form of that agreement is attached hereto as **Exhibit A**.

178. Under the terms of the non-disclosure agreement, Doe 1 agreed, among other things, to keep "all information regarding or related to the Firm's legal representation or potential legal representation of clients strictly confidential, even after the matter has ended or the Employee leaves the firm." *Id.* Doe 1 further agreed not to use, publish, communicate, describe, disseminate, or otherwise disclose confidential information to any person or entity without the express prior written consent of LLF.

179. On or about February 16, 2024, Doe 1 posted a comment on a Reddit thread about LLF in which Doe 1 admitted to having signed a non-disclosure agreement with LLF:

46



**Affectionate_Kick313** · 2y ago

I just wanted to let you know that I read this thread a while ago and you're 100% on the dot.

I work here and they made us sign an NDA. some cases are valid where there's actual abuse from partners or children and/or crossing the borders. HOWEVER as intake specialists or whatever they want to call us now, we are given 2 weeks of training on the cases and are demanded to sell 6/6 consults each day.

The main case sold here is VAWA and they try to push it on parents that have zero issues with their 21+ kids with the example you used "high school rebellion, lack of communication, depressive stages" anything to get your parents to start a case. They do not care if your parents don't have a case they will try to make one. They will get parents to give a declaration and that declaration is in English so your parents won't even know what's on there and will be too embarrassed to ask you to translate bc it's basically shit talking their kids. They put words into their mouths. Yes it's completely confidential but imagine being a parent and hearing all the negative things you just said about your child that are 100% fabricated to sound worse than what it is.

This firms saves their ass by saying "we cannot guarantee" when the reality is that they have barely been open for 3 years and they haven't even seen results. Each case takes about 5 years+ to complete. They have a whooping 6 green cards approved. But as employees you cannot ask about the numbers nor give percentages or anything else because you will be fired. We've seen it happen to everyone across all US offices.

If you see people receiving social securities in their reviews just know that if the case is denied, the work permit is now canceled too. Meaning that social is no longer valid.

There's a huge sales push here and if your parents qualify for a case just know that the managers will be called in, in order to try and sale you on it. They will ask you to call your family for a loan, the bank, the credit card company!! Anything and anyone in order to get the highest deposit and the highest commission out of you. Then completely ghost you after. A lot of these cases sit in the beginning stages because no one explains additional fees and paperwork to your parents. There's 4-5 lawyers and they are never in office. They probably glance at the case 1 time. Everything is being done by virtual teams from all over the world to reduce labor fees. Are they professionals?? No one knows and again you'll get in trouble for asking.

Don't trust it here. This is coming from inside the business.

⊖  ⇧ 1 ⇩

180. Despite this acknowledgment, Doe 1 proceeded to disclose information about LLF and its practices on Reddit, in violation of the non-disclosure agreement.

181. Doe 1's disclosures on Reddit included confidential and proprietary information about LLF's business practices, internal operations, and attorney-client matters, in breach of the non-disclosure agreement.

182. LLF performed all conditions precedent and obligations required of it under the non-disclosure agreement, or such performance was excused.

47

183. Doe 1's breach of the non-disclosure agreement has caused damage to LLF, including but not limited to reputational harm, loss of client confidence, and exposure of confidential business information.

### I. Does 2–5: Defamatory Statements on Reddit

184. In addition to Defendants' defamatory campaign, LLF has been subjected to a campaign of defamation on the social media platform Reddit, where searching the term "Lisinski Law Firm" and "Angel Lisinski" yields numerous false and defamatory posts.

185. On August 1, 2024, Doe 2, using the Reddit username "Moonbliss88," published a defamatory statement about LLF, falsely accusing the firm of "taking away people's money."[30]



Moonbliss88 · 2y ago
If I'm being completely honest, because I've worked there and I've seen it first hand. Lisinski is just happily taking away peoples money. They train their employees to beg families to make big down payment, you are not seen by an actual attorney/ lawyer just an intake team (that make commission), and they will manipulate your case and send it to USCIS. Please if you can do extensive research on an attorney or also there are non profit organizations that offer legal services.

⊖ ⇧ 2 ⇩

186. Similarly, on March 17, 2025, Doe 3, using the Reddit username "rocherjunkie," published a defamatory statement falsely accusing LLF of "lying" about getting legal status through the Violence Against Women Act:

---

[30] Further, it is false to suggest, as Doe 2 does, that it is somehow improper to utilize non-attorneys to process prospective clients' information. To the contrary, this approach increases LLF's availability and leads to reduced fees charged to clients, both of which promote immigrants' access to legal services. Indeed, upon information and belief, Betzold and his wife's company, Bella Legal Assistants, offer a nearly-identical approach. The company provides remote bilingual immigration receptionists and paralegals to other immigration law firms and touts that its (non-attorney) staff "are trained in immigration matters and software and can prepare the immigration forms, additional exhibits and cover letter for many USCIS based petitions so all you need to do is review, and sign with your client." Bella.Legal (last accessed June 3, 2026). Indeed, Betzold's own visafraud.law offers "Free Case Screening with Immigration Paralegal." *See* visafraud.law (last accessed June 9, 2026).



← r/Austin · 1y ago    ···
rocherjunkie

## Legal advice?

I was born here but my husband was born in another country and does not have legal status. We hired a law firm and we thought I was petitioning for him to arrange a green card thru our marriage but they barely asked for any of my information only his (first red glad I guess) Months go by and he decides to google the acronym of the type of case they said he was eligible for: VAWA turns out it's Violence Against Women Act. we both get weirded out and he calls them to ask if they're petitioning for legal status based on domestic abuse and they said no. That vawa isn't only based on abuse and that they're arguing based on marital problems but not abuse. (We're of dumb for believing this but I guess we were trying to have faith in this whole thing) A few weeks go by (today) and they sent him his file all he has to do is sign off on it so they can send it off and his statement portion is CRAZY. They're accusing me of being violent, humiliating him about legal status, being controlling, not allowing him to have a say in our children's upbringing. It's a really worrisome statement. We're planing on going tomorrow and asking for an explanation. But I guess I just wanted advice on how to go about this? We've already started paying in total we've given about $5K (final total is $13K) and I'm just confused as to why they would chose to go this route when we both showed up to the first consultation thinking it was me petitioning for him. Is there anything we can do? I assume we won't get any of our money back but we can't go thru with this because it's a LIE they are lying and we're afraid this might affect us when we do go to another law firm to start the process all over again. This entire thing might sound dumb but neither of us have EVER had to do any type of legal process before. I don't know anyone personally who has gone thru a green card process or anyone I can ask for advice. And I guess I just need help. Is this malpractice? Should I report? Can I even report this? Or should we just try to end the contract and hope this whole thing ends here and that they don't charge us more. We're just feeling scammed right now and any advice would be very much appreciated right now. Thanks

⇧ 22 ⇩ · 💬 20

---

 rocherjunkie OP · 1y ago

Sharing the firm we went to was Lisinski Law for those asking. We sincerely hope they don't do the same to others they did to us.

⊖  ⇧ 19 ⇩

187.     On August 25, 2025, Doe 4, using the Reddit username "Massive_Flower_6586," published a patently false and defamatory statement about LLF, telling the public "not to give any information [to LLF] because they do not have offices and they are not verified, they only want your money and sell your information to other people or companies." On August 26, 2025, Doe 4 published a second defamatory comment accusing LLF of being "big scammers."



← 🟠 r/immigration · 9mo ago    ···
Massive_Flower_6586

## Lisinski Law SCAM!

Lisinski Law is a scam. No consulten ni den informacion. Zero informacion! No tienen oficinas y no estan verificados. Solo quieren su dinero y tambien vender o dar su informacion a otras personas o companias.

⇧ 2 ⇩ · 💬 6



188.    On November 24, 2025, Doe 5, using the Reddit username "Interesting-Back-348," published a defamatory statement falsely stating that LLF "only gives clients the options of applying for VAWA and T-Visa even when they don't qualify."



189.    Does 2–5 published each of these statements on Reddit, making them publicly available to  current and prospective LLF clients and the general public.

190.    The statements by Does 2–5 accuse Lisinski and/or LLF of fraud, dishonesty, deceptive business practices, and conduct incompatible with the proper exercise of the practice of law, LLF's business. These statements tend to injure LLF in its trade, profession, and business.

191.    All conditions precedent to filing the counts contained herein have been satisfied.

## COUNT I
### Defamation Per Se
### (Against Betzold, Betzold Law, Alvarez, Avanti Law Group, Overmyer, Simakovsky, Simakovsky Law and Doe 6)

192.    LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

193.    At all relevant times, Betzold, Alvarez, Simakovsky, and Doe 6 acted within the course and scope of their employment at, and ownership of, their respective law firms.

50

194. Defendants and Doe 6 published the false statements described above, purporting to be factual assertions, to third parties, including in person, via email, and on social media platforms andwebsites. The statements then were viewed by third parties and, in some cases, hundreds of thousands of individuals, including individuals in Ohio.

195. Defendants' and Doe 6's statements identified and referred to LLF, both by name and by implication, as set forth above.

196. Defendants' and Doe 6's statements were false in material respects. Among other things, Defendants stated or implied that LLF and its team members, such as Lisinski, committed fraud, filed fraudulent immigration petitions, encouraged clients to lie on immigration applications, took advantage of vulnerable members of the Hispanic community for financial gain, engaged in criminal conduct, and were incompetent counsel. *See, e.g., supra*, ¶¶ 16-18, 26-67, 102-175.

197. Defendants' and Doe 6's statements constitute defamation per se under Ohio law because their words impute (a) a crime to LLF, including, but not limited to, fraud and (b) matters incompatible to its business or profession, including, but not limited to, deceptive business practices and conduct incompatible with the proper exercise of the legal profession.

198. Defendants and Doe 6 were negligent in determining the truth or falsity of their statements and failed to exercise reasonable care to determine whether those statements were true or false.

199. Alternatively, Defendants and Doe 6 published the statements with actual malice, in that they each knew the statements were false or acted with reckless disregard as to whether they were true or false.

200. Because the Defendants' and Doe 6's statements constitute defamation per se, damages are presumed.

201. Further, as a proximate result of Defendants' and Doe 6's defamatory statements, LLF has suffered substantial damages, including but not limited to (a) impairment of LLF's professional and business reputation; (b) loss of existing clients who cancelled their contracts citing Overmyer's content; (c) loss of prospective clients; and/or (d) lost income, in an amount to be proven at trial.

202. Defendants' and Doe 6's conduct was malicious, willful, wanton, and in reckless disregard of LLF's rights, further entitling Plaintiff to an award of punitive damages.

## COUNT II
### Defamation Per Se
### (Against Does 2–6)

203. LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

204. Does 2–6 published the statements described in paragraphs 183 through 189 above, purporting to be factual assertions, to third parties on the social media platform Reddit, where those statements are available to be viewed by the general public.

205. The statements by Does 2–6 identified and referred to LLF by name.

206. The statements by Does 2–6 were false. LLF is not a "scam"; LLF does not steal clients' money; LLF does not lie about getting legal status through VAWA; LLF does not sell clients' information; LLF has offices; and LLF does not only offer VAWA and T-Visa applications to clients who do not qualify.

207. The statements by Does 2–6 constitute defamation per se under Ohio law because their words impute (a) a crime to LLF, including, but not limited to, fraud and (b) matters

52

incompatible to its business or profession, including, but not limited to, deceptive business practices and conduct incompatible with the proper exercise of the legal profession.

208.    Does 2–6 were negligent in determining the truth or falsity of their statements and failed to use reasonable care to determine whether the statements were true or false. Alternatively, Does 2–6 published their statements with actual malice.

209.    Because the statements by Does 2–6 constitute defamation per se, damages are presumed.

210.    Further, as a proximate result of the false and defamatory implications created by Does 2–6's statements, LLF has suffered substantial damages, including but not limited to (a) impairment of its professional and business reputation; (b) loss of existing clients; (c) loss of prospective clients; and (d) lost income, in an amount to be proven at trial.

211.    The conduct of Does 2–6 was malicious, willful, wanton, and in reckless disregard of LLF's rights, further entitling LLF to an award of punitive damages.

## COUNT III
### Defamation by Implication
**(Against Betzold, Betzold Law, Alvarez, Avanti Law Group, Overmyer, Simakovsky, Simakovsky Law and Doe 6)**

212.    LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

213.    At all relevant times, Betzold, Alvarez, Simakovsky, and Doe 6 acted within the course and scope of their employment at, and ownership of, their respective law firms.

214.    Even where Defendants' and Doe 6's individual statements may have been framed selectively, presented with omitted context or juxtaposed in a misleading manner, Defendants' overall statements conveyed a false and defamatory implication to a reasonable viewer.

215.    Defendants' and Doe 6's statements, taken individually and collectively, were conveyed in such a way as to create the false impression that LLF is fraudulent, dishonest, and

incompetent – that it routinely files baseless immigration petitions, encourages clients to lie, takes advantage of vulnerable immigrants, commits malpractice, and leaves other immigration attorneys to clean up the mess – when in fact none of these implications are true.

216.    Defendants' published these defamatory implications to third parties and were understood by reasonable viewers as assertions of fact regarding LLF's professional conduct.

217.    Defendants and Doe 6 were negligent in determining the truth or falsity of the implications created by their statements and failed to use reasonable care to avoid creating false impressions. Alternatively, Defendants and Doe 6 published the statements creating these false impressions with actual malice, that is, with knowledge that the implications were false or with reckless disregard as to whether they were true or false.

218.    As a proximate result of the false and defamatory implications Defendants' and Doe 6's statements created, LLF has suffered substantial damages, including but not limited to (a) impairment of LLF's professional and business reputation, (b) loss of existing clients; (c) loss of prospective clients; and (d) lost income, in an amount to be proven at trial.

219.    Defendants' and Doe 6's conduct was malicious, willful, wanton, and in reckless disregard of LLF's rights, further entitling LLF to an award of punitive damages.

## COUNT IV
### Civil Conspiracy to Defame
### (Against Betzold, Betzold Law, Alvarez, Avanti Law Group, Overmyer, Simakovsky, and Simakovsky Law, and Doe 6)

220.    LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

221.    At all relevant times, Betzold, Alvarez,  and Doe 6 acted within the course and scope of their employment at, and ownership of, their respective law firms.

222. Defendants and Doe 6 agreed or had a common understanding to work together to injure LLF by defaming LLF as described above, including, without limitation, in paragraphs 14 through 67 and 94 through 174, *supra*.

223. This agreement or common understanding was done maliciously, as Defendants and Doe 6 knew that the defamatory statements they made were false and were made to enrich themselves and to damage LLF, a competitor to Betzold, Alvarez, and Simakovsky's immigration legal practice.

224. While Overmyer posted these videos on her own TikTok platform, the inclusion of Alvarez and Betzold gave legitimacy to these attacks against a rival lawyer – credibility that was needed since Overmyer herself was not an attorney.

225. These videos where Alvarez and Betzold appeared were coordinated livestream videos where Overmyer, Betzold, and Alvarez individually and collectively made false and defamatory statements about LLF.

226. Further, these videos with Betzold and Alvarez benefited all Defendants – by driving more engagement to Overmyer, generating more clients and business for Betzold, Alvarez, Simakovsky, and their respective law firms (including a baseless lawsuit against LLF and others from which Simakovsky and Alvarez expect substantial attorneys' fees), and reducing competition for Betzold, Alvarez, Simakovsky, and their respective law firms.

227. Simakovsky additionally separately defamed LLF and Lisinski to current LLF clients and aggressively attempted to convert at least one of LLF's clients to Simakovsky's own law firm.

228. Betzold and Alvarez also established visafraud.law, which features both Betzold and Alvarez and contains defamatory statements of LLF by name or implication, which have been viewed by Ohio residents.

229. These actions resulted in actual damages to LLF, in an amount to be proven at trial.

**COUNT V**
**Tortious Interference with Contract (Non-Disclosure Agreements)**
**(Against Alvarez, Avanti Law Group, Overmyer, Simakovsky, and Simakovsky Law)**

230. LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

231. At all relevant times, Betzold, Alvarez, and Simakovsky acted within the course and scope of their employment at, and ownership of, their respective law firms.

232. LLF has contracts with its current and former team members in the form of non-disclosure agreements.

233. Alvarez, Overmyer, and Simakovsky knew and know of the existence of LLF's non-disclosure agreements with its current and former team members.

234. On information and belief based on allegations in the Class Action Alvarez and Simakovsky filed against LLF and statements Overmyer made on TikTok, Alvarez, Overmyer, and Simakovsky engaged in the intentional procurement of the breach of at least one non-disclosure agreement between LLF and a current or former LLF team member.

235. Alvarez, Overmyer, and Simakovsky lacked a privilege or justification for the interference.

236. Because of Alvarez, Avanti Law Group, Overmyer, Simakovsky, and Simakovsky Law's interference with LLF's non-disclosure agreement, LLF has suffered damages in an amount to be determined at trial.

## COUNT VI
### Tortious Interference with Contract (Engagement Letters)
**(Against Alvarez, Avanti Law Group, Overmyer, Simakovsky, Simakovsky Law, Betzold, and Betzold Law)**

237.    LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

238.    LLF has contracts with each of its current clients in the form of engagement letters.

239.    Alvarez, Overmyer, Simakovsky, and Betzold know of the existence of LLF's engagement letters with its clients and that LLF is an Ohio limited liability company.

240.    At all relevant times, Alvarez, Simakovsky, and Betzold acted within the course and scope of their employment at, and ownership of, their respective law firms.

241.    Alvarez engaged in the intentional procurement of the termination of at least one such engagement letter through means including, but not limited to, defaming LLF, as set forth in paragraphs 21 through 67, 128 through 157, and 169 through 175, *supra.*

242.    Overmyer engaged in the intentional procurement of the termination of at least one such engagement letter through means including, but not limited to, defaming LLF, as set forth in paragraphs 14 through 67 and 94 through 175, *supra.*

243.    On information and belief, Simakovsky engaged in the intentional procurement of the termination of at least one such engagement letter through means including, but not limited to, defaming LLF, as set forth in paragraphs 36 through 37, 65 through 67, 142 through 157, and 169 through 175, *supra.*

244.    Betzold engaged in the intentional procurement of the termination of at least one such engagement letter through means including, but not limited to, defaming LLF, as set forth in paragraphs 21 through 67, 128 through 157, and 169 through 175, *supra.* Upon information and belief, at least one such engagement letter pertained to an Ohio resident.

245.     Alvarez, Overmyer,  Simakovsky, Betzold and their respective law firms lacked a privilege or justification for the interference.

246.     Because of Alvarez's, Overmyer's, Simakovsky's, and Betzold's interference with LLF's client engagement letters, LLF has lost its current clients and suffered damages in an amount to be determined at trial.

**COUNT VII**
**Civil Conspiracy to Tortiously Interfere with Contract**
**(Against Alvarez, Avanti Law Group, Overmyer, Simakovsky, and Simakovsky Law)**

247.     LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

248.     At all relevant times, Alvarez and Simakovsky acted within the course and scope of their employment at, and ownership of, their respective law firms.

249.     Alvarez, Avanti Law Group, Overmyer, Simakovsky, and Simakovsky Law agreed or had a common understanding to work together to injure LLF by encouraging LLF's current and former team members to violate their non-disclosure agreements and divulge LLF's confidential, proprietary, and possibly attorney-client information, as described in paragraphs 14 through 67 and 94 through 175, *supra*.

250.     This agreement or common understanding was done maliciously, as Alvarez, Overmyer, and Simakovsky were aware of LLF's non-disclosure agreements and nevertheless intentionally sought information protected by the non-disclosure agreement.

251.     Pursuant to this conspiracy, Alvarez appeared in Overmyer's videos and encouraged LLF's current and former team members to contact him to divulge LLF's confidential, proprietary, and likely privileged information protected by the team members' non-disclosure agreements with LLF. Additionally, Simakovsky contacted LLF's former team members so that they could speak with Alvarez for, upon information and belief, the purpose of obtaining information protected by these team members' non-disclosure agreements.

58

252. Overmyer also contacted LLF's current and former team members in an effort to induce these individuals to divulge information protected by their non-disclosure agreements with LLF.

253. Alvarez, Simakovsky, and Overmyer, knowing the same to be false or without any substantial basis for believing the same was truthful, stated that the non-disclosure agreements were unenforceable in an effort to induce current and former team members to breach those agreements.

254. On information and belief, Alvarez, Simakovsky, and Overmyer succeeded in convincing at least one current or former LLF team member to breach their non-disclosure agreement with LLF.

255. As a result of Alvarez, Avanti Law Group, Overmyer, Simakovsky and Simakovsky Law's agreement, LLF was damaged in an amount to be proven at trial.

### COUNT VIII
### Lanham Act (15 U.S.C. § 1125(a))
### (Against Betzold and Betzold Law)

256. LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

257. At all relevant times, Betzold acted within the course and scope of his employment at, and ownership of, Betzold Law.

258. Betzold made a false or misleading statement of fact about the services he offered, including on Overmyer's TikTok as described, without limitation, in paragraphs 6, 62, 68, 135, and 141, *supra*.

259. Specifically, Betzold advertised that he would provide a "second opinion" on whether the individual's immigration application was proper but instead entered into an engagement to determine whether to file a bar grievance against counsel – that is, LLF and/or Lisinski.

260.　These statements were literally false or, in the alternative, false by implication under the circumstances because they would deceive a substantial portion of the viewers on Overmyer's video.

261.　These statements were material in influencing the deceived consumer's purchasing decisions because a consumer of legal services is likely to prefer to fire LLF and forgo purchasing additional services from LLF once they have worked with Betzold to file a bar grievance against LLF and/or Lisinski.

262.　Betzold introduced these statements into interstate commerce by uttering the false statements on social media, which transmitted the statements across state lines.

263.　Betzold's statements, which were made on a TikTok, well-known in the immigrant community as a source of advertising and to buy and sell goods and services, and on a TikTok page through which Overmyer routinely promotes the sale of goods, amounting to advertising,

264.　There is a causal link between Betzold's false statements and the harm that LLF suffered, and LLF has suffered an amount in damages to be determined at trial.

## COUNT IX
### Tortious Interference with Prospective Business Relationship
### (Against Betzold, Betzold Law, Alvarez, Avanti Law, Overmyer, Simakovsky, and Simakovsky Law)

265.　LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

266.　At all relevant times, Betzold and Alvarez acted within the course and scope of their employment at, and ownership of, their respective law firms.

267.　LLF had reasonable expectations of a future economic relationship and/or contract with those seeking immigration legal services.

268.　Betzold, Alvarez, Overmyer, and Simakovsky knew of these relationships and knew that LLF was an Ohio limited liability company.

269. Betzold, Alvarez, Overmyer, and Simakovsky intentionally and improperly interfered with these relationships by, but not limited to, defaming LLF.

270. Betzold, Alvarez, Overmyer, and Simakovsky lack a privilege or justification for the interference.

271. As a result of Betzold, Betzold Law, Alvarez, Avanti Law Group, Overmyer, and Simakovsky's interference, LLF has lost prospective customers, resulting in damages in an amount to be determined at trial.

## COUNT X
**Violation of Ohio's Deceptive Trade Practice Act (Ohio Rev. Code Ann. §§ 4165.01, et seq.)**
**(Against Betzold, Betzold Law, Alvarez, Avanti Law Group, Simakovsky, and Simakovsky Law)**

272. LLF incorporates and realleges paragraphs 1 through 191 as if fully set forth herein.

273. At all relevant times, Betzold and Alvarez acted within the course and scope of their employment at, and ownership of, their respective law firms.

274. Defendants Betzold, Alvarez, and Simakovsky directed their actions and promoted their legal services to residents in Ohio.

275. By intentionally soliciting and seeking out LLF's customers and team members in Ohio using false and defamatory statements about LLF, Betzold aAlvarez and Simakovsky both "disparage[d] the goods, services, or business of [LLF] by false representation of fact." Ohio Rev. Code Ann. § 4165.02(A)(10).

276. For example, and without limitation, Betzold's reference to LLF as engaging in "Visa Fraud and Legal Malpractice" were false representations of fact as LLF has never been found to have engaged in either visa fraud or legal malpractice. *See also* ¶¶ 138-140, *supra.*

61

277. Further, and without limitation, Alvarez engaged in his own defamation campaign, posting on Facebook that no "competent immigration attorney would have signed off on [LLF's] applications having been filed." *See* ¶ 151, *supra*.

278. Simakovsky told at least one current LLF client that LLF and Lisinski were "scammers," s*ee* ¶ 146 *supra*, and upon information and belief, she has told this to other LLF clients as well in order to cause those clients to terminate LLF and instead hire Simakovsky/Simakovsky law.

279. As a result of Betzold, Betzold Law, Alvarez, and Avanti Law Group's willful disparagement and defamation of LLF through material and false representation of facts that actually deceived or have the tendency to deceive their intended audience, LLF has lost current and prospective clients, resulting in damages in an amount to be determined at trial.

## COUNT XI
### Breach of Contract
### (Against Doe 1)

280. LLF repeats and realleges paragraphs 1 through 191 as if fully set forth herein.

281. LLF and Doe 1 entered into a binding nondisclosure and confidentiality agreement with LLF prohibiting Doe 1 from disclosing LLF's confidential information.

282. The non-disclosure agreement constituted a binding and enforceable contract supported by valid consideration, including Doe 1's employment with LLF and the compensation and benefits received in connection therewith.

283. LLF performed all conditions precedent and obligations required of it under the non-disclosure agreement, or such performance was excused.

284. Doe 1 breached the non-disclosure agreement by disclosing LLF's confidential and proprietary information on Reddit, including but not limited to information about LLF's business

practices, internal operations, client matters, and other confidential information, in direct violation of the non-disclosure and confidentiality provisions of the non-disclosure agreement.

285.    Doe 1 admitted on Reddit, using the username "Affectionate_Kick313," that Doe 1 signed a non-disclosure agreement with LLF, yet proceeded to publicly disclose confidential information in violation of that agreement.

286.    As a direct and proximate result of Doe 1's breach, LLF has suffered damages, including but not limited to reputational harm, exposure of confidential business information, loss of competitive advantage, and loss of client confidence.

## DEMAND FOR RELIEF

WHEREFORE, LLF respectfully requests that this Court enter judgment in its favor and against Defendants and Doe Defendants and enter an order:

(a)    granting a temporary injunction and permanent injunction barring Defendants from engaging in unfair competition with LLF, including via directly or indirectly defaming LLF to its clients or prospective clients;

(b)    awarding LLF any damages it has sustained as a result of Defendants' and Doe Defendants' wrongdoing as described herein, including but not limited to compensatory and punitive damages and pre- and post-judgment interest; and

(c)    awarding LLF its reasonable attorneys' fees, costs and other expenses of litigation pursuant to Ohio Rev. Code Ann. § 4165.03(B) and Federal Rule of Civil Procedure 54 or as otherwise permitted.

## JURY TRIAL DEMAND

LLF demands a trial by jury on all issues so triable.

Jason P. Mehta (*Pro hac vice forthcoming*)
Primary email: jmehta@foley.com
Secondary email: dmills@foley.com
Olivia S. Singelmann (*Pro hac vice forthcoming*)
Primary email: osingelmann@foley.com
Secondary email: dmills@foley.com
Heather A. Lee (*Pro hac vice forthcoming*)
Primary email: hlee@foley.com
Secondary email: dmills@foley.com
**FOLEY & LARDNER LLP**
100 N. Tampa Street, Suite 2700
Tampa, FL 33602
Telephone: (813) 229-2300
Facsimile: (813) 221-4210

*/s/ David J. Butler*
David J. Butler (0068455), Trial Attorney
Email: dbutler@taftlaw.com
**TAFT STETTINIUS & HOLLISTER LLP**
41 S. High Street, Suite 1800
Columbus, Ohio 43215-4213
Phone: (614) 221-2838
Fax: (614) 221-2007

David M. DeVillers (0059456)
Email: David.DeVillers@btlaw.com
**BARNES & THORNBURG LLP**
41 S. High St. Suite 3300
Columbus, Ohio 43215
Phone: (614)-628-0096
Fax: (614)-628-1433

*Counsel for Plaintiff The Lisinski Law Firm, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2026, a copy of the foregoing Amended Complaint and Demand for Jury Trial was filed electronically and accordingly served on counsel of record by operation of the Court's electronic filing system.as follows:

David M. Saperstein, Esq.
Maddin Hauser Roth & Heller, PC
One Town Square, 5th Floor
Southfield, MI 48076
Email: dsaperstein@maddinhauser.com

*Attorney for Defendant James Betzold*

Cara M. Wright, Esq.
James A. Lacey, Esq.
Jeffrey A. Yeager, Esq.
Freeman, Mathis & Gary LLP
65 East State Street, Suite 2550
Columbus, OH 43215
Email: cara.wright@fmglaw.com
        James.lacey@fmglaw.com
        Jeffrey.Yeager@fmglaw.com

*Attorneys for Defendant Roberto Alvarez*

*/s/ David J. Butler*
David J. Butler