**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE LISINSKI LAW FIRM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:26-cv-00704 |
| v. | ) | |
| | ) | Judge Sarah D. Morrison |
| CAMILA OVERMYER a/k/a CAMELIA GUAD | ) | Magistrate Judge Kimberly A. Jolson |
| MAGANA MADRIGAL, JAMES BETZOLD, | ) | |
| ROBERTO ALVAREZ, INNA SIMAKOVSKY, | ) | |
| and JOHN DOES 1–5, | ) | |
| | ) | |
| Defendants. | ) | |

# MOTION TO DISMISS OF DEFENDANTS JAMES BETZOLD AND BETZOLD LAW, PLC, UNDER RULE 12(B)(2)

Defendant James Betzold ("Mr. Betzold") and Betzold Law, PLC ("Betzold Law") state as follows for this Motion to Dismiss and Brief in Support:

1. Plaintiff's Amended Complaint, ¶71, correctly alleges that Mr. Betzold is a lawyer who resides in Michigan.

2. Plaintiff's Amended Complaint, ¶72, correctly alleges that Betzold Law is domiciled in Michigan.

3. Plaintiff's Amended Complaint, ¶87, alleges personal jurisdiction over Mr. Betzold and Betzold Law pursuant to Ohio ST § 2307.382(A)(3).

4. Plaintiff's Amended Complaint does not allege sufficient facts to create personal jurisdiction under Ohio ST § 2307.382(A)(3).

5. Alternatively, Plaintiff's Amended Complaint does not allege sufficient facts to create personal jurisdiction under the due process requirements of the Fourteenth Amendment to the United States Constitution.

6. In fact, Plaintiff has filed this lawsuit against Mr. Betzold and Betzold Law with few, specific allegations about the conduct of the Betzold Defendants, and none that are sufficient to bestow personal jurisdiction under either the Fourteenth Amendment or Ohio ST § 2307.382(A)(3).

7. Plaintiff's allegations primarily address the activity of other Co-Defendants, whose conduct cannot form the basis for personal jurisdiction over Mr. Betzold and Betzold Law under *Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

8. Counsel for Mr. Betzold and Betzold Law sought concurrence in this Motion from counsel for Plaintiff. The parties conducted a meet-and-confer on Tuesday, July 14, 2026. The conference was not successful in resolving the parties' disagreement.

9. Mr. Betzold and Betzold Law rely on the attached Brief in Support.

WHEREFORE, for the reasons stated herein, Mr. Betzold and Betzold Law respectfully request that this Court enter an order dismissing them, without prejudice, from this case, and hold that jurisdiction would be proper against them in the State of Michigan.

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ........ iii
**MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT** ........ iv
**TABLE OF AUTHORITIES** ........ v
**ISSUES PRESENTED** ........ vi
**BRIEF IN SUPPORT** ........ 1
**SYNOPSIS** ........ 1
**ARGUMENT** ........ 3
**STANDARD OF REVIEW** ........ 7
**ARGUMENT** ........ 9
**I…Plaintiff has not alleged any conduct whatsoever that fits within the jurisdictional statute upon which the Amended Complaint relies** ........ 9
**II…Alternatively ,Plaintiff's attempt to exercise personal jurisdiction over the Betzold Defendants is inconsistent with due process.** ........ 10
**CONCLUSION** ........ 17
**CERTIFICATE OF SERVICE** ........ 18

## MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

*Blessing v. Chandrasekhar*, 988 F.3d 889, 904 (6th Cir. 2021)

*Carbone v. Kaal*, 140 F.4th 805 (6th Cir. 2025)

*Walden v. Fiore*, 571 U.S. 277, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014)

Ohio ST § 2307.382(A)(3)

## TABLE OF AUTHORITIES

**Cases**

*Blessing v. Chandrasekhar*, 988 F.3d 889, 904 (6th Cir. 2021) ............................................ iv, 12, 16
*Burger King Co. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) .....8
*Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)...................................... 10, 11
*Carbone v. Kaal*, 140 F.4th 805, 808–809 (6th Cir. 2025) ...........................................iv, 7, 8, 9,10, 13
Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) .......................... 8
Johnson v. Griffin, 85 F.4th 429, 433–435 (6th Cir. 2023) ................................................................ 11
*Ross v. Robinson, Hoover & Fudge, PLLC*, 173 F.4th 745, 753–754 (6th Cir. 2026)........................ 10
*Walden v. Fiore*, 571 U.S. 277, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014)............................ iv, 2, 11, 16

**Statutes**

Ohio ST § 2307.382(A)(3)......................................................................................... iv, 2, 8, 9

**Rules**

Fed. R. Civ. P. 12(b)(2)............................................................................................................ 2, 7

# ISSUES PRESENTED

I. Should the Court dismiss Mr. Betzold and Betzold Law for lack of jurisdiction under Ohio ST § 2307.382(A)(3) where the Amended Complaint does not allege that these Defendants committed a tortious act or omission in the State of Ohio?

Betzold Defendants say Yes.

II. Should the Court dismiss Mr. Betzold and Betzold Law for lack of jurisdiction under the Due Process Clause of the Fourteenth Amendment where the Amended Complaint does not allege any allegedly tortious communications by these Defendants that were specifically directed at the State of Ohio?

Betzold Defendants say Yes.

# **BRIEF IN SUPPORT**

## **SYNOPSIS**

This frivolous lawsuit has been filed against Michigan lawyer James Betzold and his Michigan firm Betzold Law, PLC, in an attempt to scare and intimidate potential witnesses and professionals who have accused Plaintiff and its principal of immigration fraud. This lawsuit also constitutes unethical interference into actual or potential investigations of Plaintiff by governmental and regulatory authorities. This lawsuit was filed in the immediate aftermath of a class action lawsuit alleging that Plaintiff and its principal Angelyne Lisinski have engaged in massive immigration fraud, including the systematic extraction of tens of millions of dollars from thousands of the most vulnerable, low-income, monolingual Spanish-speaking undocumented consumers across the United States (see **EX 1**, Class Action Complaint, ¶¶2-3). The Class Action Complaint alleges that Plaintiff and its principal operate a high-velocity sales pipeline without any meaningful legal involvement, and one that exposes Plaintiff's unsuspecting clients to statutory bars on future immigration benefits and placing them directly into active federal removal proceedings (*id.*, ¶¶ 4-8, 16-17). Although the Amended Complaint in this case mentions the Class Action (see ¶7), it was not filed as a counterclaim in that suit.

Mr. Betzold is not an attorney of record in the class action lawsuit. Indeed, this retaliatory Complaint alleges virtually no action by Mr. Betzold other than that he conducts free reviews of client files on immigration matters and that he has a website whose home page indicates "Visa Fraud and Legal Malpractice." The Complaint makes **ZERO** allegations identifying statements by Mr. Betzold that target or focus on Ohio. Indeed, the gist of the Complaint – that a potential client who reads about "Visa Fraud" or "Legal Malpractice" on a website would immediately think

about Ms. Lisinski and her firm – is an admission of guilt by Plaintiff and Ms. Lisinski, not an accusation of any wrongdoing by Mr. Betzold.

Proceeding with this lawsuit against Mr. Betzold violates both the due process clause of the United States Constitution as well as Ohio's statute on personal jurisdiction. Paragraph 83 of Plaintiff's Complaint alleges personal jurisdiction only through Ohio ST § 2307.382(A)(3), which provides that:

> (A) A court may exercise personal jurisdiction over a person *who acts directly or by an agent*, as to a cause of action arising from the person's:
>
> (3) Causing tortious injury *by an act or omission in this state*. [Emphasis added.]

Nowhere in Plaintiff's Amended Complaint does Plaintiff allege an act or omission by Mr. Betzold or Betzold Law in the State of Ohio. If Plaintiff wants to make unethical, harassing and retaliatory allegations against Mr. Betzold and his firm, it needs to do so in the jurisdiction where Mr. Betzold resides, works, and would imagine being haled into Court – the Western District of Michigan. This Complaint must be dismissed under Fed. R. Civ. P. 12(b)(2), Ohio ST § 2307.382(A)(3), *Walden v. Fiore*, 571 U.S. 277, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014), and *Blessing v. Chandrasekhar*, 988 F.3d 889, 904 (6th Cir. 2021).

# **ARGUMENT**

Statement of Facts

Ms. Angelyne Lisinski founded Plaintiff LLF in 2020 which is when she began practicing immigration law (**EX 2**, ¶¶ 3, 39, Complaint dated 6/10/26, *Lisinski v Overmyer*, Hillsborough County (Fla.)). Despite having no prior experience in immigration law, Ms. Lisinski boasts of now having sixteen offices across the country (*id.*).

How Ms. Lisinski and her firm became such an instant "success" is the subject of the class action lawsuit (**EX 1**, Complaint dated 5/28/26, *Ortega v. Lisinski Law Firm, Lisinski et al*, S.D. Ohio Case No. 2:26-cv-00644-EAS-CMV). In that lawsuit, among other allegations, the class action Plaintiff alleges that Ms. Lisinski's firm LLF and Ms. Lisinski:

- Concealed that T Visa applications required allegations of forced labor or involuntary solitude;
- Delegated substantive legal work to non-attorney staff, including aggressive monthly quotas and commission payments for non-attorney staff, and attorneys who are structurally walled off from client interaction under threat of corporate disciplinary action;
- Used nonattorneys (upon information and belief, out of allegedly 1500 professionals, only 60+ are attorneys, many of whom are contract-based, non-fulltime employees, and not permitted to communicate with the paralegals or support staff to verify client information) to generate false abuse narratives and make legal determinations without meaningful client participation;
- Caused to have her own signature applied to a plethora of applications which she did not review herself, which were then filed with USCIS.
- Prepared and filed petitions with USCIS with allegations that the clients never made, and without meaningful attorney involvement or client participation;
- Had clients sign blank sheets of paper and did not provide translations to clients of their immigration applications;
- Charged thousands of dollars without disclosing material additional costs;
- Charged approximately $12,000 - $25,000 per case despite the lack of meaningful attorney input, including the use of signature stamps in lieu of required attorney input and deceptive signature protocols;

- Unreasonably withheld client files and information when clients of LLF discovered what had been improperly prepared or filed in their names;
- Filed hundreds of petitions every month through a standardized, assembly line system designed to maximize revenue without meaningful attorney participation;
- Lied in their marketing efforts, made false guarantees, exploited community fear, and used improper bait-and-switch representations;
- Engaged in a systematic scheme to defraud vulnerable immigrants through a high-volume immigration filing operation disguised as a legitimate law practice; and
- Caused loss of employment and severe immigration exposure in light of the spike in filings of VAWA petitions and T-1 applications that triggered fraud detection units at USCIS to identify assembly line immigration firms and ghost-written declarations.

The current lawsuit was **not** filed as a counterclaim to the class action, but instead as a separate action. Nor is this lawsuit the first time that Ms. Lisinski and her firm have used lawfare to try to scare off detractors. Keeping in mind that Ms. Lisinski has alleged that she did not even start practicing immigration law until 2020 (its Articles of Organization were filed in June 2020), she also filed a lawsuit alleging that a defamatory, discriminatory harassment campaign against her began in August 2020 (**EX 3**, ¶¶ 27, 36-37, Complaint dated 8/10/22, *Lozano, Lisinski et al v John Doe*, S.D. Ohio Docket No. 2:22-cv-03089-ALM-KAJ). In that case, Ms. Lisinski alleged that a defamatory campaign flagged her videos, and that by March and April 2021, she rarely won her appeals on that social media platform (*id.*, ¶ 38). Ms. Lisinski alleged that her social media account was suspended in August 2021 and permanently barred by October 2021 (*id.*, ¶¶ 39-41). She alleged harassing phone calls in December 2020 through January 2021 (*Id.*, ¶ 70).

Ms. Lisinski was a co-Plaintiff with nonparty Alexandra Lozano in that 2022 lawsuit in Ohio (*id.*). Ms. Lisinski admitted in the pleadings that she licensed marketing material from Ms. Lozano (*id.*, ¶ 23). In May 2026, the Office of Disciplinary Counsel of the Washington State Bar Association alleged, among other things, that Ms. Lozano:

- Employed nonlawyer staff to conduct client consultations and deliver scripted sales pitches to prospective clients;

- Had her nonlawyer staff recommend strategies, provide legal advice, prepare immigration petitions, assemble supporting documentation, and draft client declarations with minimal attorney supervision;
- Had her staff make false and misleading statements and guarantees;
- Used a computer program to determine case strategies for immigration relief without attorney review;
- Charged $10,000 - $15,000 for VAWA and T-visa applications;
- Applied for statuses for which clients were not eligible;
- Did not explain potential risks to clients;
- Had her staff affix her signature to forms that she had prepared the application when she had not done so;
- Directed her staff to affix digitized replicas of client's signatures even when a wet ink signature was required;
- Had her staff affix client signatures to forms that the clients had not reviewed; and
- Violated numerous professional rules through this conduct, including RPC 1.5(a), 1.7(a)(2), 3.1, 5.3(b), 5.5(a), 8.4(c), and 8.4 (d).

[**EX 4**, Statement of Alleged Misconduct under ELC 9.3(b)(1), *In re Alexandra Lozano*, Disciplinary Board of Washington State Bar Association Proceeding No. 25#0062.]

Rather than contest the allegations, Ms. Lozano, the mentor of Ms. Lisinski, permanently resigned her bar membership in lieu of discipline, and agreed that she would be barred from any future application for reinstatement (*id.*, Resignation Form of Alexandra Lozano). She agreed that she would seek to resign permanently from the practice of law in any other state or jurisdiction in which she was admitted, and inform any potential employer who asked about prior discipline about the resignation (*id.*).

In this lawsuit, LLF alleges that the Betzold Defendants' alleged tortious conduct began in December, **2025** (Amended Complaint, ¶22). Yet, LLF alleges a variety of defamatory social media posts by people not affiliated with the Betzold Defendants that predate Mr. Betzold's involvement. For example, LLF alleges that on February 16, **2024**, nearly two years before Mr. Betzold's alleged involvement, Doe 1 posted that he or she worked at LLF, that LLF pushed VAWA on potential clients that had zero issues, that LLF tried to allege a VAWA case even when the clients did not have a viable case, that the clients did not know what was in the declarations

that they signed, that LLF fabricated the allegations in immigration declarations, and that LLF fired employees who asked about the numbers or percentages of successful cases (*id.*, ¶173). The post alleged that LLF pressured anything and anyone connected with the potential client to get the highest deposit and highest commission, and then ignored the client after they paid (*id.*).

LLF alleges that Doe 2 posted on August 1, **2024**, more than a year before Mr. Betzold's alleged involvement, that the poster worked at LLF, that the firm trained its employees to beg families to make a big down payment, that the client was not seen by an actual attorney, and that the firm manipulated the case (*id.*, ¶ 179).

LLF alleges that Doe 3 posted on **March 17**, 2025, approximately nine months before Mr. Betzold's alleged involvement, that the poster's husband was a client of LLF, that LLF did not inform him that the firm was filing an application under VAWA, that the firm then lied about that when confronted, and inquired whether LLF had committed malpractice (*id.*, ¶180). More than a year ago, this unknown poster alleged that Plaintiff LLF lied and manipulated her husband's VAWA application (*id.*, ¶180).

LLF alleges that Doe 4 posted on **August 18**, 2025, four months before Mr. Betzold's alleged involvement, that LLF were big scammers, that the firm only wanted clients' money and information to sell to other people or companies (*id.*, ¶181).

LLF alleges that Doe 5 posted on **November 24**, 2025, one month before Mr. Betzold's alleged involvement, that LLF gave clients the options of applying for VAWA and T-Visa even when they did not qualify (*id.*, ¶182).

In short, based on LLF's own allegations, if clients and potential clients read "Visa Fraud and Legal Malpractice" and immediately think of LLF and Ms. Lisinski, it is not because of Mr. Betzold or his firm. LLF made this bed; it must sleep in it.

Despite the abundance of allegations about the other Defendants and the Doe Defendants, the allegations in the Amended Complaint regarding the Betzold Defendants are few and far between. In particular, nowhere in the Amended Complaint does LLF allege that Mr. Betzold or his firm committed an act or omission in Ohio. Per his affidavit, he did not (**EX 5**).

## STANDARD OF REVIEW

Dismissal is appropriate under Fed. R. Civ. P. 12(b)(2) if the Court lacks personal jurisdiction over the Defendant.

A plaintiff filing a lawsuit in federal court bears the burden of establishing a prima facie case that the district court can maintain personal jurisdiction over **each** defendant. *Carbone v. Kaal*, 140 F.4th 805, 808–809 (6th Cir. 2025). The plaintiff can meet that burden through the complaint by "establish[ing], with reasonable particularity, sufficient contacts between the defendant and the forum state to satisfy the relevant long-arm statute and the Due Process Clause." *Id.* If the plaintiff makes a prima facie case of personal jurisdiction, the burden shifts to the defendant, who must support its motion to dismiss with evidence showing that the district court lacks jurisdiction over it. *Id.* If the defendant provides such evidence, then the burden shifts back to the plaintiff, who "may no longer stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.*

"When sitting in diversity, a federal court may exercise personal jurisdiction over an out-of-state defendant only if a court of the forum state could do so." *Id.* As a result, "[a] federal court's exercise of personal jurisdiction in a diversity of citizenship case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Id.*

With regard to authorization from Ohio's statutory system, ¶83 of Plaintiff's Amended Complaint alleges personal jurisdiction only through Ohio ST § 2307.382(A)(3), which provides:

> (A) A court may exercise personal jurisdiction over a person *who acts directly or by an agent*, as to a cause of action arising from the person's:
>
> (3) Causing tortious injury *by an act or omission in this state*. [Emphasis added.]

The Fourteenth Amendment's Due Process Clause prohibits "any State" from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. It "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotation marks omitted). Thus, courts may exercise personal jurisdiction over out-of-state defendants only where those defendants have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks omitted); *Carbone v. Kaal*, 140 F.4th 805, 809–810 (6th Cir. 2025). The defendant's conduct and connection with the forum State must be such that the nonresident defendant should reasonably anticipate being haled into court there. *Burger King Co. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985).

The Sixth Circuit applies a three-part specific-jurisdiction test for the due process component of personal jurisdiction. *Carbone, supra* at 810. Under that test, the district court's exercise of personal jurisdiction over Defendants would comport with due process if: (1) the nonresident defendant purposefully availed himself of the privilege of acting, or causing a consequence, in Ohio; (2) the plaintiff's claims against the nonresident defendant arise from the

nonresident defendant's activities in Ohio; and (3) the nonresident defendant's actions, or the consequences they caused, have a substantial enough connection with Ohio to make it reasonable for a court in Ohio to exercise jurisdiction. *Id.*

## ARGUMENT

### I. Plaintiff has not alleged any conduct whatsoever that fits within the jurisdictional statute upon which the Amended Complaint relies.

Plaintiff's Amended Complaint alleges diversity jurisdiction. A "federal court's exercise of personal jurisdiction in a diversity of citizenship case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Carbone v. Kaal*, 140 F.4th 805, 808–809 (6th Cir. 2025).

Although a court is expected to conduct the due process analysis first, *id.*, the lack of statutory authorization in the Amended Complaint is so blatantly obvious that the Betzold Defendants would respectfully suggest that the Court examine the statutory basis for this lawsuit first in order to conserve judicial resources and promote judicial economy.

Paragraph 83 of Plaintiff's Amended Complaint alleges personal jurisdiction only through Ohio ST § 2307.382(A)(3), which provides:

> (A) A court may exercise personal jurisdiction over a person *who acts directly or by an agent*, as to a cause of action arising from the person's:
>
> (3) Causing tortious injury *by an act or omission in this state*. [Emphasis added.]

The allegations in this case fail to satisfy Ohio's statute for two independent reasons: 1) no allegedly tortious act or omission occurred in Ohio and 2) the allegedly tortious conduct was not done directly by the Betzold Defendants or their agent.

None of the allegedly tortious acts or omissions by Mr. Betzold or his firm occurred in Ohio. He resides in Michigan (**EX 5**, ¶1). He established an office in Michigan (*id.*, ¶¶2-3). With regard to his interviews by Ms. Overmyer, neither he nor Ms. Overmyer were in Ohio (*id.*, ¶¶4-6). He was not in Ohio when he set up or amended his firm's website (*id.*, ¶7). Plaintiff's Complaint completely fails to make out a prima facie case that jurisdiction is proper under Ohio ST § 2307.382(A)(3).

In addition, Plaintiff cannot rely on the conduct of other people to establish personal jurisdiction over the Betzold Defendants. Under Ohio ST § 2307.382(A)(3), the Defendant being sued must either act directly or by an agent. The Amended Complaint does not allege that any other person or Co-Defendant acted as their agent. In fact, the Amended Complaint pleads the opposite: that Ms. Overmyer became interested in, and spoke about, immigration issues before any involvement of Mr. Betzold.

The Amended Complaint's attempt to use group pleading defies binding precedent from the United States Supreme Court and 6th Circuit. Each defendant's contacts with the forum State must be assessed individually. *Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *Carbone v. Kaal*, 140 F.4th 805, 808–809 (6th Cir. 2025).

## II. Alternatively ,Plaintiff's attempt to exercise personal jurisdiction over the Betzold Defendants is inconsistent with due process.

In *Ross v. Robinson, Hoover & Fudge, PLLC*, 173 F.4th 745, 753–754 (6th Cir. 2026), the Sixth Circuit held that the question of whether personal jurisdiction over a nonresident defendant accords with the Due Process Clause of the Fourteenth Amendment is framed by two Supreme Court cases: *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and *Walden*

*v. Fiore*, 571 U.S. 277, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). In *Ross*, the Court summarized the factual scenario and holdings of both cases:

> Two Supreme Court cases set the framework for our analysis. The first is *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). There, a California resident brought libel claims against a Florida-based magazine editor and reporter. *Id.* at 784–86, 104 S.Ct. 1482. The Court held that the defendants had sufficient contacts with California to support personal jurisdiction in that state. *Id.* at 788–91, 104 S.Ct. 1482. The story that they published "concerned the California activities of a California resident," relied on "California sources," circulated in California, and harmed the plaintiff's reputation among those in California's entertainment industry. *Id.* at 788–89, 104 S.Ct. 1482. In short, because their "actions were expressly aimed at California" and "calculated to cause injury to [the plaintiff] in California," the defendants should have anticipated defending themselves in a California forum. *Id.* at 789–91, 104 S.Ct. 1482.
>
> The second case is *Walden*. In that case, the defendant police officer seized thousands of dollars in cash that the plaintiffs, professional gamblers, had in their possession while waiting at their gate in the Atlanta airport. 571 U.S. at 279–80, 134 S.Ct. 1115. Following the seizure, the police officer drafted a probable-cause affidavit that allegedly misrepresented his interaction with the plaintiffs and forwarded it to the local U.S. Attorney's office. *Id.* at 280–81, 134 S.Ct. 1115. Upon returning to their home state of Nevada, the plaintiffs sued the police officer and asserted that Nevada had personal jurisdiction over him because he had known that "his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada." *Id.* at 279, 134 S.Ct. 1115. The Court disagreed. The conduct at issue had occurred in Georgia—that was ***754** where the police officer had "approached, questioned, and searched [the plaintiffs]," "seized the cash at issue," and drafted the affidavit. *Id.* at 288, 134 S.Ct. 1115. Although the police officer had supposedly known that the plaintiffs were Nevada residents, the plaintiffs' connections to the forum state could not "drive the jurisdictional analysis." *Id.* at 289, 134 S.Ct. 1115. And although it was true that the plaintiffs felt their injury in Nevada, that was mere happenstance, as they would have experienced the injury "wherever else they might have traveled and found themselves wanting more money than they had." *Id.* at 290, 134 S.Ct. 1115.
>
> Our own caselaw has helped further demarcate the boundary between *Calder* and *Walden*. In *Johnson [v. Griffin*, 85 F.4th 429, 433–435 (6th Cir. 2023)], for example, a California-based comedian posted a series of messages on social media, accusing a business executive of engaging in "homophobic conduct" in Tennessee, identifying him as a Tennessee resident, and tagging his Nashville-based employer so that other users could

> reach out to the company. 85 F.4th at 431. The executive was fired after customers threatened to cut ties with his employer, causing him to bring tort claims against the comedian in Tennessee. *Id.* at 432. We held that Tennessee had personal jurisdiction over the California comedian because the case had "more parallels to *Calder* than to *Walden*." *Id.* at 433. The comedian's posts on social media discussed actions the executive took in Tennessee and damaged the executive's Tennessee career and "livelihood." *Id.* at 433–34. The comedian, moreover, " 'undoubtedly knew' that the 'focal point' of her [posts] concerned Tennessee." *Id.* at 433 (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007)).

In *Walden*, 571 U.S. at 289–290, the United States Supreme Court expressly rejected the view that the effects test from *Calder* can be satisfied merely by the nonresident defendant's commission of an intentional tort that is aimed at a person known to be a resident of the forum state.

Sixth Circuit cases on personal jurisdiction have extensively relied on these two cases. In *Blessing v. Chandrasekhar*, 988 F.3d 889, 904 (6th Cir. 2021), the situation involved residents of California who tweeted about Kentucky high school students and their conduct at a rally in Washington, DC. The Court stated that it had not been advised of a single case in which a defendant's allegedly tortious postings on social media created jurisdiction. Rather, the Court noted that all of the cases on which the plaintiffs relied on to find personal jurisdiction either were tortious communications sent directly to the plaintiffs in the forum state or involved a pre-existing business relationship. *Id.*. The Court held that personal jurisdiction is absent as a matter of law when the communication at issue was not specifically directed at the forum state. *Id.* at 905. That is true even though the nonresident defendant urged people to identify and shame the student residents of the forum state and contact those students' school. *Id.* at 906. The Court held that tweets did not establish personal jurisdiction where the nonresident "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to" Kentucky. *Id.*

Similarly, in *Carbone v. Kaal*, 140 F.4th 805, 812 (6th Cir. 2025), the Court held that the nonresident defendants never visited Ohio or contacted anyone there. The complaint did not allege that anyone in Ohio read the defamatory statements and the actions did not target anyone in Ohio. As a result, Ohio was not the focal point of the story or the harm suffered. *Id.*

Here, of course, there was no pre-existing business relationship between Plaintiff and Mr. Betzold. Nor are there any allegations that Mr. Betzold sent tortious communications directly to Plaintiff in Ohio or directed his comments or website specifically to Ohio residents, as opposed to residents from other states.

It must be remembered that this case was not brought as a counterclaim or third party claim in the class action (**EX 1**).

The few times that the Amended Complaint specifies allegations of conduct by the Betzold Defendants, the conduct is national in scope and not directed to Ohio. The sparse allegations in the Amended Complaint against the Betzold Defendants do not establish that Ohio Courts have jurisdiction over these claims. For example, the Amended Complaint alleges that Betzold "began regularly appearing as attorney guests on [Overmyer's] livestreams" (Amended Complaint, ¶¶24, 124). This does not establish personal jurisdiction, a conspiracy, or tortious conduct. For example, every guest on Fox News did not suddenly become liable for the Dominion settlement. The fact of an appearance as a guest is not tortious conduct. Nor did it occur in Ohio (**EX 5**, ¶¶4-6).

The Amended Complaint alleges cryptically that Betzold publicly read statements from a client abuse declaration (Amended Complaint, ¶27). The Amended Complaint does not allege information sufficient to identify the date, identity, or even that the person discussed was at all connected to Plaintiff. Nor does Plaintiff allege how this is connected to Ohio, particularly when Plaintiff alleges that its founder and principal is a resident of Florida (Amended Complaint, ¶71).

The frivolous orientation of Plaintiff's Amended Complaint is proved by this paragraph's phrase "whether consented to or not." Contrary to Plaintiff's appalling misunderstanding of the attorney-client relationship, consent is relevant. Plaintiff's Amended Complaint evidences a viewpoint that once a client has signed Plaintiff's engagement agreement, that client is owned by Plaintiff. Under Plaintiff's theory, the client has no right to seek another attorney's advice, no right to ask another attorney to investigate whether Plaintiff acted unethically, or even as in the case of this paragraph's allegation, no right to decide for himself or herself what to say about their own situation. Unfortunately for the theory of Plaintiff's case, Plaintiff's clients did not give up their rights when they retained Plaintiff. *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry*, 1994-Ohio-512, 68 Ohio St. 3d 570, 574, 629 N.E.2d 431, 435 (a client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject to the obligation to compensate the attorney or firm for services rendered prior to the discharge).

Next Plaintiff alleges that on or about June 2, 2026, "Betzold and/or Alvarez" had direct communication with a former LLF employee based in Dublin, Ohio who apparently had information about Plaintiff's immigration fraud. This and other similar allegations are group pleadings that are not sufficient to establish jurisdiction. *Calder, supra,* 465 U.S. at 790. Mr. Betzold did not communicate with anyone in Dublin, Ohio on or about June 2, 2026 (**EX 5**, ¶9).

Plaintiff alleges that Betzold allegedly said that an attorney charging a high legal fee could be indicia of fraud (Amended Complaint, ¶45). Plaintiff does not allege when or where this conduct occurred, or any connection of this statement to Ohio. More to the point, does Plaintiff disagree with this opinion? Is Plaintiff aware of Rule 1.5? If the allegations of the Amended Complaint are accurate, Plaintiff routinely charged over $10,000 a client for a predetermined

process that systematically prevented meaningful attorney involvement (**EX 1**). This allegation is frivolous and the opinion does not constitute tortious conduct.

Plaintiff alleges that "Betzold and Overmyer" repeatedly refer to LLF clients as "victims" (Amended Complaint, ¶53). Group pleading is not sufficient. *Calder, supra,* 465 U.S. at 790. When and where did Betzold say this? What is the connection to Ohio? Most importantly, if the allegations of the Amended Complaint are accurate, this is a true opinion.

In one of the few quotes of a statement by Betzold, the Amended Complaint alleges that Betzold said; "[T]hey are going to investigate all the cases involving all the attorneys suspected" of fraud (Amended Complaint, ¶56). The Amended Complaint does not allege that Betzold made this statement in Ohio or that this statement has a connection to Ohio that satisfies the Due Process Clause. Moreover, the allegation is substantively frivolous as allegedly tortious conduct. Is Plaintiff contending that immigration authorities will not investigate cases involving attorneys that they suspect of fraud?

Similarly, the Amended Complaint alleges that Betzold said: "Immigration is being very strict, and if they find out that you committed fraud, they are not going to want to show you mercy" (Amended Complaint, ¶56(a)), that a client who commits fraud could face criminal charges (*id*., ¶56(b)), and other similar statements (*id*., ¶¶56(c)-(e)). This is the best Plaintiff can do? Once again, there is zero connection of these statements to Ohio. Is Plaintiff alleging that the immigration authorities will act mercifully on people who have committed fraud? That immigration fraud is not a criminal offense? The Court can take judicial notice that filing a materially false VAWA self-petition exposes the petitioner to severe federal criminal consequences, including up to ten years of imprisonment, fifteen years if committed to facilitate

drug trafficking, and 25 years if committed to facilitate terrorism. 18 U.S.C. § 1546(a); see also 18 U.S.C. § 1015. These are more frivolous allegations.

Plaintiff alleges that Mr. Betzold offered a free, second opinion on pending immigration cases (Amended, Complaint, ¶59). What is the connection to Ohio? How is that possibly a tort?

The unethical aspect of this action against Mr. Betzold is proved by this allegation, and paragraphs 62-64. Plaintiff complains that Mr. Betzold is telling Plaintiff's clients that he will review client files to determine whether to file a bar grievance against Plaintiff. That is always a client's right. Any interference with that right, such as this lawsuit, is ethical misconduct under Rule 8.4. A lawyer should not be allowed to prevent and deter regulatory and criminal investigation of ethical misconduct by hiring three AmLaw 100 firms to file a frivolous complaint against anyone who dares to offer to review Plaintiff's services.

On July 14, 2026, before Plaintiff filed the Amended Complaint, its counsel was specifically warned about this interference with governmental authority to investigate Plaintiff **(EX 6)**. Despite this, the Amended Complaint contains the same unethical allegations.

Plaintiff's allegations do not show personal jurisdiction over the Michigan Defendants. Personal jurisdiction is absent as a matter of law when the communication at issue was not specifically directed at the forum state. *Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021). Plaintiff's Amended Complaint fails to allege any tortious communication by the Betzold Defendants that was specifically directed at Ohio. The United States Supreme Court expressly rejected the view that the effects test from *Calder* can be satisfied merely by the nonresident defendant's commission of an intentional tort that is aimed at a person known to be a resident of the forum state. *Walden v. Fiore*, 571 U.S. 277. 289-290, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). In this case, of course, Ms. Lisinski is not even a resident of Ohio.

## CONCLUSION

The sole purpose of this frivolous Complaint is to unethically retaliate against Mr. Betzold because some of Plaintiff's former clients have sued the firm for massive immigration fraud (**EX 1**). The allegations of immigration fraud against Plaintiff, by Plaintiff's own telling of the story, predate Mr. Betzold's involvement by years (Amended Complaint, ¶¶173, 179-182; **EX 3**, ¶¶27, 36-41, 70, Complaint dated 8/10/22, *Lozano, Lisinski et al v John Doe*, S.D. Ohio Docket No. 2:22-cv-03089-ALM-KAJ). In the face of such preexisting allegations, all of Plaintiff's clients would act prudently by requesting a second opinion. There is nothing tortious or improper about Mr. Betzold's offering such a second opinion, or in referring potential victims of legal malpractice to an attorney willing to investigate such claims.

Knowing that her mentor is no longer able to practice law in the aftermath of allegations of immigration fraud (**EX 4**), Ms. Lisinski has chosen a different tactic. Rather than fight the Class Action, she has decided to bring this independent action to retaliate against those who would dare to question her. Unfortunately for Plaintiff, in addition to the lack of merit of the substantive allegations, Plaintiff has filed this suit in a Court that does not have jurisdiction over the Betzold Defendants. Those Defendants are based in the Western District of Michigan. If Plaintiff wants to sue them, that is where the lawsuit must be filed.

WHEREFORE Mr. Betzold and Betzold Law respectfully request that this Honorable Court grant this Motion and dismiss them for lack of personal jurisdiction.

Respectfully Submitted,

*/s/ David M. Saperstein*
David M. Saperstein (0070736), Trial
Attorney pursuant to Limited Appearance
MADDIN HAUSER ROTH & HELLER, PC
One Towne Square, Fifth Floor
Southfield, MI 48076
(248) 827-1885
dsaperstein@maddinhauser.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on **August 24, 2026** the foregoing document was submitted for filing with the Clerk of the Court via the Court's ECF system and accordingly served on counsel of record by operation of the Court's electronic filing system. The following parties have not entered appearances through counsel at this time and were accordingly served via USPS Firs-Class mail, postage prepaid, as follows:

Camila Overmyer
4020 Eagle Drive
Gosport, IN 47433
*Defendant*

*/s/ David M. Saperstein*
David M. Saperstein (0070736)
Trial Attorney pursuant to Limited Appearance

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**EVA ACEVEDO ORTEGA,**
individually and on behalf of all
others similarly situated,

Plaintiff,

v.

**THE LISINSKI LAW FIRM, LLC,**
an Ohio Limited Liability Company;

**ANGELYNE E. LISINSKI,**
an individual;

**JUAN CHINCHILLA,**
an individual; and

**REA SINGH,**
an individual,

Defendants,

Case No. 2:26-cv-644

Hon.

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiff Eva Acevedo Ortega ("Plaintiff" or "Ms. Acevedo Ortega"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, brings this Class Action Complaint and Jury Demand against Defendants The Lisinski Law Firm, LLC (the "Lisinski Law Firm"), Angelyne E. Lisinski ("Attorney Lisinski"), Juan Chinchilla ("Defendant Chinchilla"), and Rea Singh ("Defendant Singh") (collectively, "Defendants") challenging a uniform, standardized system through which Defendants operated a high-volume immigration practice that: (a) concealed from clients that their immigration petitions were VAWA self-petitions requiring allegations of domestic abuse or extreme cruelty, or "T Visa" applications that required

allegations of forced labor or involuntary servitude, among other things; (b) delegated all substantive legal work to non-attorney staff; (c) used non-attorney drafting personnel and template-driven processes to generate abuse narratives without meaningful client participation; (d) prepared and/or filed petitions with United States Citizenship and Immigration Services ("USCIS") containing allegations that clients say they never made, and without attorney contact, review or client understanding; (e) charged thousands of dollars for this process while failing to disclose material additional costs; and (f) unreasonably withheld client files and case information when clients discovered or questioned what had been prepared or filed in their names. Plaintiff is requesting equitable fee forfeiture, disgorgement, restitution, and damages arising from Defendants' systematic scheme to defraud vulnerable immigrants through a high-volume immigration filing operation disguised as a legitimate law practice.

The Lisinski Law Firm operates as a high-volume VAWA (Violence Against Women Act) and T Visa filing mill, processing hundreds of immigration petitions every month through a standardized, assembly-line system designed to maximize revenue while providing no meaningful legal representation. The firm built its business model on fabrication, the systematic exploitation of vulnerable, predominantly Spanish-speaking immigrants, and the deliberate recharacterization of federal statutory eligibility standards to manufacture USCIS filings for clients who did not qualify.

Lisinski did not develop this operation independently. In or around 2021/2, Defendant Angelyne E. Lisinski paid an undisclosed sum to acquire and/or license the proprietary operational model and assembly-line "Arreglar Sin Salir" method (A.S.S.) from Washington based attorney Alexandra Lozano, whose competing firm claimed to have pioneered the departmentalized, high-volume VAWA and T Visa filing structure and marketed it to Spanish-speaking immigrants. In

acquiring that model, Lisinski imported not only Lozano's organizational template and forms but its most dangerous attribute: ***the capacity to certify and submit mass immigration filings under an attorney's signature, at industrial scale, without any meaningful attorney-client contact or individualized eligibility review***.

Lisinski's A.S.S. operation placed profit above client loyalty, ethical representation, and the fundamental safety of vulnerable immigrants. The firm's business model was an assembly-line system designed to maximize revenue, converting prospective clients into fee-paying contracts through commissioned non-attorney staff who were given individual monthly revenue targets and monthly conversion quotas. This structure prioritized volume over quality, processing upwards of 800 to 1200 cases per month at a per case fee of at least $12,000. This revenue focus necessitated the systemic fabrication of client declarations and immigration histories by non-attorney staff, the implementation of a sham attorney consultation protocol, and the automatic affixing of Lisinski's signature to petitions she had not reviewed for clients she never met. The goal was not legal service, but profit, leading to the deliberate concealment of the permanent inadmissibility risk that these fraudulent filings created for every class member.

This action does not seek to review, overturn, or interfere with any administrative eligibility determinations made by United States Citizenship and Immigration Services (USCIS) or the Executive Office for Immigration Review (EOIR). Adjudication of the claims requires no interpretation of federal immigration law or individual petition merits; rather, it focuses exclusively on Defendants' systemic business conduct in marketing, contract execution, non-attorney operations, unvetted document logistics, and commercial fund handling.

**Introduction**

1. This is a federal class action brought to dismantle and seek comprehensive civil remedies for a multi-million-dollar industrialized immigration factory disguised as a legitimate law

practice.

2. Operating out of its corporate headquarters in Powell, Ohio, the Lisinski Law Firm has systematically extracted tens of millions of dollars from thousands of the most vulnerable, low-income, monolingual Spanish-speaking undocumented consumers across the United States.

3. The core of this action does not address any individual legal malpractice or the standalone technical merits of individual petitions; rather, the Class seeks redress for an intentional, systemic business architecture designed by Defendants to maximize corporate revenue through the complete abdication of an attorney's sacred oath of loyalty.

4. The gravamen of this case centers on the execution of a fundamentally flawed system engineered by Defendants, a conveyor-belt model that is structurally incapable of delivering individualized legal representation, deliberately substituting a high-velocity sales pipeline for legitimate, licensed attorney engagement.

5. The fatal flaw embedded across the entirety of Defendants' operational framework is that ***at no point*** during the intake, screening, contract execution, narrative generation, or document checkout phases ***does an actual licensed attorney engage*** in an evaluation of the potential client's case, let alone provide a meaningful legal review.

6. Substantive legal determinations are systematically delegated to non-attorney sales staff driven by aggressive monthly quotas and commission payments, while the firm's licensed attorneys are structurally walled off from client interaction under threat of corporate disciplinary action.

7. To maintain this high-volume operation, Defendant Attorney Lisinski systematically executes, via an automated digital workflow or signature stamp, official certifications

under penalty of perjury on thousands of complex immigration applications, primarily petitions under the Violence Against Women Act ("VAWA") (Form I-360) and Victims of Human Trafficking Visas ("T-Visas") (Form I-914), and accompanying personal declarations.

8. Defendant Lisinski submits these solemn certifications to the United States government despite the fact that ***she has never met with, spoken to, or consulted the clients*** whose applications and declarations she purports to verify, establishing a total failure to adhere to the oath of loyalty to the client overall and the advancement of a system that furthered that breach.

9. Under Ohio law, the attorney-client relationship is one of the highest trust and confidence known to law.

10. When an attorney commits a clear and serious violation of that duty, the client is entitled to forfeiture of fees paid, without the need to prove that the breach caused actual damages.

11. This action does not depend on the merits or outcomes of any individual immigration petition.

12. Plaintiff's claims are based on the uniform process through which Defendants marketed, sold, documented, and filed immigration petitions, a process that allegedly failed to provide informed consent, meaningful attorney involvement, accurate disclosures, or meaningful client review before submitting sworn immigration filings.

13. The enterprise relies upon a standardized methodology of "narrative engineering" to generate non-viable or structurally fabricated humanitarian claims at scale.

14. In public broadcasts to over a million social media viewers, Attorney Lisinski explicitly advertised that "*typical or normal*" family arguments or standard workplace friction

automatically qualify individuals for federal protection.

15. Once a consumer enters the pipeline, offshore writing teams systematically distort, mischaracterize, and exaggerate ordinary childhood milestones and life events into fabricated grounds for domestic abuse and human trafficking claims, keeping clients in the dark by forcing them to execute signature blocks on completely blank pages or document packets overlaid with bright warning stickers or highlighted signature lines.

16. The consequences of this systemic breach are catastrophic. While Defendants collect massive corporate flat fees ranging between $12,000 and $25,000 per case, their unreviewed, rubber-stamped filings routinely trigger immediate administrative rejections or denials, exposing unsuspecting clients to statutory bars on future immigration benefits, and placing them directly into active federal removal proceedings.

17. Defendants' conduct was not the product of isolated errors or poor judgment in individual cases. It was a deliberate, profit-driven enterprise that exploited immigrants' desperation for legal status, their limited English proficiency, and their inability to navigate complex immigration law.

18. Since its founding in 2020, Lisinski Law Firm has grown to 15 offices across 11 states, employs over 1,500 professionals including more than 60 attorneys, and claims to have assisted over 55,000 individuals.

19. The Firm welcomes "high volumes of new clients each month.”

20. Plaintiff brings this action individually and on behalf of a Nationwide Master Class and State Subclasses to halt Defendants' ongoing fraudulent operations, compel complete equitable fee forfeiture and disgorgement for the uniform violation of the duty of loyalty, and recover actual, treble, exemplary, and statutory damages for the severe financial and

proprietary injuries inflicted by this predatory system.

**Jurisdiction and Venue**

21. This Court has subject matter jurisdiction over the federal claims asserted in this action pursuant to 28 U.S.C. Section 1331 (federal question jurisdiction) because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sections 1961, 1962(c), and 1962(d).

22. This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) the proposed class contains more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the proposed class is a citizen of a state different from any defendant.

23. This Court has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. Section 1367(a) because the common law and statutory consumer protection claims arise out of a common nucleus of operative facts, are part of the same case or controversy, and form an integral part of the overarching racketeering scheme to defraud.

24. Plaintiff Eva Acevedo Ortega is a citizen of Mexico. Defendant Lisinski Law is an Ohio limited liability company with its principal place of business in Ohio. Defendants Attorney Lisinski and Chinchilla are individuals domiciled in Ohio or Florida. Defendant Singh is an individual domiciled in Ohio. Minimal diversity exists under CAFA.

25. Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391(b)(1) because Defendants reside in this District, and under § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, where Defendants maintain their principal place of business and headquarters.

**Parties**

**A. Plaintiff**

26. Plaintiff Eva Acevedo Ortega is a natural person and citizen of Mexico who retained The Lisinski Law Firm for immigration representation.

27. Ms. Acevedo Ortega made payments to Defendants via debit card and through electronic withdrawals by Lisinski Law from her bank account.

28. Ms. Acevedo Ortega is a highly vulnerable consumer who was trapped in Defendants' high-volume sales pipeline, induced to pay a total of $10,500 in flat fees based on false legal assurances, and subjected to systemic narrative fabrication and deceptive signature protocols that resulted in the loss of her employment and severe federal immigration exposure.

**B. Defendants**

29. Defendant Lisinski Law is an Ohio limited liability company with its corporate headquarters and principal place of business located at 3982 Powell Road, Suite 330, Powell, Ohio 43065. The Lisinski Law Firm is a citizen of the State of Ohio.

30. The firm acts as the operational entity through which the high-volume legal mill is executed, managing the billing apparatus, employment structures, and social media platforms used to distribute deceptive commercial content.

31. Lisinski Law is an immigration law practice that entered into representation agreements with Plaintiff and putative class members, collected fees, and prepared and/or filed immigration petitions on their behalf.

32. The firm maintains 15 offices in 11 states: Arizona (Phoenix), California (Riverside, Pasadena), Colorado (Denver), Florida (Tampa, Miami), Georgia (Atlanta), Illinois

(Chicago), North Carolina (Charlotte), Ohio (Columbus/Dublin), Tennessee (Nashville), Texas (Austin, Dallas, Houston), and Virginia/Washington D.C.

33. It states that it employs over 1,500 professionals, including more than 60 immigration attorneys, and states that it has helped over 55,000 individuals pursue pathways to legal status since its founding in 2020.

34. Defendant Angelyne E. Lisinski is an attorney licensed to practice law in the States of Ohio and Colorado.

35. Attorney Lisinski is a resident of the State of Ohio and acts as the sole owner, managing member, and principal figurehead of the Lisinski Law Firm.

36. She directs the firm's macro-marketing strategies, operates the @AbogadaAngel TikTok channel, and serves as the primary certifying authority whose signature stamp or electronic mark is automatically affixed to thousands of federal immigration filings that ***she does not personally review***.

37. Prior to founding the firm, she had no stated immigration law experience.

38. She directed and implemented the policies, procedures, and systems through which the business operates, including the standardized process challenged in this action.

39. Defendant Juan Chinchilla is an individual residing in the State of Ohio or Florida.

40. Defendant Chinchilla is the husband of Attorney Lisinski and serves as a high-level executive officer, operator, and enforcer within the Lisinski Law Firm enterprise whose official job title is Business Manager.

41. Defendant Chinchilla directly manages post-fraud liability mitigation, corporate operations, and client relations, personally placing coercive and deceptive telephone communications to aggrieved clients to suppress complaints and obstruct civil remedies.

42. Defendant Rea Singh is an attorney licensed to practice law in the State of Ohio.

43. She is an individual residing in the State of Ohio.

44. During the Class Period, Defendant Singh served as an in-house associate and ethics/compliance trainer for Lisinski Law.

45. Defendant Singh is a primary operational architect of the firm's deceptive intake procedures and personally instructed staff to execute the fraudulent "Consultation Charade Protocol" described herein, making her personally liable for racketeering activity, conspiracy, and egregious breaches of fiduciary duties.

**Statutory, Regulatory, and Industry Framework**

46. This action is situated against a backdrop of strict federal statutory requirements governing humanitarian immigration benefits under the Immigration and Nationality Act (“INA”). Congress enacted the Violence Against Women Act (“VAWA”) self-petition framework and the Victims of Human Trafficking Visa framework (“T-Visa”) to protect bona fide victims of severe domestic violence and human trafficking from deportation while providing a safe path to lawful immigration status.

47. Because these humanitarian benefits provide highly sought-after employment authorization documents (“EADs”) and adjustment of status to that of lawful permanent resident inside the United States without requiring a lawful entry or consular exit, they are heavily guarded by federal adjudicators.

48. The Violence Against Women Act, originally enacted in 1994 and reauthorized multiple times, provides a pathway for certain abused immigrants to self-petition for immigration benefits without the knowledge or consent of their abuser. VAWA self-petitions are filed using USCIS Form I-360.

49. VAWA self-petitions are available to spouses, children, and parents of abusive U.S.

citizens or lawful permanent residents. Under INA § 204(a)(1)(A)(iii), a parent of a U.S. citizen son or daughter who is twenty-one years of age or older may self-petition if the parent demonstrates that he or she has been battered or subjected to extreme cruelty by the U.S. citizen son or daughter.

50. A parent-based VAWA petition requires the petitioner to demonstrate: (a) a qualifying relationship with a U.S. citizen child who is at least 21 years old; (b) that the petitioner resided with the abusive child; (c) that the petitioner was subjected to battery or extreme cruelty by the child; (d) good moral character; and (e) residence in the United States with their abuser.

51. In recent years, federal agencies have documented a catastrophic 2,239% surge in parent-child Form I-360 filings nationwide.

52. A T visa (T nonimmigrant status) is for victims of severe human trafficking who are physically present in the U.S. on account of the trafficking, cooperate with law enforcement (with important exceptions), and would face unusual and severe harm if removed.

53. Between FY 2021 and FY 2024, a FOIA-based analysis calculates an 801% increase in T-1 filings.

54. This unprecedented spike has triggered immense structural scrutiny and immediate security audits by United States Citizenship and Immigration Services ("USCIS") fraud detection units to identify assembly-line immigration firms and ghost-written declarations.

55. Upon approval of a VAWA self-petition, the petitioner receives deferred action status. The simple act of filing the I-360 allows the concurrent filing of an I-485 form for adjustment of status to that of a lawful permanent resident and, thus, the filing of I-765 form to obtain

employment authorization and the I-131 form to obtain advance parole which allows the individual to travel outside the country and return lawfully.

56. These tangible, immediate benefits make VAWA petitions particularly attractive to undocumented immigrants who have limited avenues for obtaining legal status.

57. The combination of a relatively low evidentiary threshold, immediate tangible benefits upon approval, and the desperation of undocumented immigrants for lawful status makes the VAWA self-petition process uniquely susceptible to exploitation by high-volume immigration practices that prioritize case volume over the accuracy and integrity of individual filings.

58. Upon approval of a T-visa, the principal applicant receives lawful temporary immigration status and is generally eligible for employment authorization. These concrete, near-term protections and work privileges make T-visa relief particularly attractive to undocumented trafficking survivors who otherwise have few viable paths to lawful status.

**Federal Consequences of False Filings**

59. VAWA self petitions and T visa applications are submitted under penalty of perjury. The applicant declarations that accompany them are sworn statements to a federal agency.

60. An applicant/petitioner who signs a declaration containing false statements is exposed to serious legal consequences, whether or not the applicant/petitioner was aware that the statements were false at the time of signing.

61. Submitting an unvetted, rubber-stamped, or fabricated application to a federal immigration agency carries terminal legal and administrative consequences.

62. Under federal criminal law, specifically 18 U.S.C. Section 1546(a), it is a felony offense to knowingly present or submit an immigration petition knowing it to contain any false

statement under penalty of perjury.

63. Furthermore, a formal finding of fraud or wilful misrepresentation made in an attempt to obtain an immigration benefit triggers a ground of inadmissibility requiring a formal and discretionary waiver to overcome.

## Factual Allegations

### A. The Corporate Architecture and the Alexandra Lozano Licensing Scheme

64. In or around 2021, Attorney Lisinski sought to rapidly expand her immigration law practice into a high-margin commercial enterprise. To achieve this, Attorney Lisinski entered into a formal licensing and mentorship agreement with Alexandra Lozano, a Washington-based attorney[1] who operates a controversial, high-volume immigration factory model under the corporate banner of Alexandra Lozano Immigration Law, PLLC ("ALIL")[2] and the "AMIGA" networking group.

65. Attorney Lisinski paid a significant amount of capital to Alexandra Lozano to purchase the operational blueprints, pre-packaged training templates, and case-processing workflows of Lozano's assembly-line methodology.

66. Under this licensed structure, the law firm was deliberately departmentalized into siloed corporate units such as scheduling, legal intake (sales), drafting, collections, and offshore writing teams, a system which was expressly designed to replace traditional, individualized legal advocacy with an automated, algorithmic data processing machine built for throughput.

---

[1] On May 26, 2026 Alexandra Lozano officially resigned her license to practice law in the State of Washington in lieu of facing disciplinary charges.

[2] Due to Lozano recently resigning and permanently giving up her license to practice law in lieu of disciplinary action, the business now operates under the name Luz Legal del Camino Legal, PLLC.

67. In September 2020, a prominent human trafficking legal expert provided foundational T visa training to Attorney Lisinski and her staff.

68. Immediately following the training, Attorney Lisinski was explicitly warned that her proposed high-volume business model which was eerily similar to controversial program being operated by Alexandra Lozano.

69. Defendant Lisinski categorically rejected the warning and asserted that she had "cleared everything with her ethics attorneys and was not doing anything wrong."

70. Having suppressed internal and external ethical pushback, Defendants fully operationalized their high-volume mill.

71. By 2023, the Lisinski Law Firm was processing an estimated 800 humanitarian visa applications per month. On average corporate fees exceeding $13,000 per transaction, the enterprise established a massive sales apparatus generating tens of millions of dollars in recurring pipeline revenue, entirely dependent on ***non-attorney processing*** and a systematic violation of the oath of loyalty.

**B. Deceptive Mass Marketing and Systemic Statutory Dilution**

72. *Industrialized Scale and Corpus Expansion*: Defendants' predatory business architecture was built for standardized, high-volume production rather than individualized legal advocacy.

73. A detailed forensic investigation into the Lisinski Law Firm's social media advertising pipeline demonstrates that its fraudulent activities were not incidental, but rather the result of a deliberate, institutionalized corporate strategy directed from the top to optimize institutional volume.

74. While the firm previously claimed its marketing was limited, a forensic analysis of the

firm's broader public broadcasting operation reveals a massive body consisting of 2,254 distinct immigration-related videos distributed across platforms like TikTok under the professional brand "Abogada Angel."

75. This multi-year marketing catalog amassed a staggering 82,205,434 cumulative views, establishing an aggressive commercial funnel designed to systematically exploit the legal vulnerabilities and enforcement anxieties of low-income, monolingual Spanish-speaking undocumented consumers across the United States.

76. Forensic Statistical Tactic Breakdown: The forensic audit of the 2,254-video dataset exposes a calculated formula used by the Enterprise to systematically dilute federal statutory standards, minimize evidentiary burdens, and manufacture false hope to induce contract signings. The following chart details the statistical prevalence, reach, and primary operational mechanisms of fraud executed uniformly across the firm's mass-marketing catalog:

| **Deceptive Marketing Category** | **Prevalence in Corpus** | **Cumulative Reach (Views)** | **Primary Operational Mechanism of Fraud** |
|---|---|---|---|
| Emotional Exploitation | 96.9% (2,185 videos) | 79,943,465 views | Bypasses rational consumer decision-making by utilizing high-production emotional imagery (e.g., tearful families hugging the attorney) to promise an absolute "future with papers". |
| False Guarantee and Outcome Claims | 79.8% (1,798 videos) | 68,591,220 views | Delivers absolute verbal promises of positive legal residency outcomes while burying legally required disclaimers in microscopic, unreadable on-screen text. |
| Miracle Promises and Severe Bar | 62.2% (1,403 videos) | 57,665,887 views | Falsely assures consumers that severe immigration violations, such as prior deportations, arrests, and the 10-year |

| Deceptive Marketing Category | Prevalence in Corpus | Cumulative Reach (Views) | Primary Operational Mechanism of Fraud |
|---|---|---|---|
| Deception | | | permanent bar, can be easily resolved inside the United States without leaving the country. |
| VAWA and Humanitarian Misrepresentati-on | 40.4% (911 videos) | 35,493,322 views | Intentionally dilutes federal law by reframing the strict statutory requirement of "battery or extreme cruelty" as everyday domestic arguments, "toxic relationships," or minor generational friction. |
| Manufactured Urgency and Rapid Timelines | 35.7% (804 videos) | 32,809,143 views | Pushes immediate retention by promising that clients will receive work authorization and protection "muy muy rápido" or "en tan solo meses," downplaying massive multi-year USCIS backlogs. |
| Fear-Based Marketing and Political Anxiety | 22.8% (514 videos) | 20,818,797 views | Exploits intense community fear surrounding executive administrations and policy changes to induce panic and drive immediate, high-volume contract intake. |
| Competitor Discrediting and False Exclusivity | 17.4% (392 videos) | 18,787,953 views | Maliciously discredits ethical attorneys who gave honest, negative assessments of weak cases, deceptively positioning the firm as possessing a "secret" legal loophole. |
| The "100% Protection" Notice Trap | 7.4% (166 videos) | 6,960,114 views | Markets standard USCIS administrative receipt notices as absolute shields against arrest, while hiding that filing unreviewed or meritless applications exposes individuals directly to active removal proceedings via automatic Notice to Appear (NTA) referrals. |
| Evidentiary Minimization ("Your Word is Enough") | 0.4% (9 videos) | 288,059 views | Falsely claims that "nothing more than your word" is required to win complex humanitarian cases, lower consumer friction, and induce high retainer fees for non-viable cases. |

79. **Systemic Insulation Against Deportation and Notice to Appear Exposure:** To insulate

the Enterprise from the catastrophic legal fallout of its high-volume denial rates, Defendants systematically executed a coordinated digital damage-control campaign to downplay the extreme dangers of federal removal proceedings and Notice to Appear ("NTA") issuance.

80. For example, despite a client receiving an active NTA to appear in immigration court on November 19, 2025, Attorney Lisinski looked directly into a broadcast camera on December 12, 2025, in an official promotional video and explicitly stated to viewers in Spanish: *"The truth is this: IS THERE REALLY A RISK OF AN NTA WHEN FILING A VAWA CASE? Filing a case does not put you at risk of receiving an NTA... we have never seen a person receive an NTA for filing a case. At my firm we help more clients than almost any other firm in the country. If this were happening, we would know.*"

81. This statement was a direct, calculated misrepresentation designed to suppress client panic, reframe systemic deportation risks as mere "rumors," and preserve the firm's lucrative intake pipeline.

82. Similarly, on November 20, 2025, literally one day after the same client was placed in removal proceedings, Defendants released a video falsely asserting that concurrent USCIS filings could unilaterally stop deportations and terminate active immigration court proceedings.

83. As of May 26, 2026, Attorney Lisinski continues to assert this position.

84. Defendants further minimized federal enforcement risks in a January 29, 2026 video, delivering a dangerous and false guarantee that appearing virtually at an immigration hearing completely shields an undocumented client from physical arrest by Immigration and Customs Enforcement (ICE).

79. ***Emotional Exploitation***: Defendants systematically designed and executed video marketing campaigns engineered to bypass a consumer's rational evaluation of legal risks by replacing objective case assessments with emotionally manipulative psychological anchors.

80. This rhetorical strategy is exemplified in video, which relies entirely on highly curated, high-production emotional imagery of pregnant women and tearful families embracing the attorney while holding flowers, accompanied by a voiceover promising an absolute "future with papers."

81. Within the context of Plaintiff's common law fraud and consumer protection claims, this tactic functions as an unconscionable business practice. The Enterprise intentionally utilized these handpicked, positive emotional outcomes to establish unearned trust and obscure the severe legal realities of their assembly-line intake pipeline, while deliberately burying the legally required disclaimer that "results vary" in microscopic, low-contrast, fast-scrolling text entirely unreadable to the target monolingual consumer base.

85. ***False Guarantee and Outcome Claims***: To maximize corporate throughput and induce immediate contract signings, Defendants uniformly broadcasted direct, verbal guarantees of successful legal outcomes that stood in stark, fraudulent contradiction to federal immigration realities.

86. On February 19, 2024, Defendants published a calculated "bait-and-switch" campaign via video, which visually features firm office staff holding manufactured signs reading "¡NOSOTROS DECIMOS QUE SÍ!" (We say YES!) while the script delivers an absolute verbal promise of a guaranteed residency outcome.

87. This deceptive tactic forms a core pillar of Plaintiff's fraudulent inducement and common

law fraud counts; the Enterprise deployed these explicit verbal promises of a guaranteed "yes" to override consumer caution and extract high retainer fees, while masking the deceptive nature of the transaction behind an illegible screen crawl stating that "results cannot be guaranteed" and "not everyone qualifies."

77. ***Miracle Promises and Severe Deception regarding certain immigration consequences***: Defendants continuously targeted highly vulnerable immigrants by airing absolute, unqualified guarantees that the firm possessed specialized methods capable of easily resolving severe federal statutory bars entirely within the United States. In one video from May 4, 2024, the Attorney Lisinski looked directly into the camera and explicitly delivered a direct guarantee to individuals subject to severe immigration violations, stating: “It also serves you if you have deportations, arrests, or more than one entry into the country without permission. And we fix all your papers without leaving.”

78. This representation is deeply fraudulent and directly underpins Plaintiff’s claims.

79. Promising to easily resolve cases involving multiple illegal entries and prior removal orders without requiring consular processing or departure directly misrepresents federal law, as these complex violations automatically trigger the severe 10-year permanent bar under INA § 212(a)(9)(C), the exact statutory reality that Defendants consciously ignored when steering Ms. Acevedo Ortega into a non-viable, high-fee humanitarian pipeline.

80. ***VAWA and Humanitarian Misrepresentation***: To artificially expand their consumer intake funnel, Defendants systematically diluted strict federal statutory thresholds by deceptively reframing narrow, victim-based humanitarian pathways as everyday domestic occurrences. This dangerous misrepresentation occurred in November 29, 2023, wherein the attorney explicitly states in Spanish that a VAWA self-petition allows undocumented

individuals to secure papers based on “situaciones de maltratos muy comunes en muchos hogares” (mistreatment situations very common in many homes).

81. Within the context of Plaintiff’s claims, this tactic represents an intentional perversion of federal law.

82. By conditioning low-education consumers to believe that minor relationship arguments, standard domestic friction, or ordinary "toxic relationships" meet the stringent federal requirement of "battery or extreme cruelty," the Enterprise successfully induced non-qualifying individuals to pay exorbitant fees for meritless petitions, directly mirroring the exact intake mechanism used to defraud Ms. Acevedo Ortega over her objections regarding her minor son.

83. ***Manufactured Urgency and Rapid Timelines***: Defendants systematically manufactured imaginary legal shortcuts and accelerated procedural timelines to exploit client desperation and force immediate financial retentions. For example, on March 23, 2026, Defendants released a video that delivered the severe legal misrepresentation that an applicant could significantly accelerate and bypass standard federal statutory three-year waiting periods for permanent residency simply by having the firm submit a personal letter to the United States Department of Justice.

84. This tactic directly substantiates Plaintiff’s claims for breach of the professional standard of care and legal malpractice. By presenting fabricated administrative workarounds as legitimate, high-velocity shortcuts, the Enterprise deliberately induced consumers into signing agreements under an artificial sense of urgency, while completely concealing massive multi-year federal backlogs and standard regulatory constraints.

85. ***Fear-Based Marketing and Political Anxiety***: Directly advancing the Enterprise's

racketeering activity and unconscionable business practices, Defendants routinely weaponized the intense political anxieties of the undocumented immigrant community to spark panic and drive high-volume contract intake. On May 20, 2025, Defendants published a video wherein the Attorney Lisinski explicitly exploited community fear surrounding shifting presidential administrations to pressure viewers into immediately calling her firm to file cases.

86. Within the context of Plaintiff's consumer fraud and fraudulent inducement claims, this video functions as a calculated trap by delivering a dangerously oversimplified explanation of executive power and falsely asserting that administrative shifts cannot impact filed applications. The firm actively concealed how executive policy adjustments, including heightened USCIS evidentiary scrutiny and changing local deportation priorities, can severely and catastrophically impact a client's case outcome.

87. ***<u>Competitor Discrediting and False Exclusivity</u>***: To isolate vulnerable consumers from ethical legal networks and capture individuals whose weak or non-existent cases were properly rejected by competent counsel, Defendants executed aggressive public campaigns designed to discredit the broader legal community.

88. In a November 22, 2023 video, the script explicitly manipulates the emotional despair of previously rejected applicants by stating in Spanish: "And many people have lost hope of fixing their immigration status because others have told them they don't qualify. But here at Lisinski Law Firm, we work with different types of cases." The Enterprise maliciously framed the honest case rejections provided by ethical attorneys as mere incompetence, deceptively positioning the Lisinski firm as possessing a "secret" or exclusive loophole to bypass federal statutory blocks, thereby inducing consumers to hand over their life savings

for legally non-viable cases.

89. ***<u>The "100% Protection" Notice Trap</u>***: Defendants routinely executed a severe and highly dangerous legal misrepresentation by marketing affirmative application filings as absolute shields against federal enforcement, while intentionally obscuring the catastrophic consequences of an agency denial. On May 13, 2025, Defendants distributed a video wherein Attorney Lisinski addresses federal Notice to Appear ("NTA") referral policies and delivers the absolute guarantee that filing an affirmative case with her firm constitutes a mechanism to secure “protection forever.”

90. Within the context of Plaintiff's RICO predicate acts and consumer protection violations, this represents an intentional, predatory fraud. Under strict federal immigration guidelines, filing weak, uncorroborated, or manufactured affirmative applications directly exposes an undocumented individual to automatic NTA referral and active removal proceedings upon denial. A severe operational hazard that the Enterprise actively concealed to preserve its lucrative intake pipeline.

91. ***<u>Evidence Minimization and the “Your Word Is Enough” Doctrine</u>***: To systematically lower consumer resistance and induce contract signings from individuals lacking any corroborating legal evidence of trauma, Defendants heavily promoted the deceptive "Your Word is Enough" doctrine.

92. Federal immigration law does not require that every VAWA self-petitioner or T visa applicant produce police reports, medical records, or third-party affidavits in every case. USCIS policy expressly recognizes that victims of domestic violence and human trafficking may lack traditional documentary evidence due to the nature of abuse, coercion, trauma, fear, isolation, or control by the perpetrator. Accordingly, both VAWA and T visa

adjudications permit applicants to submit "any credible evidence" relevant to the claim, including sworn personal declarations.

93. However, Defendants systematically distorted and oversimplified this legal standard into the false commercial representation that "your word alone is enough" or that "proof does not matter." In reality, the applicant still bears the burden of establishing eligibility by a preponderance of the evidence, and USCIS evaluates the totality of the record, including credibility, specificity, consistency, plausibility, corroborating documentation when reasonably available, and the overall reliability of the submission.

94. Defendants weaponized the existence of the "any credible evidence" framework to convince vulnerable consumers that no meaningful corroboration or evidentiary support was necessary, thereby inducing legally weak or non-viable filings into the Enterprise's high-volume pipeline.

95. On February 13, 2024, Defendants published a video explicitly declaring to their target audience that under their humanitarian pathways, *"it doesn't matter if it was a long time ago, or if you don't have proof. It's still possible to qualify."*

96. This intentional simplification directly underpins Plaintiff's fraud counts. The Enterprise utilized this alleged baseline rule to falsely convince low-education consumers that complex discretionary benefits require no independent physical or documentary proof.

97. This intentional downplaying of statutory burdens served as the foundation for the Enterprise's offshore drafting apparatus. When a client's actual circumstances, such as those of Named Plaintiff Acevedo Ortega, failed to meet the rigorous legal criteria for relief, this assembly-line system routinely manufactured and engineered fraudulent accounts of mistreatment to fill the evidentiary void.

**C. The Total Absence of Attorney Review and Automated Signature Practices**

98. Once a consumer calls the number displayed on the social media funnel, they are routed through call centers where ***non-attorney*** "Legal Intake Specialists" are driven by a strict individual and team revenue quota as well as other incentives.

99. To incentivize aggressive sales tactics, these ***non-attorney*** intake specialists receive up to a 3% cash commission on any client deposits collected on the same day (requiring a minimum immediate down payment of $2,500), and up to 1.5% on follow-up collections.

100. To maintain the illusion of a legitimate law firm while executing these ***non-attorney*** sales transactions, Defendants institutionalized the consultation charade protocol.

101. Taught by the firm's in-house ethics and compliance trainer, Defendant Rea Singh, this protocol trained sales staff to weave phrases like “in your attorney's review” or “in the attorney's opinion” into their sales pitches.

102. Most critically, Defendant Singh institutionalized a deceptive staging practice that involved instructing sales representatives to present a high-fee visa strategy, abruptly excuse themselves from the room, and spend approximately ten to fifteen minutes walking the office hallways to simulate an authentic file evaluation, before returning to inform the client that the attorney had reviewed the case and personally vetted their eligibility.

103. In reality, sales personnel were strictly prohibited from speaking with or contacting firm attorneys under threat of immediate disciplinary write-ups or termination.

104. The ***non-attorney*** intake specialists were themselves making the determination that the client was eligible for either a VAWA or T visa process.

105. At no point did an actual U.S. licensed attorney engage in a review of the intake notes or questionnaire, let alone a meaningful review, during the intake process.

106. At no point did an actual U.S. licensed attorney engage with the potential client directly to provide any meaningful review, advice or information during the intake process.

107. This total absence of attorney oversight extends to the final document execution and filing phases.

108. Once a contract is signed, non-attorney staff compile the file, offshore teams draft the text of the declaration, and the final application packages are routed through an automated electronic workflow.

**D. Attorney Lisinski Signed All Applications Despite Never Meeting with Clients**

109. On July 26, 2023, Lisinski explicitly confirmed that she could not possibly review all applications which carried her signature, posting on Facebook: "Looking for contract attorney support for final review of VAWA and/or T-Visa cases before filing."

110. None of the other attorneys retained by Defendants ever met with the clients and certainly did not review the applications or the declarations with the clients personally.

111. To execute filings at scale without executing basic fiduciary duties, Attorney Lisinski systematically authorizes the application of her signature stamp or electronic mark onto the preparer's certification of the Form I-360 or Form I-914 and accompanying forms, certifying under penalty of perjury that the facts contained within the petition and supporting client declarations are complete, true, correct, and verified by the client to her specifically as well as that the client authorized its filing.

112. Defendant Lisinski executes these solemn federal certifications despite the fact that she has never met with, spoken to, or consulted the clients to review their applications or herself verify the truthfulness of the declarations prepared by her staff, constituting a wholesale abdication of the attorney's professional oath of loyalty and a structural flaw in the model

itself.

113. For example, Attorney Lisinski signed the Preparer's Certification for Ms. Acevedo Ortega on June 11, 2025 wherein she certified under penalty of perjury that "***petitioner has reviewed*** the completed petition, including the Declaration and Certification…and ***informed me*** that all of this information in the form and in the supporting documents was complete, true and correct."

***Preparer's Certification***

By my signature, I certify, under penalty of perjury, that I prepared this petition at the request of the petitioner or authorized signatory. The petitioner has reviewed this completed petition, including the **Petitioner's Declaration and Certification**, or **Petitioner's or Authorized Signatory's Declaration and Certification**, and informed me that all of this information in the form and in the supporting documents is complete, true, and correct.

***Preparer's Signature***

8. Preparer's Signature (sign in ink) Date of Signature (mm/dd/yyyy) 06/11/2025

Form I-360 Edition 01/20/25 Page 18 of 19

114. However, Attorney Lisinski never met with or spoke with Ms. Acevedo Ortega regarding the form.

115. Additonally, Attorney Lisinski never met with or spoke with Ms. Acevedo Ortega regarding the supporting documents including the Declaration drafted by Lisinski's staff.

116. Ms. Acevedo Ortega never confirmed to Attorney Lisinski that the information contained in the form and supporting declaration was complete, true and correct.

117. In fact, Ms. Acevedo Ortega signed the form on June 5, 2025 at her home in Colorado.


I certify, under penalty of perjury, that all of the information in my petition and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my petition, and that all of this information is complete, true, and correct.

***Petitioner's Signature***

6. Petitioner's Signature ➡ Eva Acevedo Ortega — Date of Signature (mm/dd/yyyy) 06-05-2025

118. Ms. Acevedo Ortega never spoke with Attorney Lisinski either in person or over the phone and only ever spoke with Defendants' ***non-attorney*** staff despite her many requests to speak directly with Attorney Lisinski.

119. It is a best practice for an attorney, especially the one signing the preparer's certification, to review the immigration application with the client personally.

120. It is a best practice for an attorney, especially the one signing the preparer's certification, to review the declaration to be submitted in support of an immigration application, with the client personally.

121. Attorney Lisinski did not follow this best practice with every client for whom she signed the preparer's certification.

122. In fact, Attorney Lisinski has not personally reviewed an application or supporting declaration with a client since she moved to Florida several years ago.

123. To keep clients from discovering that their official federal submissions contain unvetted or engineered assertions, Defendants deployed deceptive document execution workflows.

124. On January 30, 2024, Defendant Lisinski openly detailed her mechanics for collecting client signatures blindly, posting on Facebook: "We spend A TON of time putting colored flags on forms to mail to clients to sign and then removing them... I'm wondering if we can do something quicker like use a highlighter to note where the client needs to sign, and whether if we submit the original signatures to USCIS, because that's what we do to not

have to keep the original signatures in our file... I prefer to use Adobe highlighting because it's much easier and ***we can just print the signature pages with highlighting*** from Adobe and send them to the client."

125. Through these protocols, intake specialists and managers systematically forced clients and independent interpreters to sign entirely blank sheets of paper or isolated signature sheets overlaid with bright neon stickers, ordering them to blindly sign highlighted blocks in English without receiving line-by-line translations and/or attorney explanations.

**E. Post-Filing Fraud and USCIS Investigation Tampering**

126. Because the applications submitted by Lisinski Law are structurally unvetted, USCIS regularly issues comprehensive Requests for Evidence (“RFEs”) or immediate rejections.

127. Rather than remediating their errors, Defendants utilize the RFE stage as a secondary revenue stream.

128. Representatives of the firm contact clients upon receipt of an RFE and attempt to charge an additional $1,500 fee to "help create and make" false evidence, pressuring family members to author letters detailing fabricated abuse that never occurred.

129. Upon information and belief, in or around late 2024, the structural fraud perpetrated by the Lisinski Law Firm triggered an active, multi-case federal investigation by USCIS adjudicators.

130. Upon realizing that federal authorities had flagged their operational pattern, Defendants engaged in an extraordinary campaign of investigation tampering and cover-up.

131. The firm flew numerous clients from across the country directly to its corporate headquarters in Powell, Ohio, heavily coached them to memorize the fabricated narratives contained in their unreviewed declarations, and deployed firm employees to attend official

USCIS interviews with the clients, surreptitiously acting as Spanish-language interpreters with an undisclosed connection to Attorney Lisinski to insulate her from professional accountability and obscure the firm's systemic fraud from federal oversight.

**E. Direct Post-Fraud Concealment and Broad Pattern Evidence**

132. As the structural deficiencies of the Defendants' immigration mill began resulting in widespread federal pushback, the Enterprise actively deployed Defendant Juan Chinchilla to engage in direct post-fraud concealment, financial narrative control, and proactive witness intimidation across state lines.

133. Specifically, on or about May 1, 2026, an aggrieved client placed a comprehensive complaint call to the firm, challenging the Enterprise's pattern of narrative fabrication, missing filing receipts, and the extraction of unearned fees.

134. Defendant Chinchilla personally intervened on behalf of the corporate mill.

135. Rather than exercising basic fiduciary care, Defendant Chinchilla utilized the communication to actively mislead the caller regarding application statuses, provide pretextual administrative excuses for billing and operational breakdowns, and deploy coercive rhetoric to suppress complaints.

136. Defendant Chinchilla's conduct on the May 1, 2026 communication serves as direct, illustrative pattern evidence of the Enterprise's operational architecture.

137. It demonstrates a coordinated, top-down execution of liability control designed to corruptly persuade victims to abandon their legal remedies, insulate Attorney Lisinski from scrutiny, and actively discourage consumers from cooperating with or participating in impending class action litigation against the firm, constituting active witness tampering and obstruction under federal racketeering definitions.

138. Such interference and attempted intimidation continues today.

**The Experience of Named Plaintiff Eva Acevedo Ortega**

139. In or around August 2024, Plaintiff Eva Acevedo Ortega, a monolingual Spanish-speaking undocumented individual, was facing an immediate threat to her livelihood. She had been employed at a stable job where her employer explicitly warned her that upcoming corporate document audits required her to present a renewed valid Employment Authorization Document ("EAD").

140. Specifically, Ms. Acevedo Ortega's reliance chain commenced on or about August 20, 2024, when she viewed a specific, date-stamped '@AbogadaAngel' TikTok video broadcast across interstate wires, which delivered false outcome guarantees and minimized the statutory requirements for humanitarian relief.

141. Driven by this digital inducement, she initiated a telephonic intake call over interstate wires on August 28, 2024, which routed her to the enterprise's high-volume pipeline and resulted in her formal intake consultation at the Denver office on August 29, 2024.

142. Shortly thereafter, Ms. Acevedo Ortega underwent a formal intake consultation at the Denver office of Lisinski Law.

143. In strict compliance with the firm's standardized workflows and the charade protocol she never spoke to an attorney.

144. Instead, a male sales representative conducted a one-hour screening. Ms. Acevedo Ortega explicitly informed the representative that she needed an immediate renewal of her asylum-based work permit to save her job.

145. The sales representative completely ignored her request. Upon learning that Ms. Acevedo Ortega had a U.S. citizen son who would soon turn 21, the representative deployed the pre-

rehearsed scripts.

146. He assured her that a routine work permit renewal was an inferior option and that the firm's principal attorney had a specialized, confidential "humanitarian strategy" that would guarantee her an EAD within six to eight months and a green card within three years.

147. The sales representative abruptly exited the consultation room, claiming he was required to submit her file for immediate attorney review down the hall.

148. After executing the hallway-walking sequence as taught by Defendant Singh to simulate an authentic legal evaluation, he returned and stated that Attorney Lisinski had personally vetted her file and authorized a VAWA strategy.

149. Ms. Acevedo Ortega was shocked and repeatedly informed the representative that she did not qualify for a VAWA petition because she had suffered absolutely no abuse or extreme cruelty from her son, and that her son was not yet 21 years of age.

150. The representative overrode her objections, stating that under the firm's specialized method, "typical family problems" were entirely sufficient, and that the firm would simply hold the application until her son reached the statutory age of 21.

151. Driven by desperation to preserve her employment and relying entirely on the firm's false legal assurances, Ms. Acevedo Ortega executed a Contract for Legal Services with the Lisinski Law Firm for a total of $12,000 on August 29, 2024.

152. Ms. Acevedo Ortega made the following payments via electronic processing to Lisinski Law:

a.

| | |
|---|---|
| 9/3/2024 | $2,500.00 |
| 9/11/2024 | $2,500.00 |

| | |
|---|---|
| 10/11/2024 | $389.00 |
| 11/12/2024 | $389.00 |
| 12/12/2024 | $389.00 |
| 1/13/2025 | $389.00 |
| 2/11/2025 | $389.00 |
| 3/11/2025 | $389.00 |
| 4/11/2025 | $389.00 |
| 5/13/2025 | $389.00 |
| 6/11/2025 | $389.00 |
| 7/11/2025 | $389.00 |
| 8/11/2025 | $389.00 |
| 9/11/2025 | $389.00 |
| 10/14/2025 | $389.00 |
| 11/12/2025 | $389.00 |
| 12/10/2025 | $389.00 |
| 1/10/2026 | $389.00 |
| 2/10/2026 | $389.00 |
| 3/10/2026 | $387.00 |

153. Following the execution of the contract, the Enterprise's offshore declarations team engaged in systemic narrative engineering.

154. To facilitate the submission of this unvetted package, the Enterprise utilized interstate commercial carriers to execute its deceptive signature protocols.

155. On or about May 28, 2025, Defendants transmitted a document packet containing entirely blank or isolated signature pages overlaid with bright neon 'ALTO' stickers via the United States Postal Service (USPS) to Ms. Acevedo Ortega's residence in Colorado.

156. Following her blind execution of the highlighted lines under false legal assurances, she returned the unvetted signature block to Defendants' Ohio headquarters on June 2, 2025,

using a private commercial carrier (FedEx).

157. Ms. Acevedo Ortega only discovered the staggering depth of this deception after the application package had already been compiled and mailed to immigration authorities.

158. Representatives of the firm transmitted a translated copy of the already filed declaration directly to her email.

159. Upon reading the text in her native language, she was horrified to discover that the Enterprise had systematically twisted and re-engineered minor, historic incidents from when her son was a young minor to construct a fraudulent, fabricated narrative of adult domestic abuse, including:

a. **The Childhood Smashed Door Fabrication:** The declaration claimed her son smashed a glass door during a violent argument, resulting in a hospital trip for stitches. In reality, Ms. Acevedo Ortega clarified that this was an accidental incident that occurred while he was a *young child at play*.

b. **The Childhood Homework Mischaracterization:** The declaration asserted that her son maliciously jeopardized her employment by refusing to complete his schoolwork, forcing her to leave work early. In reality, this referred to standard childhood behavioral friction when her son was an *elementary school minor*.

c. **The "Forced Illegal Acts" Lie:** The declaration claimed her son coerced and forced her to perform illegal acts, such as driving him to medical therapy without a valid license. In reality, Ms. Acevedo Ortega noted that he never forced her to do anything, as he was simply a *young minor* requiring parental transportation to childhood therapy.

d. **The Falsified Verbal Abuse Claim:** The declaration alleged that her son verbally

abused her and explicitly blamed her immigration status for denying him vacations. In reality, Ms. Acevedo Ortega clarified that her son merely exhibited normal childhood sadness because their financial and legal status prevented them from going on family vacations.

160. In addition to twisting childhood events into a narrative of domestic abuse, the Lisinski Law Firm completely falsified Ms. Acevedo Ortega's immigration background, submitting official statements to USCIS under penalty of perjury that were entirely false and incorrect as it relates to her history of entries and returns to the United States.

161. To facilitate the submission of this unvetted, perjurious package, representatives forced her to sign completely blank pages and mailed her document packets overlaid with bright "ALTO" (STOP) stickers, ordering her to blindly execute highlighted signature blocks in English without ever providing an explanation or detailed review of the text by an attorney.

162. In June 2025, the firm submitted the Form I-360 VAWA package.

163. Due to the Enterprise not including Plaintiff's address on the application, she was scheduled for a mandatory USCIS biometrics appointment at an agency office in Ohio, causing her extreme logistical distress, severe anxiety, and an intense fear of federal border enforcement.

164. The practical effect of utilizing the Enterprise's address on applications was that clients would not receive notices, receipts or other correspondence from USCIS.

165. On February 12, 2026, Ms. Acevedo Ortega received formal Rejection Notices from USCIS for her Form I-485 (Adjustment of Status), Form I-765 (Work Authorization), and Form I-131 (Travel Document) applications.

166. As a direct, proximate, and foreseeable result of Defendants' racketeering pattern and

mechanized business architecture, Ms. Acevedo Ortega suffered severe, concrete economic and proprietary injuries.

167. The causal chain flows uninterrupted from the deceptive marketing inducements to the non-attorney intake protocol, the extraction of $10,500 in flat fees, and the submission of a fabricated narrative package to federal authorities.

168. This unreviewed filing directly triggered formal USCIS Rejection Notices dated February 12, 2026, which immediately stripped Ms. Acevedo Ortega of her employment authorization, resulting in the direct loss of her stable job and total forfeiture of her life savings.

**Confirmed Anecdotal Evidence of widespread harm among Lisinski clients**

169. **<u>Stuck in Mexico on VAWA Advanced Parole</u>**: Father traveled to Mexico with his child on VAWA advance parole (AP). When Father attempted to re-enter the U.S., Customs & Border Patrol (CBP) questioned him as to the origins of his AP. Father stated that is through a petition that his child filed for him. The CBP officer stated that it is a VAWA case, and asked if his child abused him. Father did not know what VAWA was and stated that he was traveling with his child who petitioned for him. He was denied re-entry based on fraudulently obtained AP.

170. **<u>I-601A denial due to VAWA filing</u>**: Daughter was the beneficiary of an approved I-130 by her oldest U.S. citizen son, and she has a single entry without inspection to the U.S. Her Legal Permanent Resident mother was the qualifying relative for her I-601A provisional waiver application. Daughter filed I-601A waiver with local attorney. While the I-601A was pending, the Daughter went to Lisinski Law for a second opinion. She told Lisinski Law she had an I-601A waiver pending. They told her that she should file for VAWA, as

it would have no impact on her I-601A process, and she could file for her undocumented husband with this too. She agreed and they filed a VAWA petition (based on abuse by her oldest U.S. citizen son) with an I-485 Adjustment of Status application. USCIS subsequently denied Daughter's I-601A waiver because people with pending I-485 Adjustment of Status applications are ineligible for I-601A approval. Daughter was unable to refile. Daughter was unable to refile her I-601A waiver because her qualifying relative mother passed away, so there is no option to refile. Lisinki Law filed a VAWA for Daughter based on supposed abuse by her oldest son, who had filed the I-130 petition for her. She said the worst incident of "abuse" she experienced from him was when he was applying to college and struggled with the FAFSA. He said "I hate having undocumented parents" because he could not get financial aid. However, Daughter's second oldest child had actually physically abused her. She has had to call the police because of this, and she could be well suited for a U visa as a result as a crime victim. She told Lisinski Law about him, but was told that the VAWA needed to be based on the child who filed the I-130 petition.

171. **T Applicant has dementia, but signs affidavit**: Applicant files for a T visa, with his spouse as a derivative. The T visa claim itself is valid, but none of the critical details were included (specifically, nothing about forced labor) in the application. The T visa was denied due to digital signatures being used. Lisinski Law sent signature pages for the applicant and wife to sign so that they could refile the same application. Applicant's daughter stepped in and told Lisinki Law that her father, the principal applicant, had dementia and could not sign anything. Lisinski Law insisted that he sign anyway. The applicant's daughter refuses. The applicant ends up signing without the daughter's knowledge. The same T visa, still missing critical elements, was refiled with new signatures. However, the original denied T

visa caused the applicant's wife to receive an Notice To Appear. The Applicant is already subject to a final order of removal. Applicant's wife is now in removal proceedings. She is not eligible for any relief in immigration court to remain in the United States.

172. **Alias from FOIA included in T application without applicant knowledge**: Lisinski Law files T visa application for applicant who told them he entered the U.S. once without inspection in 2003 near Brownsville. Applicant stated that he once *attempted* to enter without inspection but was caught immediately, at which time he gave his real name to immigration authorities. He successfully entered the U.S. a couple of days later. The T visa application filed by Lisinski stated that the applicant was known by another name, had an Alien number assigned to him, and was subject to a final order of removal in front of an Immigration Judge. The applicant only learned this information after another attorney obtained a copy of the file and reviewed it with him. Applicant had never heard of the alias nor has he ever used it. The alias, A number, and removal information matches an FBI FOIA found in the Lisinski Law file. None of this vital information was ever reviewed with applicant before it was filed with USCIS. Due to his removal order, he was apprehended and removed, and he is now back in Mexico.

## Class Action Allegations

173. Plaintiff brings this action individually and on behalf of a Nationwide Master Class and State Subclasses pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

### A. Class Definitions

174. Plaintiff seeks certification of the following Master Class and Subclasses:

a. **THE NATIONWIDE MASTER CLASS:** All individuals residing in the United States

who, during the period from four years prior to the filing of this complaint, through the date of class certification (the "Class Period"), retained The Lisinski Law Firm, LLC and paid fees for the processing of any humanitarian immigration benefit (including VAWA, T-Visa, or U-Visa applications).

b. **THE OHIO SUBCLASS:** All members of the Nationwide Master Class who retained Defendants within the State of Ohio, or whose deceptive contracts and transactions flowed from operational decisions executed at Defendants' corporate headquarters in Powell, Ohio.

c. **THE COLORADO SUBCLASS:** All members of the Nationwide Master Class who resided in the State of Colorado at the time of retention, or who entered into contracts for legal services managed through Defendants' brick-and-mortar office infrastructure located in Denver, Colorado.

175. Excluded from the Class and Subclasses are the Defendants; any entities in which Defendants have a controlling interest; the Defendants' legal representatives, heirs, successors, and assigns; and any judge to whom this case is assigned, including their immediate judicial staff.

**B. Rule 23(a) Prerequisites**

176. Numerosity (Fed. R. Civ. P. 23(a)(1)): The members of the Nationwide Master Class and Subclasses are so numerous that joinder of all members is impracticable. Forensic data analysis reveals that Defendants' immigration mill enterprise processed up to 800 application packets per month, establishing that the proposed classes encompass thousands of geographically dispersed consumers across the United States.

177. Commonality (Fed. R. Civ. P. 23(a)(2)): There are numerous, uniform questions of law and fact that are common to the claims of Plaintiff and the classes, which predominate over

any questions affecting only individual members. These common questions include:

a. whether Defendants operated an association-in-fact Civil RICO enterprise designed to extract fees through a pattern of mail and wire fraud;

b. whether the licensing architecture was engineered to systematically replace individual attorney review with non-attorney sales processing;

c. whether the consultation charade was institutionalized by Defendant Singh to mislead consumers regarding attorney vetting;

d. whether Defendants' social media marketing campaigns systematically misrepresented federal statutory eligibility standards;

e. whether Defendants engaged in deceptive trade practices by shunting unearned flat client fees directly into general operating accounts rather than secure IOLTA client trust accounts; and

f. whether Defendant Juan Chinchilla engaged in a coordinated pattern of witness tampering to suppress client claims.

178. Adjudication of liability and remedies will rely exclusively on common, standardized corporate proof that is completely uniform across the entire class. This common proof includes: the unified social media marketing corpus, the standardized training scripts taught by Defendant Singh, the electronic logs of automated signature stamps, the structured commission and quota records for intake staff, and the centralized offshore drafting protocols. Because the primary remedy is system-wide fee forfeiture for a uniform breach of loyalty, no individualized inquiry into individual petition merits or immigration outcomes is required.

179. Typicality (Fed. R. Civ. P. 23(a)(3)): Plaintiff's claims are entirely typical of the claims of

the members of the Master Class and Subclasses. Plaintiff and all class members were subjected to the exact same industrialized assembly line, targeted by the same deceptive social media funnel, routed through the same non-attorney sales quotas, subjected to the same narrative fabrication protocols, and suffered identical economic injuries consisting of the loss of corporate legal fees and severe immigration exposure.

180. Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)): Plaintiff will fairly and adequately protect and represent the interests of the Class and Subclasses. Plaintiff has no interests that are antagonistic to or in conflict with those of the class. Furthermore, Plaintiff has retained counsel who are highly experienced in complex civil rights impact litigation, consumer protection class actions, and removal defense.

**C. Rule 23(b) Pleading Criteria**

181. Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)): A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The central legal and fact questions surrounding Defendants' corporate architecture, specifically the absolute failure to provide licensed attorney review and the systematic execution of signatures under penalty of perjury without client contact, predominate over any individual variations.

182. Because the primary damages theory relies upon equitable fee forfeiture for a uniform breach of the duty of loyalty, the Court is removed from examining individual case outcomes, creating an unassailable foundation for class certification. Joinder is impossible, and separate actions would create a severe risk of inconsistent and contradictory adjudications.

183. Injunctive and Declaratory Relief (Fed. R. Civ. P. 23(b)(2)): Defendants have acted and

refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole. Plaintiff seeks a permanent injunction halting Defendants' deceptive non-attorney sales operations, stopping the automated signature workflows, and compelling the immediate release of complete client files to all class members.

**D. Statute of Limitations and Fraudulent Concealment Equitable Tolling**

184. Any applicable statute of limitations has been conclusively tolled by operation of the doctrine of fraudulent concealment.

185. Defendants actively, affirmatively, and continuously concealed the true nature of their non-attorney assembly line, utilized the charade protocol to fake attorney file evaluations, and deployed Defendant Juan Chinchilla to actively mislead and intimidate aggrieved consumers.

186. Plaintiff and class members could not have discovered the underlying fraud through the exercise of reasonable diligence because Defendants maintained absolute control over the physical files, restricted client access to receipts, and threatened critics with defamation lawsuits.

## <u>Legal Counts and Causes of Action</u>

### COUNT I
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. Section 1962(c) Against Defendant Lisinski)

187. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

188. At all times relevant to this litigation, Defendants functioned as an "Enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c). Specifically, Defendants operated an association-in-fact enterprise composed of:

a. The Lisinski Law Firm, LLC;

b. Defendant Angelyne E. Lisinski;

c. Defendant Juan Chinchilla;

d. Defendant Rea Singh;

e. All employees of Lisinski Law in the United States;

f. All employees of Lisinski Law or related entities located outside of the U.S.;

g. All entities related to and/or owned/operated by Attorney Lisinski or Lisinski Law whether in the United States or abroad;

h. All contract attorneys retained by Lisinski Law;

i. Upstream co-conspirators, including Alexandra Lozano and her related entities.

189. The association-in-fact enterprise is separate, distinct, and independent from the legal identity of Defendant Lisinski as a RICO person.

190. The Enterprise spans a multi-layered hierarchy including the corporate entity, individual executives, independent contract attorneys, offshore drafting personnel, and separate non-party licensing entities (such as Alexandra Lozano's 'AMIGA' infrastructure), each operating through separate lines of commercial authority, distinct decision-making workflows, and segregated corporate functions.

191. The Enterprise functions with a common shared purpose: to maximize corporate revenue by extracting tens of thousands of dollars in legal fees from vulnerable, undocumented

immigrants through an assembly-line processing framework structurally devoid of licensed attorney oversight.

192. Attorney Lisinski was associated with, employed by, and actively participated in the conduct of the Enterprise’s affairs, directly or indirectly, through a "pattern of racketeering activity" as defined under 18 U.S.C. Section 1961(5).

193. The threat of long-term continuity is open-ended, active, and persistent. As of the current date (May 28, 2026), Defendants continue to broadcast identical deceptive marketing claims across digital platforms, maintain their rigid non-attorney sales quotas, and actively funnel hundreds of vulnerable consumers monthly through the exact same unreviewed signature and automated filing pipelines, creating a persistent and ongoing danger of severe immigration exposure and financial fraud.

194. This racketeering activity encompassed the coordinated, multi-year commission of dozens of distinct federal predicate acts, including:

a. wire fraud (18 U.S.C. Section 1343) by:

i. transmitting deceptive marketing broadcasts, false legal assurances, and scripted sales representations across wires via TikTok and cellular communications to induce fee payments; and

ii. The receipt and processing of payments from clients through wire transfers and/or electronic payment methods.

b. mail fraud (18 U.S.C. Section 1341) by utilizing interstate postal carriers to transmit immigration packets that were not reviewed by a U.S. licensed attorney; and

c. witness tampering (18 U.S.C. Section 1512) by utilizing interstate cellular

transmissions, specifically executed by Defendant Juan Chinchilla, to intimidate aggrieved clients, provide pretextual excuses for operational fraud, and corruptly influence victims to withhold testimony and decline civil participation.

195. The predicate acts committed by the Defendants are directly related, possess identical commercial targets of victims, deploy identical operational methodologies, and carry a distinct threat of long-term continuity because the Enterprise continues to broadcast deceptive content and process thousands of immigrant consumers through its assembly-line infrastructure daily.

196. As a direct and proximate result of the Defendants' racketeering activity and management of the Enterprise, Plaintiff and the members of the Nationwide Master Class suffered concrete financial and proprietary injuries, including the forfeiture of thousands of dollars in corporate flat fees and the complete loss of lawful employment.

**COUNT II**

**CONSPIRACY TO VIOLATE CIVIL RICO (18 U.S.C. Section 1962(d) — Against All Defendants)**

197. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

198. Defendants, through their executive leadership, corporate ownership, and employment actions, knowingly, willfully, and intentionally conspired, combined, and agreed together with each other, and with upstream co-conspirators Alexandra Lozano, to violate 18 U.S.C. Section 1962(c).

199. Each Defendant explicitly agreed to the overall structure of the racketeering conspiracy and knew that the success of the multi-million-dollar immigration mill depended entirely

upon the coordinated commission of federal wire fraud, mail fraud, and post-fraud witness tampering.

200. In furtherance of the conspiracy, the individual Defendants executed clear operational tasks:

a. Attorney Lisinski managed the macro-marketing redefinitions on TikTok and executed unreviewed federal filings;

b. Defendant Rea Singh institutionalized, and executed the deceptive consultation charade protocol to weaponize non-attorney staff; and

c. Defendant Juan Chinchilla executed direct witness intimidation to insulate the conspiracy from civil exposure.

201. As a direct and proximate result of the Defendants' racketeering conspiracy, Plaintiff and the members of the Nationwide Master Class suffered severe financial and proprietary injuries within the meaning of 18 U.S.C. Section 1964(c).

## COUNT III
## BREACH OF FIDUCIARY DUTY / BREACH OF THE DUTY OF LOYALTY

**(Ohio Common Law — Against Defendants Lisinski and Lisinski Law — On Behalf of the Nationwide Master Class and Ohio Subclass)**

202. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

203. An attorney-client relationship existed between each class member and Defendants throughout the Class Period.

204. Under Ohio law, an attorney owes every client an absolute, non-delegable fiduciary duty of loyalty.

205. This sacred obligation requires that an attorney act with scrupulous honesty, maintain

undivided loyalty, and protect the client's vital legal interests.

206. Crucially, the duty of loyalty flatly prohibits an attorney from designing or advancing an automated, entrepreneurial system that is structurally incapable of delivering individualized legal representation while charging substantial legal fees for it.

207. Defendants committed a clear, serious, and uniform breach of the duty of loyalty to every member of the Class.

208. The gravamen of this count does not rest on an individualized inquiry into the specific technical merits or outcomes of any single filing, nor does it allege professional malpractice.

209. Instead, the breach is the execution of the flawed system itself.

210. Defendants engineered an operational architecture that systematically separates the client from licensed counsel, completely abdicating the professional standard of care by ensuring that at no point during the process does an actual licensed attorney engage in an evaluation of the file, let alone a meaningful one on one review with the client.

211. Defendants further advanced this systemic breach of loyalty by utilizing an automated protocol where Attorney Lisinski applies her electronic or stamped signature to official federal preparer certifications and supporting declarations under penalty of perjury.

212. Defendant Lisinski executes these certifications despite the fact that she has never met with, spoken to, or consulted the clients to review their applications or verify the truthfulness of the underlying text, using her licensed credentials as a mechanism to advance a pipeline that completely furthers the uniform betrayal of client loyalty.

213. Under long-standing Ohio common law an attorney or law firm that engages in a clear and serious violation of the duty of loyalty is subject to the equitable remedy of complete fee

forfeiture and disgorgement.

214. Because this breach was built into the firm's foundational workflows, was executed in bad faith, and placed thousands of clients at risk of severe administrative fraud penalties, Plaintiff and the Class are entitled to an equitable order compelling the complete forfeiture, disgorgement, and restitution of all fees collected by Defendants during the Class Period, without offset for the purported value of any services rendered, and without requiring individual proof of harm.

**COUNT IV**
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (OCSPA)**
**(R.C. Section 1345.01 et seq. - Against Defendants Lisinski and Lisinski Law)**

215. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

216. Plaintiff and the members of the Ohio Subclass are "consumers" as defined under R.C. Section 1345.01(D).

217. Defendants are "suppliers" as defined under R.C. Section 1345.01(C), and the transactions executed between the parties constitute "consumer transactions" within the meaning of R.C. Section 1345.01(A).

218. Defendants engaged in numerous unfair, deceptive, and unconscionable acts and practices in connection with these consumer transactions, in direct violation of R.C. Sections 1345.02 and 1345.03, by: representing that their industrialized assembly line constituted a legitimate, individualized law practice under attorney supervision; actively misrepresenting federal statutory eligibility criteria across public social media platforms to induce ineligible consumers to execute contracts; utilizing the deceptive consultation protocol to actively mislead consumers into believing an attorney had vetted their file; and

taking unconscionable advantage of the absolute dependency, lack of legal education, and language barriers of monolingual immigrants to extract thousands of dollars for non-viable, unreviewed legal filings.

219. For the avoidance of doubt, the unfair, deceptive, and unconscionable acts challenged under this Count do not concern core legal advice, privileged strategic decisions, or standard attorney malpractice.

220. Instead, this claim is strictly limited to the purely commercial, entrepreneurial, and administrative aspects of Defendants' operation, specifically a mass-market social media broadcasts, high-pressure sales intake procedures, non-attorney commission-driven conversion quotas, unconscionable flat-fee routing protocols, and mechanized signature logistics.

221. Pursuant to R.C. Section 1345.09, Plaintiff and the Ohio Subclass are entitled to recover rescission of their unconscionable contracts, actual economic damages, statutory damages, reasonable attorney's fees, and class-wide treble damages.

## COUNT V

## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (CCPA) (C.R.S. Section 6-1-101 et seq. — Against Defendants Lisinski and Lisinski Law — On Behalf of the Colorado Subclass)

222. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

223. Colorado law applies conclusively to the claims of the Colorado Subclass because the consumer transactions were executed within Colorado, the physical storefront infrastructure was maintained in Denver, and the economic injuries were sustained by Colorado residents.

224. Furthermore, the deceptive contracts executed by Colorado consumers utilized unconscionable fee routing provisions engineered to bypass traditional attorney trust protocols (IOLTA), shunting unearned client funds directly from Colorado into general operating accounts managed by the enterprise.

225. The Colorado Consumer Protection Act, C.R.S. Section 6-1-101 et seq. (the "CCPA"), applies downstream to the conduct of Defendants within this litigation because Defendants established a continuous, systematic, and highly lucrative business nexus within the State of Colorado throughout the Class Period.

226. Defendants deliberately targeted Colorado's low-income, monolingual Spanish-speaking consumer population through broadcast-style, nationally accessible social media campaigns via the @AbogadaAngel TikTok account, pulling vulnerable consumers into their industrialized sales pipeline. To service this pipeline, Defendants maintained physical office infrastructures in Denver, Colorado, which generated over $1,000,000 in monthly sales through the execution of the firm's rigid corporate sales quotas.

227. Under Ohio's choice-of-law principles, which follow the Restatement (Second) of Conflict of Laws, Colorado law applies to the deceptive trade practices and fiduciary injuries inflicted upon the Colorado Subclass because the economic injuries were sustained in Colorado, the storefronts were operated in Colorado, and the deceptive client contracts executed by Colorado consumers contained unconscionable fee routing provisions explicitly designed to bypass traditional lawyer trust account (IOLTA) protocols to shunt unearned client funds directly into the firm's general operating accounts.

228. Defendants knowingly engaged in deceptive trade practices in the course of their business within the meaning of C.R.S. Section 6-1-105 by committing, among other acts:

a. knowingly misrepresenting the characteristics, uses, and benefits of the legal services they offered for sale, in violation of C.R.S. Section 6-1-105(1)(g);

b. advertising services with the intent not to sell them as advertised, in violation of C.R.S. Section 6-1-105(1)(e), by holding out a licensed firm providing attorney oversight while operating an intake pipeline staffed entirely by quota-compensated non-attorneys; and

c. knowingly engaging in unconscionable, deliberately misleading, and fraudulent acts within the meaning of C.R.S. Section 6-1-105(1)(rrr), by authorizing specialists to fake attorney evaluations and automatically affixing digital signatures to penalty-of-perjury certifications without attorney file review or client contact.

229. Defendants' deceptive practices possess a significant and devastating public impact.

a. the fraudulent scheme targeted a massive, distinct, and uniquely vulnerable pool of undocumented consumers across the State of Colorado;

b. the deceptive content was distributed via broad, broadcast-style public media channels; and

c. the immense disparity in legal sophistication was deliberately engineered by the firm's architecture to prevent consumers from recognizing the underlying fraud. Pursuant to C.R.S. Section 6-1-113, the Colorado Subclass is entitled to recover class-wide actual economic damages, statutory treble damages upon proof of bad faith, mandatory costs of suit, and reasonable attorney's fees.

## Prayer for Relief

WHEREFORE, Plaintiff Eva Acevedo Ortega, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment in her favor and against the Defendants, granting the following comprehensive relief:

A. An Order certifying the Nationwide Master Class, the Ohio Subclass, and the Colorado Subclass under Federal Rule of Civil Procedure 23, designating Plaintiff as Class Representative, and appointing undersigned counsel as Class Counsel;

B. An Order entered under Civil RICO (18 U.S.C. Section 1964(c)) awarding Plaintiff and the Nationwide Master Class **threefold (treble) their actual economic damages**, along with all costs of suit and reasonable attorney's fees;

C. An Order compelling complete **fee forfeiture, disgorgement, and restitution** of every dollar collected by Defendants from class members during the Class Period under equitable breach of fiduciary duty and breach of the duty of loyalty principles, without offset or reduction;

D. An Order awarding class-wide **treble damages and statutory penalties** under the Ohio Consumer Sales Practices Act and the Colorado Consumer Protection Act for Defendants' bad-faith and intentional deceptive trade practices;

E. A Permanent Injunction immediately halting Defendants' non-attorney sales pipelines, prohibiting the automated electronic execution of unreviewed signature blocks, and compelling Defendants to immediately produce complete client files to all class members;

F. Pre-judgment and post-judgment interest at the maximum statutory rate allowed by law; and

G. All other and further relief, at law or in equity, to which Plaintiff and the classes may be justly entitled.

## Jury Demand

Plaintiff Eva Acevedo Ortega, individually and on behalf of all others similarly situated, hereby demands a trial by jury on all counts and issues so triable as a matter of right.

Dated: May 28, 2026

Respectfully submitted,

*/s/ Rachel Zupan*

Rachel Zupan (OH 99694)

**AVANTI LAW GROUP, PLLC**

By: */s/ Robert Anthony Alvarez, Sr.*
Robert Anthony Alvarez, Sr. (Pro Hac Vice Anticipated)
Attorneys for Plaintiff and the Putative Classes

# EXHIBIT 2

# Electronically Certified Court Record

This is to certify that this is a redacted copy of the original on file in this office.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Hillsborough County Clerk of the Circuit Court |
| **Clerk of the Circuit Court:** | The Honorable Victor D. Crist |
| **Date Issued:** | 6/12/2026 12:24:51 PM |
| **Unique Reference Number:** | CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J |
| **Case Number:** | 26-CA-006394 |
| **Case Docket:** | COMPLAINT |
| **Requesting Party Code:** | 504 |
| **Requesting Party Reference:** | 19356915 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Victor D. Crist, Hillsborough County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Hillsborough Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

**The web address shown above contains an embedded link to the verification page for this particular document.

*If you are a person with a disability who needs an accommodation, you are entitled, at no cost to you, to the provision of certain assistance. To request such an accommodation please contact the Clerk's ADA Coordinator within seven working days of the date the service is needed; if you are hearing or voice impaired, call 711.

Clerk of Court & Comptroller's Office ADA Coordinator

601 E. Kennedy Blvd., Tampa, FL 33602

Phone: (813) 276-8100, extension 4347

Email: HOVER@hillsclerk.com

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

ANGELYNE LISINSKI,

Plaintiff,

Case No.:

vs.

CAMILA OVERMYER a/k/a
CAMELIA GUAD MAGANA MADRIGAL,

Defendant.

______________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Angelyne Lisinski ("Lisinski"), by and through her undersigned counsel, brings this action against Defendant Camila Overmyer, also known as Camelia Guad Magana Madrigal ("Overmyer"), and states as follows:

**INTRODUCTION**

1. This action arises from a calculated and reckless campaign of defamation designed to destroy the reputation and livelihood of Angel Lisinski, a successful immigration attorney who built her career and her law firm from the ground up.

2. Lisinski is an attorney licensed to practice law who rededicated her legal career to providing immigration counsel after her own experience navigating the immigration system with her husband.

3. Lisinski founded The Lisinski Law Firm, LLC ("LLF") in 2020. Since then, Lisinski has evolved LLF into a premier immigration firm with sixteen offices across multiple states, including Florida, Ohio, Illinois, Georgia, North Carolina, Texas, Colorado, California, and Virginia.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 1 of 25

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 2 of 25

4. Over time, the firm's business has grown steadily and legitimately through the provision of primarily humanitarian-based legal services to the immigrant community. LLF has provided federal immigration counsel since its inception and has represented immigrants seeking to attain legal status in the United States. Through a deep commitment to justice, Lisinski and LLF have gained a strong reputation in the community, having helped reunite countless families and defend the rights of non-citizens seeking legal status in the United States.

5. Lisinski's reputation came under attack in or around March 2025, when Overmyer, an aspiring TikTok personality who had long peddled shampoos, perfumes, and the like to a small following on her platform with minimal success, began branding herself as an immigration expert and posting a series of defamatory videos on TikTok and Facebook targeting Lisinski by name.

6. Overmyer, despite, on information and belief having no legal training or experience whatsoever, used these defamatory statements to grow her own social media following, increase engagement on her monetized TikTok account, and misappropriate Lisinski's reputation and success in the immigration law space for Overmyer's own financial benefit.

7. Although Overmyer states that she is "not an attorney," she is understood to be a "certified document preparer," as reflected in repeated comments on her social media posts from individuals she has hosted. These comments appear in connection with videos that also include Overmyer's contact information. In the immigrant community, such a document preparer is colloquially referred to as a "notario": an unlicensed individual who charges immigrants to prepare their immigration cases with no qualifications, no training, and no accountability.

8. Armed with this self-proclaimed expertise, in or around March 2025, Overmyer began publicly criticizing Lisinski's legal positions on social media, stumbling upon a way to generate more attention than she had ever seen before: by attacking Lisinski.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 3 of 25

9. Among other things, Overmyer made serious and false accusations against Lisinski, including that she committed fraud, legal malpractice, and unethical conduct; that under Lisinski's direction, LLF encourages clients to lie on immigration applications and files fraudulent petitions; and that Lisinski "took advantage" of vulnerable members of the Hispanic community without any substantiation.

10. Overmyer's attacks have been not just unprofessional, but also deeply personal and vicious, with Overmyer calling Lisinski a "rat," a "thief," "rotten," "disgusting," "corrupt," "old," "big forehead," and a "fraud," threatening that she will "end up in an orange jumpsuit," and subjecting her to a torrent of profanity and other personal attacks.[1]

11. As part of these personal and derogatory attacks, Overmyer has even resorted to suggesting that Lisinski has the "face of an embittered woman" because she "needs" a female sexual product. Consistent with that campaign, even when Overmyer does not identify Lisinski by name, she continues – most recently as of June 4, 2026 – to promote the narrative that the attorneys, reasonably understood to include Lisinski, belong in jail. Overmyer has gone so far as to depict what reasonable viewers would understand to be Lisinski as a rat in an orange prison jumpsuit headed to jail, while referring to her as a "wicked rat." She also refers to Lisinski as "Ratinski" or the "word lawyer," telling LLF clients that the practice of submitting sworn declarations or mere "words" in their immigration cases without additional supporting evidence is insufficient to support an immigration application.

12. Overmyer began her attacks on Lisinski by targeting her position that a client may qualify for humanitarian immigration relief even where a sworn personal declaration is their only

[1] Overmyer's videos and posts are in Spanish. Quotes from the videos and posts contained herein reflect English translations of the Spanish-language videos and posts.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 4 of 25

evidence of the mistreatment or abuse they suffered. Despite, on information and belief, having no legal training or experience, Overmyer declared that position false and began broadcasting it to her viewers. In publicly contradicting and generating controversy against well-known Lisinski, Overmyer finally garnered the social media attention she so desperately craved.

13. Overmyer made no reasonable effort to verify, clarify, or confirm the truth of her accusations before publishing them to hundreds of thousands of viewers. Indeed, Overmyer's statements regarding evidentiary issues are wrong. USCIS policy explicitly recognizes a personal declaration as primary evidence in support of a humanitarian immigration application, and LLF has successfully assisted many clients in achieving the relief sought in their humanitarian petitions under these circumstances.

14. The truth, however, did not matter to Overmyer – views did. Overmyer's conduct was motivated by financial self-interest. Since garnering a growing following, Overmyer monetized her TikTok account by earning affiliate commissions and selling beauty products. Her content about Lisinski and LLF was, by far, her most popular and most viewed, driving dramatic increases in engagement and generating financial opportunities for Overmyer. And, seeing the engagement she could generate by openly challenging Lisinski and a firm as widely recognized as LLF, Overmyer began to escalate her attacks.

15. In or around October 2025, Lisinski sent Overmyer a cease-and-desist letter demanding that she stop publishing false and defamatory statements. Overmyer publicly responded by claiming that all she does is interview people, stating she was "not afraid" and would "not stay quiet." In her comments, Overmyer called Lisinski a "coward" and her team "unprofessional."

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 5 of 25




16. Overmyer continued to amplify these false statements and noted that she would not be scared and would not stay silent.

17. For example, in a livestream on November 15, 2025, Overmyer hosted an LLF client, instructing her to send the declaration prepared as part of her T-Visa application to Overmyer, thereby encouraging her to disclose privileged information. In the same livestream, Overmyer had a lawyer on to talk about "fraudulent lawyers" who "swindle their clients." Overmyer also referred to "lawyers" who "tell people to apply for visas that they know the clients will not qualify for." Given that she had just hosted an LLF client, reasonable listeners would understand these references to refer to Lisinski, even where Overmyer omitted her name.

18. On November 19, 2025, Overmyer posted a TikTok video in which she interviewed a former LLF client, who stated Lisinski failed to advise her of a court date and properly represent her. These statements were false. Overmyer perpetuated these false statements by stating: "The job [LLF] did was to put you in a deportation, did you hire them for that? And for that, they charged you $11,000."

19. On February 11, 2026, Overmyer again discussed "fraudulent and unethical lawyers" during a TikTok livestream. She stated: "To all employees and former employees who worked or work for these firms and your conscience doesn't let you sleep because you see the

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 6 of 25

garbage and atrocities they are doing to people, the way they are lying to them, and you don't want to carry that in your conscience, I call on you to contact me."

20. In the same livestream, Overmyer stated: "Yesterday I saw a video of 'La Lisinski' saying, 'We have submitted fifty thousand cases in four years.'" Overmyer then calculated the revenue generated by those cases and claimed that this was why "these women" were troubled by Overmyer's movement, implying that Lisinski and others were motivated by financial self-interest. When a commenter asked when Overmyer intended to sue these lawyers, Overmyer responded on the livestream that the commenter was using a fake profile, thereby suggesting the commenter was associated with LLF, and that "[the commenter's] female boss would soon be in an orange jumpsuit," thereby implying that Lisinski is a criminal.

21. On April 27, 2026, Overmyer explicitly confirmed that she would stop naming firms, stating: "On the recommendation of my lawyer, Roberto, I am omitting the names of firms on my live streams—but that does not mean I have stopped or am afraid to expose and seek justice for the victims." However, this assurance quickly broke down, with Overmyer hosting an LLF client and referring to Lisinski and the firm in a livestream on May 4, 2026.

22. Again, on May 17, 2026, Overmyer hosted a client to talk about Lisinski, calling her "Fallen Angel" and "Angel Ratinski," highlighting comments from viewers calling Lisinski a "rat." She also stated, without specifically naming Lisinski, that the Violence Against Woment Act ("VAWA") offers a legitimate immigration process, but that it has been used by a bunch of "old rats to defraud people" and "sell them a lie." She further stated, defiantly: "what are they going to do, sue me?"

23. Overmyer's videos have been widely disseminated, reaching hundreds of thousands of viewers on TikTok and Facebook, and the harm to Lisinski is extensive and ongoing.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 7 of 25

Commenters, some being LLF clients, have posted on Lisinski's social media pages that, as a result of Overmyer's videos, they believe Lisinski is a fraudulent lawyer and are firing LLF.

24. For example, on October 24, 2025, two days after Overmyer published her first video featuring LLF client Rosi, a commenter on Lisinski's TikTok page stated that "[they are] seeing videos saying that the lawyer commits fraud and that she is not serious in her cases."




25. Another comment on Lisinski's YouTube page from October 24, 2025, reads: "Hello attorney there are a lot of videos of camilaovermyer regarding your office really bad comments [*sic*] I have a case with you and now I am very scared I don't want to continue my case thank you."




26. Another comment on Lisinski's TikTok page states that "more and more people who have been scammed by [Lisinski's] fraud keep coming forward," and tagged Overmyer.



6/10/2026 7:13 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 7

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 8 of 25




27. Overmyer's statements accused LLF of committing criminal acts, fraud, legal malpractice, unethical conduct, and professional misconduct. These statements relate to Lisinski's business.

28. As a result of Overmyer's reckless campaign of defamation, Lisinski has suffered and continues to suffer severe reputational, financial, and emotional harm.

**PARTIES, JURISDICTION, AND VENUE**

29. This is an action for damages between $50,000.00 and $74,000, exclusive of interest and costs.

30. Lisinski is an individual residing in Tampa, Hillsborough County, Florida. Lisinski is an attorney at law and the founder, CEO, and Managing Attorney of LLF.

31. Overmyer, also known as Camelia Guad Magana Madrigal, is an individual whose principal residence is in Gosport, Indiana. On information and belief, Overmyer is domiciled in Indiana. Overmyer is a social media influencer who advertises products and services nationwide on TikTok and Facebook, and who holds herself out as a certified immigration forms preparer.

32. This Court has personal jurisdiction over Defendant pursuant to Florida's long-arm statute, *Florida Statutes* § 48.193(1)(a)(2), because Overmyer committed tortious acts, specifically, the publication of false and defamatory statements, directed into Florida, caused injury to Lisinski in Florida, and were viewed in Florida.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 9 of 25

33. Overmyer's defamatory videos received tens of thousands, and in some cases hundreds of thousands, of views. Commenters on Overmyer's videos identified themselves as residing in Florida, demonstrating that Overmyer's defamatory content actually reached and was viewed by a Florida audience:






Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 10 of 25

34. To repeat, Overmyer specifically targeted Lisinski, a Florida resident, in her defamatory videos, and Overmyer knew and knows that Lisinski lives in Florida.

35. Consistent with constitutional considerations, exercising jurisdiction over Overmyer would not offend traditional notions of fair play and substantial justice because Overmyer could have, and indeed should have, reasonably foreseen being haled into a Florida court after she specifically targeted a Florida resident and deliberately directed her tortious conduct into Florida.

36. Venue for this action is properly in Hillsborough County, Florida because the Court has personal jurisdiction over Overmyer, and the cause of action accrued in Hillsborough County, Florida.

## STATEMENT OF FACTS

### A. Lisinski's Professional Background and the Growth of LLF

37. Lisinski is an attorney at law who has rededicated her career to providing immigration counsel. She was inspired to pursue immigration law by her own experience helping her husband through his immigration journey.

38. Lisinski is the founder, CEO, and Managing Attorney of LLF. Through a deep commitment to justice, Lisinski has grown LLF into a multi-state immigration law firm, helping reunite families and defend the rights of non-citizens.

39. LLF has provided federal immigration counsel since 2020. LLF concentrates its practice in immigration law, representing individuals seeking to attain legal status in the United States.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 11 of 25

**B. Overmyer's Background and Monetization of Her Social Media Platform**

40. Overmyer began posting content on TikTok under the username "@CamilaOvermyer87" on or about October 2, 2024.[2] Initially, Overmyer's TikTok videos pertained primarily to general lifestyle topics, including wellness, beauty, fashion, humor, and daily life.

41. In addition to TikTok videos, Overmyer also hosted livestreams on the platform, where she interacted directly with followers. Overmyer's videos and comments are primarily in Spanish.

42. Prior to 2025, there does not appear to be much engagement with Overmyer's videos, thus it is unlikely that she was meaningfully financially profiting from her videos.

43. That changed on January 22, 2025. On that day, Overmyer announced that she would begin speaking out on issues affecting the Hispanic community.[3] Over the next three days, Overmyer's TikTok posts consisted almost entirely of immigration-related content. Overmyer's January 23, 2025 TikTok video about immigration received 14,900 views, 743 likes, and 98 comments, and, at that time, it was the most popular video she had posted.[4]

44. Soon thereafter, Overmyer began posting promotional TikTok videos, allowing her to earn commissions as an affiliate creator, the first step in monetizing TikTok content.

45. On information and belief, Overmyer also generates revenue from her TikTok account by advertising her services as a certified immigration forms preparer. In one repost of a TikTok livestream, Overmyer stated that she is "certified as a preparer of doc–" before the clip

[2] Overmeyer's original TikTok account, @CamilaOvermyer87, was suspended in or around February 2026. She now posts from the TikTok account @camilaovermyer41.

[3] This video was available on Overmyer's original TikTok account, which has been taken down.

[4] This video was available on Overmyer's original TikTok account, which has been taken down.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 12 of 25

abruptly ended. A screenshot of an October 26, 2025, livestream shows that commenters on Overmyer's page repeatedly posted her cell phone number and advertised that Overmyer "es preparadora certificada[,] no es abogada" ("is a certified preparer, not an attorney").




46. Upon information and belief, Overmyer is not an attorney, has received no formal legal training, and is not qualified to provide legal advice. Nevertheless, Overmyer holds herself out to her social media followers as a certified immigration document preparer and uses that representation to induce individuals to disclose privileged or otherwise confidential information in seeking legal advice from her.

47. Upon information and belief, Overmyer could increase her revenue from TikTok affiliate commissions, direct sales of her beauty products, and her immigration forms preparation services by increasing the number of people who view and interact with her TikTok content.

**C. Overmyer's Defamatory Videos Targeting Lisinski and Her Legal Practice**

48. Beginning in March 2025, Overmyer began developing a narrative that immigration lawyers, including Lisinski, were defrauding their clients. Despite, on information

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 13 of 25

and belief, having no legal training or experience, Overmyer posted dozens of social media videos and hosted several hours-long livestreams about "corrupt" law firms and "fraudulent" attorneys.

49. Of note, this pivot to attacking "corrupt" and "fraudulent" law firms and attorneys generated significant media attention for Overmyer. Not only did Overmyer malign others, she also enriched herself through her monetized content.

50. For example, on March 20, 2025, Overmyer posted a TikTok video in which she stated:

> There is a lawyer – I won't say her name here, but you'll know who she is – who appears a lot on TikTok saying things like, "Oh, if you don't have evidence for the T Visa or the VAWA Visa, your testimony alone is enough." And that's not true. In fact, I've been contacted by many people who applied through that lawyer for the T Visa and their cases were denied because they didn't present any evidence . . . . So don't fall for this fraud.[5]

51. Although Overmyer declined to name Lisinski or LLF in this video, TikTok users commenting on the video quickly identified both Lisinski and LLF as the lawyer and firm Overmyer was referring to. Overmyer made no effort to correct her followers' identification. This video received 31,600 views and 1,026 likes and was at that time Overmyer's most popular TikTok video.

52. On March 22, 2025, Overmyer posted a video explaining that she changed her formerly positive opinion of a lawyer when she heard from clients of the lawyer who "applied for a process for which they have no evidence and their petition was denied."[6] Once again, TikTok users identified Lisinski in the comments as the lawyer to whom Overmyer was referring, and once again, Overmyer did not correct commenters' assumptions.

[5] This video was available on Overmyer's original TikTok account, which has been taken down.

[6] This video was available on Overmyer's original TikTok account, which has been taken down.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 14 of 25

53. Over the next several months, Overmyer continued to post content on TikTok claiming that lawyers are "taking advantage" of the Hispanic community by encouraging their undocumented clients to undertake expensive applications knowing that clients lack the evidence needed for those applications to succeed, so that the lawyers can charge clients significant fees.[7]

54. On October 22, 2025, Overmyer posted on TikTok and Facebook a video interview with a former client of LLF named "Rosario (aka "Rosi"). The video was captioned "Victima de la abogada Abogada Angel Lisinski," which translates to "Victim of Attorney Angel Lisinski." This video received over 112,100 views, 1,549 likes, and 2,1,972 shares on TikTok, as well as 67,000 views, 673 likes, and 119 comments on Facebook.[8] It was, by far, Overmyer's most popular video at the time.




55. During this interview, Overmyer elicited and directed Rosi's statements to ensure they corroborated Overmyer's preexisting narrative about Lisinski and her legal services. First, when Overmyer asked Rosi why LLF advised her to apply for a T-Visa instead of Parole in Place,

---

[7] These videos were available on Overmyer's original TikTok account, which has been taken down.

[8] *See* https://www.facebook.com/61557651634825/videos/1109709974485719 (last accessed on June 8, 2026).

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 15 of 25

Rosi stated: "They told me they didn't do Parole in Place, but that they recommended the T Visa to us."

56. Overmyer later commented on the video, asserting that Lisinski, whom she tagged, told Rosi not to use Parole in Place "para poderle sacar mucho mas dinero," which translates to "so she could get a lot more money out of her."




57. This statement is false. Although LLF does handle Parole in Place applications, it did not recommend that option for Rosi because it was not the strongest form of relief available to her.

58. The video also contained several additional false and defamatory statements, including that (a) LLF told Rosi that she "did not need evidence" to apply for a "T Visa," implying that Angel and/or LLF encouraged applications without evidence; and (b) Rosi's application was denied "because she had no evidence."

59. These statements were false because (a) Rosi's personal statement was, in fact, evidence, as USCIS regulations specifically recognize a personal statement as primary evidence

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 16 of 25

in support of a T-Visa application; and (b) neither Rosi's nor her husband's applications had been denied.[9]

60. Further, by specifically denoting Rosi as a "victim" of Lisinski/LFF, Overmyer communicated the factual assertion that Lisinski/LFF had engaged in misconduct the injured Rosi.

61. On October 23, 2025, Overmyer hosted another LLF client to share information about his case on TikTok. Overmyer identified the client as "another victim" of Lisinski and/or LLF and tagged Lisinski's TikTok account, "@AbogadaAngel." When the client initially referred to Lisinski only by her first name, Overmyer interrupted to supply her last name, "Lisinski," thereby explicitly identifying her.




62. Again, the depiction of the client as a "victim" connoted the inaccurate factual assertion that Lisinski had engaged in misconduct.

---

[9] USCIS Victims of Human Trafficking: T Nonimmigrant Status, Applying for T Nonimmigrant Status (Dec. 22, 2025), https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (last accessed May 26, 2026).

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 17 of 25

63. Also on October 23, 2025, in response to a comment on Overmyer's TikTok stating that "there are many thieves disguised as attorneys," Overmyer replied: "they take advantage because they know that Hispanics do not complain to the Bar. But that's over now." In the context of the discussion—where Overmyer had just identified a client as "another victim of @AbogadaAngel" and had expressly clarified that the client meant Angel Lisinski—her statement reasonably conveyed that Angel was among the "thieves disguised as attorneys" who, in her view, preyed on Hispanic clients.




64. On October 24, 2025, a commenter on Overmyer's page tagged Lisinski and asked her to clarify Overmyer's accusations. Overmyer responded to the comment stating: "@AbogadaAngel isn't going to answer, she's busy recording videos promoting her ill-gotten services." Although the commenter responded to Overmyer, stating that she personally knew people who have successfully had their immigration cases handled by Lisinski, Overmyer made no effort to retract or correct her statement.

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 18 of 25




65. On October 24, 2025, Overmyer displayed Lisinski's name on screen during a video and stated that, although she did not believe Lisinski committed "abuses" in 100% of her cases, she wanted to "expose the truth," namely, that "these lawyers take advantage of their clients in the Hispanic community." Overmyer further stated that she was "doing the right thing by shedding light on irregularities by attorney Angel Lisinski."

66. On or about October 25, 2025, LLF sent Overmyer a cease-and-desist letter. Overmyer publicly responded by claiming that all she does is interview people, stating she was "not afraid" and would "not stay quiet." In her comments, Overmyer called Lisinski a "coward" and her team "unprofessional."

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 19 of 25




67. In a livestream on November 15, 2025, Overmyer hosted another LLF client, instructing her to send the declaration prepared as part of her T-Visa application to Overmyer, thereby encouraging her to disclose privileged information. In the same livestream, Overmyer had a lawyer on to talk about "fraudulent lawyers" who "swindle their clients." Overmyer also referred to "lawyers" who "tell people to apply for visas that they know the clients will not qualify for." Given that she had just hosted an LLF client, reasonable listeners would understand these references to refer to Lisinski, even where Overmyer omitted names.

68. On November 19, 2025, Overmyer posted a TikTok video in which she interviewed a former LLF client, who stated that Lisinski failed to advise her of a court date and properly represent her. Lorena's statement was false. Overmyer perpetuated these false statements by stating: "The job [LLF] did was to put you in a deportation, did you hire them for that? And for that, they charged you $11,000."

69. On February 11, 2026, Overmyer again discussed "fraudulent and unethical lawyers" during a TikTok livestream. She stated: "To all employees and former employees who worked or work for these firms and your conscience doesn't let you sleep because you see the

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 20 of 25

garbage and atrocities they are doing to people, the way they are lying to them, and you don't want to carry that in your conscience, I call on you to contact me."

70. In the same livestream, Overmyer stated: "Yesterday I saw a video of 'La Lisinski' saying, 'We have submitted fifty thousand cases in four years.'" Overmyer then calculated the revenue generated by those cases and claimed that this was why "these women" were troubled by Overmyer's movement, implying that Lisinski and others were motivated by financial self-interest. When a commenter asked when Overmyer intended to sue these lawyers, Overmyer responded on the livestream that the commenter was using a fake profile and that "[the commenter's] female boss would soon be in an orange jumpsuit," thereby implying that Lisinski is a criminal.

71. On April 27, 2026, Overmyer explicitly confirmed that she would stop using names in her videos, stating: "On the recommendation of my lawyer, Roberto, I am omitting the names of firms on my live streams—but that does not mean I have stopped or am afraid to expose and seek justice for the victims." However, this assurance quickly broke down, with Overmyer hosting an LLF client and referring to Lisinski and her firm in a live stream on May 4, 2026.

72. Again, on May 17, 2026, Overmyer hosted a client to talk about Lisinski, calling her "Fallen Angel" and "Angel Ratinski," highlighting comments from viewers calling Lisinski a "rat." She also stated, without specifically naming Lisinski, that VAWA is a legitimate process, but that it has been used by a bunch of "old rats to defraud people" and "sell them a lie." She further stated, defiantly: "what are they going to do, sue me?"

**D. Overmyer's Videos Have Harmed Lisinski's Reputation**

73. Overmyer's false allegations have been widely disseminated, reaching hundreds of thousands of viewers on TikTok and Facebook, and the harm to Lisinski has been extensive and ongoing. Commenters, some being LLF clients, have posted on Lisinski's social media pages, as



6/10/2026 7:13 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 20

Unique Code : CAA-FAE-BCAFH-HDFHHEAJAIEBJAHHAEDH-BFEGHCA-J Page 21 of 25

a result of Overmyer's videos, stating that they believe Lisinski is a fraudulent lawyer and are leaving the firm.

74. For example, on October 24, 2025, two days after Overmyer published her first video featuring LLF client Rosi, a commenter on Lisinski's TikTok page stated that "[they are] seeing videos saying that the lawyer commits fraud and that she is not serious in her cases."




75. Another comment on Lisinski's YouTube page from October 24, 2025, reads: "Hello attorney there are a lot of videos of camilaovermyer regarding your office really bad comments [*sic*] I have a case with you and now I am very scared I don't want to continue my case thank you."




76. Another comment on Lisinski's TikTok page states that "more and more people who have been scammed by [Lisinski's] fraud keep coming forward," and tagged Overmyer.

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

ALEXANDRA LOZANO
ANGELYNE LISINSKI,
GIULIA FANTACCI, AND
LAUREN EAGAN,

Plaintiffs,

v.

JOHN DOES I-X; JANE DOES I-X; ABC PARTNERSHIPS I-X; DEF LIMITED LIABILITY COMPANIES I-X; AND XYZ CORPORATIONS;

Defendants.

Case No. 2:22-cv-03089

**COMPLAINT**

**JURY DEMAND ENDORSED HEREON**

Now come plaintiffs Alexandra Lozano, Angelyne Lisinski, Giulia Fantacci, and Lauren Eagan (collectively, "Plaintiffs"), and by and through undersigned counsel, for their claims state as follows:

**PARTIES**

1. Plaintiff Alexandra Lozano, ("Lozano"), is an immigration attorney who resides in the State of Washington. Lozano is the founder of AMIGA, a supportive and educational group for female immigration attorneys across the United States. Lozano founded AMIGA as a way to connect and educate immigration attorneys, as well as share her extensive knowledge of special forms of immigration relief. Lozano has mentored each of the Plaintiffs in immigration law, and in particular in the use of Violence Against Women Act Visas and Victims of Trafficking in Person Visas.

2. Plaintiff Angelyne Lisinski, ("Lisinski"), is an immigration attorney who resides in the State of Ohio.

3. Plaintiff Giulia Fantacci, ("Fantacci"), is an immigration attorney who resides in the State of Florida.

4. Plaintiff Lauren Eagan, ("Eagan"), is an immigration attorney who resides in the State of Washington.

5. JOHN and JANE DOES I-X are fictitious persons who may have an interest herein. ABC PARTNERSHIPS I-X, DEF LIMITED LIABILITY COMPANIES I-X, and XYZ CORPORATIONS I-X (collectively, "Defendants") are fictitious entities who may have an interest herein. When the true name of said fictitious persons and/or entities become known to Plaintiffs, Plaintiffs will amend their pleadings to reflect the same.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the claims raised in this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

7. Upon information and belief, a substantial portion of Defendants' tortious actions, upon which the allegations in this Complaint are based, occurred, and caused events to occur in the Southern District of Ohio.

8. Upon information and belief, the Court has personal jurisdiction over Defendants.

9. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

10. Plaintiffs are each immigration attorneys who operate their own successful law firms. Plaintiffs specialize in helping victims of human trafficking and victims of domestic

violence in obtaining visas to stay in the United States. Plaintiffs work predominantly with the Latino community. Specifically, each Plaintiff has specialized knowledge of Violence Against Women Act ("VAWA") visas and Victims of Trafficking in Person or "T" visas, which are misunderstood and underutilized. These visas can lead to work authorizations and make it possible to obtain green cards without having to leave the country to obtain legal status.

## Plaintiffs' Trademarks

11. Lozano is the founder of Alexandra Lozano Immigration Law. Lozano has continuously used Abogada Alexandra in commerce as a trademark since at least as early as 2016 in connection with Lozano's legal services ("Lozano Trademark"). Among other uses, Lozano uses Lozano Trademark A on her website, on the Alexandra Lozano Immigration Law Facebook account page, and on other social media sites like Instagram and TikTok.

12. As a result of her widespread, continuous, and exclusive use of Lozano Trademark to identify Lozano's legal services and Lozano as the source of those legal services, Lozano owns valid and subsisting common law rights in and to Lozano Trademark.

13. Lisinski is the founder of Lisinski Law. Lisinski has continuously used Lisinski Law in commerce as a trademark since at least as early as September 2020 in connection with Lisinski's legal services ("Lisinski Trademark"). Among other uses, Lisinski uses Lisinski Trademark A on her website, on the Lisinski Law Facebook account page, and on other social media sites like Instagram and TikTok.

14. As a result of her widespread, continuous, and exclusive use of Lisinski Trademark to identify Lisinski's legal services, and Lisinski as the source of those legal services, Lisinski owns valid and subsisting common law rights in and to Lisinski Trademark.

15. Fantacci is the founder of GF Immigration. Fantacci has continuously used ABOGADA JULIA in commerce as a trademark since at least as early as November 2, 2020, in connection with Fantacci's legal services (the "Fantacci Trademark").

16. As a result of her widespread, continuous, and exclusive use of Fantacci Trademark to identify Fantacci's legal services, and Fantacci as the source of those legal services, Fantacci owns valid and subsisting common law rights in and to Fantacci Trademark.

17. On September 3, 2021, GF Immigration filed an application for the Trademark with the U.S. Patent and Trademark Office, which was assigned Serial No. 97011552, and is currently pending in International Class 045 for "Legal Services."

18. Eagan is the founder of Eagan Immigration. Eagan has continuously used Eagan Immigration in commerce as a trademark since at least as early as January 1, 2016, in connection with Eagan's legal services (the "Eagan Trademark").

19. A result of her widespread, continuous, and exclusive use of Eagan Trademark to identify Eagan's legal services, and Eagan as the source of those legal services, Eagan owns valid and subsisting common law rights in and to Eagan Trademark.

20. In addition to her common law trademark, Lozano also coined the phrase, "arreglar sin salir", which translates to "fix without leaving" to raise awareness among the Spanish-speaking immigrant community of the possibilities of the VAWA and T visas.

21. Lozano has continuously used "Arreglar sin salir" in commerce as a trademark since at least as early August 2016 in connection with Lozano's legal services ("Arreglar Sin Salir Trademark").

22. On July 15, 2022, Lozano filed an application for the Arreglar Sin Salir Trademark with the U.S. Patent and Trademark Office, which was assigned Serial No.

97504788, and is currently pending in International Class 041 for "Education and Entertainment Services."

23. Lozano has permitted each of Plaintiffs to use Arreglar Sin Salir in their marketing and educational materials, particularly on social media websites such as TikTok.

24. Plaintiffs have expended substantial time, money, and resources marketing, advertising, and promoting their legal services which they have offered, sold, and provided under each of the Trademarks (Lozano Trademark, Lisinski Trademark, Fantacci Trademark, and Eagan Trademark, together with Arreglar Sin Salir are hereinafter referred to as "The Trademarks"), including through Plaintiffs' social media accounts and through other online and offline marketing channels.

25. Likewise, each of Plaintiffs have expended substantial time, money, and resources marketing, advertising, and promoting her legal services and educational services which they have offered, sold, and provided under Arreglar Sin Salir Trademark.

26. The legal services offered under each of The Trademarks are of high quality and, as a result of Plaintiffs' expenditures and efforts, the Trademark has come to signify the high quality of the legal services designated by the Trademark, and has acquired incalculable distinction, reputation, and goodwill belonging exclusively to Plaintiffs.

**<u>Doe Defendants Conduct a Defamatory Campaign Against Plaintiffs</u>**

27. Upon information and belief, as early as August 2020, the Plaintiffs became the target of a defamatory, discriminatory harassment campaign by the Doe Defendants. The Doe Defendants orchestrated this campaign by targeting Plaintiffs' TikTok accounts, making false reports about the contents of Plaintiffs' TikTok postings.

28. For example, in or about August 2020, upon information and belief, the Doe Defendants falsely reported a video posted to Eagan's TikTok account, claiming the video violated TikTok's Community Guidelines. The Doe Defendants made the report with the intent of having the video removed and Eagan's account suspended.

29. Based on this false report, TikTok removed Eagan's video for "violating [its] Community Guidelines."

30. Eagan filed an appeal with TikTok pursuant to the Community Guidelines, as removal of the video not only caused financial damage to Eagan, as Eagan depends on traffic from TikTok to generate leads, but the removal also caused reputational damage to Eagan. Despite Eagan's appeal, TikTok did not reinstate the video.

31. The pattern of defamatory harassment against Eagan continued. For example, in or about December 2020, TikTok notified Eagan that her TikTok account "was temporarily blocked from posting" until December 18, 2020. In support of that suspension, TikTok claimed Eagan had committed "multiple violations" of its policies.

32. Though Eagan successfully appealed her first temporary suspension, the harassment continued to the point that TikTok again temporarily blocked Eagan from posting, then temporarily blocked Eagan from posting as well as "commenting, messaging, and other rights." This pattern has repeated itself multiple times over.

33. Eagan appealed each of her takedowns and bans with only approximately 50 percent of her videos being reinstated.

34. The discriminatory campaign against Eagan escalated when on or about July 29, 2021, Eagan received notice that TikTok permanently banned her account, @eaganimmigration, for no apparent reason other than the discriminatory, defamatory reports.

35. At no time did Eagan's posts in fact violate TikTok's Community Guidelines.

36. Plaintiffs Lisinski, Fantacci, and Lozano have likewise suffered from the same discriminatory defamation campaign by the Doe Defendants.

37. Upon information and belief, the Doe Defendants have targeted Lisinski's TikTok account, making discriminatory and defamatory reports regarding Lisinski's posts, resulting in TikTok taking down those posts, even though they did not violate any Community Guidelines.

38. Though Lisinski had some success appealing TikTok's takedown of Lisinski's videos, by March and April of 2021, Lisisnki rarely won any of her appeals.

39. For example, on or about the week of July 27, 2021 to August 2, 2021, two out of five of Lisinski's videos on her TikTok account were preemptively flagged by TikTok as promoting illegal goods. Subsequently, Lisinski's account was then temporarily suspended.

40. By October 2021, every video that Lisinski posted was automatically held by TikTok for review, without cause. Some of the videos were released while others were not.

41. On or about December 12, 2021, TikTok notified Lisinski that her account was permanently banned. After an appeal, Lisinski's account was reinstated. Nine days later, on or about December 21, 2021, Lisinski was again permanently banned by TikTok. She appealed and her account was restored the next day, though she was still banned from posting for seven days.

42. Lisinski was forced to create a secondary account due to TikTok's repeated improper banning of her main account due to Doe Defendants' actions.

43. Lisinski's videos are still subject to preemptive review, and upon information and belief, the Doe Defendants continue to falsely report Lisinski's content as violating TikTok's Community Guidelines. As recently as June 2022, Lisinski has had a video falsely reported and improperly removed.

44. The reports have steadily increased as now Lisinski has videos falsely flagged for violating community guidelines daily.

45. At no time have Lisinksi's posts in fact violated the Community Guidelines.

46. Likewise, upon information and belief, the Doe Defendants have targeted Fantacci's TikTok account, making discriminatory and defamatory reports regarding Fantacci's posts, resulting in TikTok removing those posts, even though they did not violate any Community Guidelines. Fantacci has also been temporarily suspended by TikTok due to these discriminatory and defamatory reports.

47. Fantacci was suspended for one week in December 2020. TikTok cited "illegal activities" as the reason for this suspension. After this happened, Fantacci struggled to post on TikTok. During 2021, most of Fantacci's videos were flagged, especially during the first half of the year.

48. As recently as October 2021, TikTok began preemptively reviewing each video Fantacci attempts to post.

49. In July 2022, Fantacci had a video removed. Then, on or about July 6, 2022, Fantacci's entire account was reported and was placed "under review" by TikTok. Fantacci had four videos and stories removed in July 2022, alone.

50. At no time have Fantacci's posts in fact violated the Community Guidelines.

51. Between 2020 and 2021, Lozano has had over 63 videos removed from TikTok.

52. TikTok has also placed multiple bans on Lozano's account during that time.

53. In 2022, Lozano's videos have been falsely reported and removed numerous times, for allegedly violating the Community Guidelines. One of these videos relayed the following simple message: "Blessings to you!" Not only that, Lozano's account has been suspended because old videos were being falsely reported.

54. In the two years since the attacks on Plaintiffs began, Lozano has never been able to consistently post on TikTok.

55. At no time have Lozano's posts in fact violated the Community Guidelines.

56. Beyond TikTok, Doe Defendants have targeted Plaintiffs' other social media accounts. For example, Lisinski's marketing content, paid advertising, and organic posts are all being reported to Facebook, even though none of the posts violate any Facebook guidelines. Her Facebook account is being spammed with false reviews. Lozano is being targeted with false reviews on Google and Glassdoor. The list goes on.

## Fraudulent Accounts

57. Each of Plaintiffs have had imposter accounts use The Trademarks on TikTok, Instagram, and Facebook.

58. Upon information and belief, it is the Doe Defendants who have created the imposter accounts.

59. For example, there are three imposter accounts impersonating Fantacci on TikTok, using her trademarked logo: @abogadaajulia; @.abogadajulia; and, @abogadajulia.creator. Fantacci has reported those fake accounts multiple times, but TikTok has done nothing to remove them.

60. Even more, in April 2022, Fantacci discovered a Facebook account titled "Julia GF" on Facebook.

61. The fraudulent Facebook account attempted to pass itself off as Fantacci's own account by using variations of Fantacci's name as its title, using pictures Fantacci uses on her actual Facebook page, and using the Fantacci Trademark.

62. Through the fraudulent Facebook account using the Fantacci Trademark, Doe Defendants requested that potential and current clients contact them at a phone number that did not belong to Fantacci. The fraudulent Facebook account also directly contacted Fantacci's clients, asking for payments.

63. Lisinski has been targeted by the same scheme. Doe Defendants have used the Lisinski Trademark, as well as Lisinski's image, logo, branding, and marketing statements to create fraudulent Facebook accounts. Doe Defendants have used those fraudulent to message current and potential clients making defamatory statements regarding Lisinski and her legal practice. Doe Defendants have also asked Lisinski's clients for payments.

64. Lisinski has also discovered that the Lisinski Trademark, as well as Lisinksi's image, logo, branding, and marketing statements to create fraudulent TikTok accounts. These

TikTok accounts are reaching out to current and potential clients, and asking for payments as well.

65. The intent of the fraudulent accounts is to confuse current and potential clients, to divert business away from Plaintiffs, and to damage Plaintiffs' reputations through improper competitive harm.

**Unauthorized Use of The Arreglar Sin Salir Trademark**

66. An April 7, 2021 article in Mother Jones highlighted The Arreglar Sin Salir Trademark and noted that the hashtag "#arreglarsinsalir" has topped over 1 million views on TikTok.[1] However, the TikTok videos described in the Mother Jones article are nothing like the videos Plaintiffs post. The article describes the posts as following a "simple formula": a Mariachi song or reggaeton beat, a lawyer dancing and flashing work permits, often guaranteeing employment authorization in six months and a green card within two years.

67. These are unauthorized uses of the Arreglar Sin Salir Trademark.

68. Plaintiffs do not use The Arreglar Sin Salir Trademark in this manner, and in particular, do not guarantee results. However, Plaintiffs have been lumped in with these lawyers who have infringed on The Arreglar Sin Salir Trademark, and have become the target of detractors who make false statements regarding Plaintiffs' marketing and ethical conduct.

**The Doe Defendants Have Harassed Plaintiffs Through Spam Phone Calls**

69. Upon information and belief, the Doe Defendants have harassed Plaintiffs through spam phone calls.

---

[1] https://www.motherjones.com/politics/2021/04/the-tiktok-trend-that-has-immigration-lawyers-worried/

70. Lisinski and Eagan received numerous phone calls over a span of several weeks in December 2020 through January 2021.

71. Along with the phone calls, Eagan's firm received 10-20 explicit and inappropriate messages from a single phone number.

72. Upon information and belief, the same Doe Defendants who have defamed Plaintiffs on TikTok and other social media websites are also responsible for the harassing phone calls and messages.

**COUNT I**
**(Defamation)**

73. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

74. Doe Defendants have made false statements about Plaintiffs in relation to their employment, quality of work, and job performance.

75. Doe Defendants have made false statements about Plaintiffs' ethics, which reflect upon Plaintiffs' character and brings each of them into ridicule, hatred, or contempt.

76. These false statements include but are not limited to: (i) reporting Plaintiffs' videos to TikTok for violating Community Guidelines, including accusing Plaintiffs of promoting illegal goods; (ii) making false reports to Facebook; (iii) posting false and defamatory reviews on Google, Facebook, and Glassdoor; and (iv) making false statements to current and prospective clients through TikTok, Facebook, and other social media messaging features.

77. These false statements were made to third parties, including, but not limited to TikTok, Facebook, Google, Glassdoor, and current and potential clients.

78. Doe Defendants made the false statements with negligence and/or actual malice.

79. The false statements were directed at Plaintiffs' occupation and profession, and therefore constitute defamation per se or caused special harm to Plaintiffs.

80. As a direct and proximate result of Doe Defendants' defamation, Plaintiffs have been damaged monetarily, emotionally, and in reputation, in an amount that exceeds $75,000.

**COUNT II**
**(Tortious Interference)**

81. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

82. Plaintiffs have existing business relationships with individuals, entities, and organizations relating to their businesses.

83. Plaintiffs have a reasonable expectation of future business relationships with individuals, entities, and organizations with whom Plaintiffs do business or whom Plaintiffs may reasonably expect to do business.

84. At all material times hereto, Doe Defendants were aware of Plaintiffs' existing and/or prospective business relationships.

85. Upon information and belief, Doe Defendants intentionally and/or purposefully interfered with Plaintiffs' existing and prospective relationships by making false and defamatory reports, including but not limited to : (i) reporting Plaintiffs' videos to TikTok for violating Community Guidelines, including accusing Plaintiffs of promoting illegal goods; (ii) making false reports to Facebook; (iii) posting false and defamatory reviews on Google, Facebook, and Glassdoor; and (iv) making false statements to current and prospective clients through TikTok,

Facebook, and other social media messaging features. These reports were made with the goal of interfering with Plaintiffs' business relationships.

86. In interfering with Plaintiffs' existing and prospective relationships, Doe Defendants acted with malice.

87. Doe Defendants lacked any justification or privilege to make such reports and interference.

88. As a direct and proximate result of Doe Defendants' tortious interference, Plaintiffs have been damaged monetarily, emotionally, and in reputation, in an amount that exceeds $75,000.

**COUNT III**
**(Invasion of Privacy – False Light)**

89. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

90. Doe Defendants have made false reports regarding Plaintiffs, including but not limited to: (i) reporting Plaintiffs' videos to TikTok for violating Community Guidelines, including accusing Plaintiffs of promoting illegal goods; (ii) making false reports to Facebook; (iii) posting false and defamatory reviews on Google, Facebook, and Glassdoor; and (iv) making false statements to current and prospective clients through TikTok, Facebook, and other social media messaging features Doe Defendants have made these false reports to third parties, including but not limited to TikTok.

91. The false reports have placed Plaintiffs in a false light.

92. The false reports are highly offensive to a reasonable person and have been shared with the intent of causing harm.

93. Doe Defendants knew the false reports were false or acted in reckless disregard as to the falsity of the false reports.

94. Doe Defendants acted with malice in making the false reports.

95. As a direct and proximate result of Doe Defendants' tortious actions, Plaintiffs have been damaged monetarily, emotionally, and in reputation, in an amount that exceeds $75,000.

**COUNT IV**
**(Intentional Infliction of Emotional Distress)**

96. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

97. By sharing the false reports, convincing TikTok to remove Plaintiffs' posts and videos resulting in the suspension of Plaintiffs' accounts, harming Plaintiffs' businesses, and harassing the Plaintiffs through the reports to TikTok, as well as phone calls and other means, and by creating fraudulent imposter accounts, Doe Defendants have engaged in extreme and outrageous conduct.

98. Doe Defendants engaged in extreme and outrageous conduct with the intention to cause Plaintiffs severe emotional distress.

99. Doe Defendants knew and/or recklessly disregarded the near certainty that such emotional distress would result from their conduct.

100. Doe Defendants acted with malice when making false reports, including those to TikTok, and in harassing the Plaintiffs.

101. As a direct and proximate result of Doe Defendants' tortious actions, Plaintiffs have been damaged monetarily, emotionally, and in reputation, in an amount that exceeds $75,000.

**COUNT V**

**(Federal Unfair Competition – 15 U.S.C. § 1125(a)(1)(A))**

102. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

103. Doe Defendants' unauthorized use in commerce of The Trademarks, through unauthorized use of The Trademarks as well as the fraudulent Facebook and TikTok Accounts, has already deceived and is likely to deceive consumers of legal services as to the origin, source, sponsorship, or affiliation of Doe Defendants' fraudulent services (through impersonation of Plaintiffs) and is likely to cause consumers to believe, contrary to fact, that Doe Defendants' fraudulent services are sold, authorized, endorsed, or sponsored by Plaintiffs, or that Doe Defendants are in some way affiliated with or sponsored by Plaintiffs, or that Doe Defendants actually are Plaintiffs.

104. Doe Defendants' unauthorized use in commerce of The Trademarks as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

105. Upon information and belief, Defendants committed the conduct alleged herein with full knowledge of Plaintiffs' prior rights in The Trademarks and with the willful intent to cause confusion, mistake, or deception and trade on Plaintiffs' reputation and goodwill.

106. Upon information and belief, Doe Defendants' conduct as alleged herein is willful and is intended to cause, has caused, and is likely to continue to cause confusion, mistake, or deception as to the affiliation, connection, or association of Doe Defendants with Plaintiffs.

107. Doe Defendants' conduct as alleged herein, constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

108. Doe Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiffs, and to their goodwill and reputation, and will continue to both damage Plaintiffs and confuse the public unless enjoined by this Court. Plaintiffs have no adequate remedy at law.

109. Plaintiffs are entitled to, among other relief, injunctive relief and an award of actual damages, Doe Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

**COUNT VI**
**(Civil Conspiracy)**

110. Plaintiffs incorporate and reallege the preceding paragraphs as if fully set forth herein.

111. Doe Defendants participated in a malicious combination with the purpose of causing damage to Plaintiffs' businesses and reputations.

112. Doe Defendants, each and collectively, engaged in unlawful activity including defamation, tortious interference, invasion of privacy, intentional infliction of emotional distress, and unfair competition independently and in conspiracy with each other.

113. As a direct and proximate result of Doe Defendants' tortious actions, Plaintiffs have been damaged monetarily, emotionally, and in reputation, in an amount that exceeds $75,000.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this court enter judgment in their favor and issue the following relief as applicable:

1. Preliminary and permanent injunctive relief as against Doe Defendants from defaming and harassing Plaintiffs;

2. An award of general, specific, compensatory, punitive, special, and exemplary damages in an amount exceeding $75,000;

3. Pre- and post-judgment interest;

4. An award of Plaintiffs' reasonable attorneys' fees, costs, and expenses incurred; and,

5. Such other relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs respectfully request a trial by jury on all claim so triable.

Date: August 10, 2022

Respectfully submitted,

/s/ Shawn J. Organ

Shawn J. Organ (0042052)
*Trial Attorney*
Kirsten R. Fraser (0093951)
Ashley T. Merino (0096853)
**ORGAN LAW LLP**
1330 Dublin Road
Columbus, Ohio 43215
614.481.0900

614.481.0904 (f)
sjorgan@organlegal.com
kfraser@organlegal.com
amerino@organlegal.com

*Attorneys for Plaintiffs*

JS 44 (Rev. 04/21) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Alexandra Lozano, Angelyne Lisinski, Giulia Fantacci, and Lauren Eagan | John Does I-X; Jane Does I-X; ABC Partnerships 1-X; DEF Limited Liability Companies I-X; and XYZ Corporations |
| **(b)** County of Residence of First Listed Plaintiff ______ *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant ______ *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>See attachment | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- [x] 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S. Code § 1338

Brief description of cause:
Claim for Federal Unfair Competition

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE: 08/10/2022

SIGNATURE OF ATTORNEY OF RECORD: /s/ Shawn J. Organ

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**ATTACHMENT**

Shawn J. Organ (0042052)
Organ Law LLP
1330 Dublin Road
Columbus, Ohio 43215
614.481.0901
614.481.0904 (f)
sjorgan@organlegal.com

Kirsten R. Fraser (0093951)
Organ Law LLP
1330 Dublin Road
Columbus, Ohio 43215
614.869.3221
614.481.0904 (f)
kfraser@organlegal.com

Ashley T. Merino (0096853)
Organ Law LLP
1330 Dublin Road
Columbus, Ohio 43215
614.481.0907
614.481.0904 (f)
amerino@organlegal.com

# EXHIBIT 4

FILED
May 26, 2026
Disciplinary Board
Docket # 001

DISCIPLINARY BOARD
WASHINGTON STATE BAR ASSOCIATION

| | |
|---|---|
| In re<br><br>**ALEXANDRA LOZANO,**<br><br>Lawyer (Bar No. 40478). | Proceeding No. 25#00062<br><br>ODC File No(s). 24-01460, 24-01482, 24-01631, 24-01852, 25-01047, 25-01348, 25-01335, 25-01501, 25-01469, 25-01953, 25-01958, 25-01990, 25-02076, 25-02100, 25-02179, 25-02205, 25-02210, 26-00043, 26-00294, 26-00461, 26-00464<br><br>Resignation Form of Alexandra Lozano (ELC 9.3(b)) |

I, Alexandra Lozano, declare as follows:

1. I am over the age of eighteen years and am competent. I make the statements in this declaration from personal knowledge.

2. I was admitted to practice law in the State of Washington on October 27, 2008.

3. After consulting with my counsel, I have voluntarily decided to resign from the Washington State Bar Association (the Association) in Lieu of Discipline under Rule 9.3 of the Washington Supreme Court's Rules for Enforcement of Lawyer Conduct (ELC).

4. Attached hereto as Exhibit A is Disciplinary Counsel's statement of alleged misconduct for purposes of ELC 9.3(b). I am aware of the alleged misconduct stated in



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

Disciplinary Counsel's statement, but rather than defend against the allegations, I wish to permanently resign from membership in the Association.

5. Although I am choosing not to defend, I dispute the accuracy of the attached Exhibit A - Statement of Alleged Misconduct, and I deny any misconduct

6. I consent to entry of an order under ELC 13.9(e) assessing expenses of $1,500 in this matter.

7. I agree to pay any additional costs or restitution that may be ordered by a Review Committee under ELC 9.3(g).

8. I understand that my resignation is permanent and that any future application by me for reinstatement as a member of the Association is currently barred. If the Washington Supreme Court changes this rule or an application is otherwise permitted in the future, it will be treated as an application by one who has been disbarred for ethical misconduct. If I file an application, I will not be entitled to a reconsideration or reexamination of the facts, complaints, allegations, or instances of alleged misconduct on which this resignation was based.

9. I agree to (a) notify all other states and jurisdictions in which I am admitted, of this resignation in lieu of discipline; (b) seek to resign permanently from the practice of law in any other state or jurisdiction in which I am admitted; and (c) provide Disciplinary Counsel with copies of any such notification(s) and any response(s). I acknowledge that this resignation could be treated as a disbarment by all other jurisdictions.

10. I agree to (a) notify all other professional licensing agencies in any jurisdiction from which I have a professional license that is predicated on my admission to practice law of this resignation in lieu of discipline; (b) seek to resign permanently from any such license; and (c) provide disciplinary counsel with copies of any of these notifications and any responses.



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

11. I agree that when applying for any employment, I will disclose the resignation in lieu of discipline in response to any question regarding disciplinary action or the status of my license to practice law.

12. I understand that my resignation becomes effective on Disciplinary Counsel's endorsement and filing of this document with the Clerk, and that under ELC 9.3(c) Disciplinary Counsel must do so promptly following receipt of this document.

13. When my resignation becomes effective, I agree to be subject to all restrictions that apply to a disbarred lawyer.

14. Upon filing of my resignation, I agree to comply with the same duties as a disbarred lawyer under ELC 14.1 through ELC 14.4.

15. I understand that, after my resignation becomes effective, it is permanent. I will never be eligible to apply and will not be considered for admission or reinstatement to the practice of law nor will I be eligible for admission for any limited practice of law.

16. I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

5/26/2026
Date and Place

Alexandra Lozano, Bar No. 40478

ENDORSED BY:

Marina Busse, Disciplinary Counsel
Bar No. 54411



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

# EXHIBIT A

DISCIPLINARY BOARD
WASHINGTON STATE BAR ASSOCIATION

In re

**ALEXANDRA LOZANO,**

Lawyer (Bar No. 40478).

Proceeding No. 25#00062

ODC File No(s). 24-01460, 24-01482, 24-01631, 24-01852, 25-01047, 25-01348, 25-01335, 25-01501, 25-01469, 25-01953, 25-01958, 25-01990, 25-02076, 25-02100, 25-02179, 25-02205, 25-02210, 26-00043, 26-00294, 26-00461, 26-00464

STATEMENT OF ALLEGED MISCONDUCT UNDER ELC 9.3(b)(1)

The following constitutes a Statement of Alleged Misconduct under Rule 9.3(b)(1) of the Washington Supreme Court's Rules for Enforcement of Lawyer Conduct (ELC).

## I. ADMISSION TO PRACTICE

1. Respondent Alexandra Lozano was admitted to the practice of law in the State of Washington on October 27, 2008.

## II. ALLEGED FACTS

2. Respondent is the sole owner and manager of Alexandra Lozano Immigration Law (ALIL).

3. ALIL primarily represents client on petitions for humanitarian visas filed with United



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

States Citizenship and Immigration Services (USCIS).

4. ALIL currently has over 35,000 clients. Respondent is currently listed as the lawyer of record for tens of thousands of clients with petitions pending before USCIS.

5. Respondent employs nonlawyer staff to conduct client consultations and deliver scripted sales pitches to prospective clients. In these consultations, the nonlawyer staff recommend strategies and provide legal advice about the effects of filing certain forms.

6. Respondent's scripts include false and misleading statements about what Respondent can accomplish for the prospective client, such as providing assurances of "100% protection" from Immigration and Customs Enforcement (ICE) upon filing certain applications.

7. Respondent uses a computer program to determine case strategies for immigration relief. Neither Respondent, nor any other ALIL lawyer, review the case strategies before they are pitched to the clients.

8. The majority of Respondent's clients apply for immigration benefits under the Violence Against Women Act (VAWA) or for T nonimmigrant status (T-visa), for which Respondent typically charges a flat fee of $10,000–$15,000.

9. Since approximately mid-2023, Respondent has referred clients to Salud Total, a company Respondent owns, for "immigration impact assessments" which Respondent requires for all clients. The assessments are not performed by licensed mental health professionals, but rather by laypersons with no professional qualifications. Salud Total charges up to $1,200 for these assessments. While Respondent discloses Respondent's financial interest in Salud Total to clients, Respondent does not disclose that Salud Total staff are not licensed mental health professionals.

10. In virtually all Respondent's VAWA applications, Respondent included an application



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

for adjustment of status to lawful permanent resident (AOS), regardless of whether the client was ultimately eligible for AOS. Respondent did not explain to clients the potential risks of USCIS denying an AOS application, which can include being placed in proceedings in immigration court.

11. One or more of Respondent's clients have been issued a Notice to Appear (NTA) in immigration court after USCIS denied their AOS applications.

12. One or more of Respondent's clients have been deported after their AOS petitions were denied.

13. Nonlawyer staff at ALIL answered questions from clients, prepared immigration petitions, assembled supporting documentation, and drafted client declarations with minimal supervision. Once the applications were completed, staff affixed Respondent's signature to the immigration forms, certifying under penalty of perjury that Respondent prepared the application, even in cases when Respondent had not done so.

14. Respondent directed ALIL staff to file the applications bearing Respondent's signature with USCIS, despite knowing that Respondent had not personally reviewed the cases.

15. As of March 17, 2026, Respondent's signature was on 53,923 petitions pending before USCIS.

16. Respondent directed ALIL staff to affix digitized replicas of client's signatures to immigration forms, even in instances where the form stated that a wet ink signature was required.

17. In one or more cases, ALIL affixed client signatures to immigration forms even when the clients did not review the documents.

18. One or more of the clients' applications were delayed or denied due to Respondent's failure to comply with signature requirements.

19. Respondent represented M.R.A. on applications for VAWA and AOS. Respondent



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

knew that M.R.A. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for M.R.A. USCIS denied M.R.A.'s AOS application. On April 30, 2025, the Department of Homeland Security (DHS) issued an NTA based on the information contained in the denied AOS application. M.R.A. paid Respondent a flat fee of $8,525 and $2,157.90 in costs. On October 8, 2024, M.R.A. filed a grievance against Respondent.

20. Respondent represented A.S.A. on applications for VAWA and AOS. Respondent knew that A.S.A. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for A.S.A. When USCIS scheduled an interview with A.S.A., nonlawyer staff at ALIL advised A.S.A. that ALIL should withdraw the AOS application because A.S.A. was not eligible for AOS. Respondent withdrew the AOS application. On October 23, 2025, DHS issued an NTA based on the information contained in the withdrawn AOS application. In total, A.S.A paid Respondent $13,000 in fees and $1,261.75 in costs. On October 29, 2024, A.S.A. filed a grievance against Respondent. On January 8, 2025, Respondent provided A.S.A. with a refund of $1,500.

21. Respondent represented J.C.A. on a T-visa application. According to J.C.A.'s grievance, ALIL staff affixed J.C.A.'s signature to a sworn declaration that was submitted in support of J.C.A.'s T-visa application and. J.C.A. did not personally review the declaration. According to J.C.A., J.C.A. subsequently discovered that ALIL staff had included false information in the declaration inconsistent with J.C.A.'s experience. J.C.A.'s T-visa application was denied based on the information in the declaration. In total, J.C.A. paid ALIL $9,500 in fees. On December 2, 2024, J.C.A. filed a grievance against Respondent.

22. Respondent represented Z.M.Q. on an application for VAWA and AOS. According to Z.M.Q.'s grievance, ALIL failed to promptly inform Z.M.Q. of USCIS's decision denying Z.M.Q.'s VAWA application, which negatively impacted Z.M.Q.'s ability to appeal. ALIL also



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

failed to promptly provide Z.M.Q.'s client file to new counsel. Z.M.Q. paid ALIL a fee of $13,150 and $1,261.75 in costs. On July 1, 2025, Z.M.Q. filed a grievance against Respondent.

23. Respondent represented T.B.J. on an application for VAWA and AOS. T.B.J. wished to include T.B.J.'s two minor children as derivative applicants. T.B.J. was falsely informed by nonlawyer staff that T.B.J.'s minor children could not be included as derivative applicants on T.B.J.'s VAWA application until the VAWA application was approved. ALIL then added additional charges to T.B.J.'s account of $4,500 per child to prepare and file two immigration forms per child. T.B.J. paid ALIL $8,650 in fees and $3,344.25 in costs. On April 14, 2025, ALIL refunded $5,500 to T.B.J. On August 5, 2025, T.B.J. filed a grievance against Respondent.

24. Respondent represented J.G.M.R. on an application for VAWA and AOS. Respondent knew J.G.M.R. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for J.G.M.R. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had reviewed the application with J.G.M.R., when in fact Respondent had not done so. Nonlawyer staff falsely informed J.G.M.R. that J.G.M.R.'s employment authorization document would protect J.G.M.R. from deportation. In July 2025, J.G.M.R. received a notice from DHS that J.G.M.R. did not understand. J.G.M.R. called ALIL and asked to speak with a lawyer about the notice. Nonlawyer staff said they would "escalate" J.G.M.R.'s request. However, J.G.M.R. was never able to speak with a lawyer at ALIL about the notice. J.G.M.R. was subsequently detained by ICE. J.G.M.R. paid ALIL $10,500 in fees and $2,155 in costs. On August 11, 2025, J.G.M.R. filed a grievance against Respondent. In October 2025, J.G.M.R. was deported.

25. A.J.S. hired Respondent to file a family-based visa petition based on A.J.S.'s marriage to a U.S. citizen. A.J.S. only ever spoke with nonlawyers about A.J.S.'s case, even when USCIS



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

sent a Request for Evidence (RFE), requesting certain tax information. After being unable to communicate with any ALIL lawyer, A.J.S. submitted a response to the RFE. A.J.S.'s petition was denied on the basis that responsive tax information was not submitted in response to the RFE. In total, A.J.S paid $7,000 in fees to ALIL. On September 5, 2025, A.J.S. filed a grievance against Respondent.

26. Respondent represented C.V.P. and C.V.P.'s spouse on applications for a T-visa and AOS. Respondent filed C.V.P.'s AOS application based on C.V.P.'s approved T-visa before C.V.P was statutorily eligible for AOS. USCIS denied C.V.P.'s application but noted that C.V.P. could refile the application when C.V.P. became eligible. C.V.P. was eligible by the time USCIS issued its denial decision. Instead of refiling the AOS petition, ALIL nonlawyer staff advised C.V.P. to file a motion to reconsider. ALIL charged C.V.P. an additional $4,500 for the motion to reconsider, which was denied. After the denial of the motion to reconsider, C.V.P.'s T-visa had expired and C.V.P no longer had the ability to apply for AOS based on the approved T-visa. ALIL then advised C.V.P. to file an application to extend the T-visa which would cost an additional $4,500. C.V.P. refused to pay additional funds and ultimately ALIL agreed to file the extension for no additional cost. However, C.V.P. declined and hired a new lawyer. C.V.P. paid ALIL $23,100 in fees and more than $2,425 in costs. On September 8, 2025, C.V.P. filed a grievance against Respondent.

27. J.H.C. paid $150 to ALIL for a consultation conducted by a nonlawyer staff member, who referred J.H.C. to another lawyer. Respondent took 30% of a flat fee J.H.C. paid to the other lawyer. ALIL and Respondent did nothing on J.H.C.'s case aside from referring J.H.C. to the other firm, therefore the work Respondent performed was not proportionate to the division of the fee Respondent received. On November 13, 2025, J.H.C. filed a grievance against Respondent.



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

28. A.M.M. paid $99 for a consultation with a nonlawyer staff member at ALIL, who advised A.M.M. to apply for a T-visa. A.M.M. hired Respondent to file the T-visa application. However, Respondent did not file the T-visa application. A.M.M. called ALIL to ask about the status of the case several times but was never permitted to speak with a lawyer. Finally, A.M.M. elected to terminate the representation. In total, A.M.M. paid $7,427 in fees to ALIL. On November 14, 2025, A.M.M. filed a grievance against Respondent.

29. Respondent represented J.L.S. on an application for VAWA and AOS. Respondent knew J.L.S. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for J.L.S. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had reviewed the application with J.L.S, when in fact Respondent had not done so. ALIL also affixed J.L.S.'s signature to immigration forms and a sworn declaration without J.L.S. having reviewed the forms and declaration first. According to J.L.S.'s grievance, J.L.S. subsequently discovered that ALIL staff had included false information in the declaration. J.L.S.'s AOS application was denied. Neither Respondent, nor anyone at ALIL informed J.L.S. about the right to appeal within 30 days of the denial. J.L.S. paid $10,650 in fees and $1,260 in costs to ALIL. On November 19, 2025, J.L.S. filed a grievance against Respondent.

30. Respondent represented D.B.D. on an application for VAWA and AOS. Respondent knew D.B.D. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for D.B.D. USCIS denied D.B.D.'s AOS application. D.B.D. paid at least $13,150 in fees to ALIL. On November 24, 2025, D.B.D. filed a grievance against Respondent.

31. ALIL represented M.B.A. and M.B.A.'s sibling in an appeal from the denial of M.B.A.'s asylum application. ALIL failed to advise M.B.A. that M.B.A. was likely eligible for relief under VAWA, or that M.B.A.'s sibling was likely eligible for relief as a Special Immigrant



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

Juvenile (SIJ). ALIL staff affixed Respondent's signature on the appeal, Form EOIR-27, and the appeal brief, although Respondent never reviewed any of the documents filed. Respondent failed to raise multiple potential grounds for relief in the asylum appeal. The appeal was denied. According to M.BA.'s grievance, ALIL failed to inform M.B.A. of the denial. M.B.A. paid ALIL $6,500 in fees and $675 in costs. On December 1, 2025, M.B.A filed a grievance against Respondent.

32. Respondent represented M.G.A. on an application for VAWA and AOS. Respondent knew M.G.A. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for M.G.A. USCIS denied M.G.A.'s application. M.G.A. paid ALIL at least $10,650 in fees and $1,261.75 in costs. On December 23, 2025, M.G.A. filed a grievance against Respondent.

33. Respondent represents M.V.G. on an application for asylum. M.V.G.'s case was handled entirely by nonlawyer staff. ALIL staff did not permit M.V.G. to speak with a lawyer about the case, despite multiple requests made by M.V.G. Despite this, Respondent charged M.V.G. a flat fee of $15,800. M.V.G. paid ALIL $11,970.55 in fees and $2,385 in costs. On December 23, 2025, M.V.G. filed a grievance against Respondent.

34. Respondent represented E.C.L. on an application for VAWA, a request to waive inadmissibility, and AOS. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had reviewed the application with E.C.L., when in fact Respondent had not done so. The request to waive inadmissibility and AOS were both denied because ALIL affixed a copy of E.C.L.'s signature to the applications and the forms required a wet signature. ALIL quoted a fee of $2,500-3,500 to appeal the denial of the AOS application. E.C.L. paid at least $21,340 in fees to ALIL. On December 26, 2025, E.C.L. filed a grievance against Respondent.



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

35. Respondent represented C.P.N. on an application for VAWA and AOS. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had reviewed the application with C.P.N., when in fact Respondent had not done so. USCIS determined that C.P.N.'s signature on the form was not a wet ink signature as required, and asked that C.P.N. submit a new application form with a wet ink signature. ALIL appealed USCIS's decision and argued that the signature was a wet-ink signature under applicable regulations. However, ALIL did not file a new AOS application form as required by USCIS. C.P.N.'s application was denied. C.P.N. paid at least $13,200 in fees and at least $1,760 in costs to ALIL. On January 9, 2026, C.P.N. filed a grievance against Respondent.

36. On August 27, 2024, J.R.R. paid ALIL $99 for an initial consultation with a nonlawyer ALIL staff member, who advised that J.R.R. was eligible to apply for VAWA and AOS. On August 29, 2024, J.R.R. paid Respondent a flat fee of $9,500 for the VAWA and AOS applications. By May 2, 2025, ALIL had everything it needed to submit the applications except for J.R.R.'s signature on the forms. On September 4, 2025, J.R.R. called ALIL to confirm that they had received J.R.R.'s signed forms. ALIL did not file the VAWA or AOS applications. J.R.R. was detained by ICE. ALIL informed J.R.R.'s representatives that ALIL could not provide further assistance. J.R.R. requested a refund of the flat fee, as the VAWA and AOS applications had not been filed. ALIL declined to provide a refund. J.R.R. requested an accounting of how the flat fee was used. ALIL did not provide an accounting or a refund. ALIL did not file the VAWA or AOS petitions. On February 11, 2026, J.R.R. filed a grievance against Respondent.

37. Respondent represented S.C.G. on an application for VAWA and AOS. S.C.G. paid a flat fee of $10,400 and costs of $1,250 for the VAWA and AOS applications. Respondent knew S.C.G. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for S.C.G.



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

USCIS denied S.C.G.'s AOS application. Nonlawyer ALIL staff members then advised S.C.G. that the denial could be overcome through an appeal. S.C.G. paid a flat fee of $2,500 and $1,653.15 in costs for the appeal. The argument ALIL presented in support of the appeal had no basis in law or fact. The appeal was denied on the same grounds as AOS application. In total, S.C.G. paid at least $12,900 in fees and $2,903.15 in costs to ALIL. On March 5, 2026, S.C.G. filed a grievance against Respondent.

38. Respondent represented G.V.N. on an application for VAWA and AOS. Respondent knew G.V.N. was ineligible for AOS. Nevertheless, Respondent filed an AOS application for G.V.N. ALIL staff affixed Respondent's signature to the AOS application, certifying that Respondent had prepared the application and reviewed it with G.V.N., when in fact Respondent had not done so. ALIL staff later told G.V.N. that G.V.N. was not eligible for AOS, and that the AOS application was submitted solely to allow G.V.N. to obtain a work permit. On March 5, 2026, G.V.N. filed a grievance against Respondent alleging that ALIL and/or Respondent had misled G.V.N. about G.V.N.'s eligibility for AOS and that G.V.N. would not have agreed to pay the fee if G.V.N. had known G.V.N. was ineligible for AOS. G.V.N. paid $150 for an initial consultation, a flat fee of $12,500 and costs of $1,225 for the VAWA and AOS applications. On March 5, 2026, G.V.N. filed a grievance against Respondent.

## III. ALLEGED MISCONDUCT

39. By directing staff to utilize a script that contained false and/or misleading information when communicating with prospective clients, it appears that Respondent violated RPC 8.4(c).

40. By filing applications for immigration benefits with USCIS when Respondent knew the clients were ineligible for those benefits, Respondent violated RPC 3.1 and RPC 8.4(d).

41. By utilizing nonlawyers to perform legal functions on behalf of clients, and/or by



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

delegating legal functions to nonlawyer staff such as performing client consultations and providing legal advice and/or by providing Respondent's signature stamp for nonlawyer staff to affix to documents that Respondent did not personally review, it appears that Respondent violated RPC 5.5(a).

42. By failing to adequately supervise nonlawyer staff who performed legal functions and affixed Respondent's signature to filings, Respondent violated RPC 5.3(b).

43. By referring clients to Salud Total without disclosing that evaluations were performed by unlicensed individuals, Respondent violated RPC 1.7(a)(2).

44. By directing staff to submit forms to USCIS bearing signatures that falsely certified that Respondent had prepared the forms, Respondent engaged in dishonesty and conduct prejudicial to the administration of justice in violation of RPC 8.4(c) and RPC 8.4(d).

45. By charging unreasonable fees for work performed by nonlawyers and for preparation of applications for which the clients were ineligible, Respondent violated RPC 1.5(a).

Dated this 26th day of May 2026,

Marina Busse, Disciplinary Counsel
Bar No. 54411



OFFICE OF DISCIPLINARY COUNSEL
OF THE WASHINGTON STATE BAR ASSOCIATION
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
(206) 727-8207

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE LISINSKI LAW FIRM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:26-cv-00704 |
| v. | ) | |
| | ) | Judge Sarah D. Morrison |
| CAMILA OVERMYER a/k/a CAMELIA GUAD MAGANA MADRIGAL, JAMES BETZOLD, ROBERT ALVAREZ, INNA SIMAKOVSKY, BETZOLD LAW, PLC d/b/a VISA FELIZ, AVANTI LAW GROUP, PLLC, SIMAKOVSKY LAW GROUP, LLC and JOHN DOES 1 - 6, | ) | Magistrate Judge Kimberly A. Jolson |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF JAMES L. BETZOLD**

I, James L. Betzold swear under penalty of perjury and state as follows:

1. I reside in western Michigan.

2. I am the sole owner of business Betzold Law, PLC d/b/a Visa Feliz.

3. The primary office of Betzold Law, PLC d/b/a Visa Feliz is in Holland, Michigan. A secondary location is in Wyoming, Michigan.

4. I have been interviewed by Camila Overmyer.

5. I have never been located in the State of Ohio when interviewed by Overmyer.

6. Based on information and belief, Overmyer has never been located in the State of Ohio when she interviewed me.

7. I have been a Michigan resident when setting up and amending my firm's website. I have not been present in Ohio during any actions involving my website.

8. I have never lived in Ohio, and have never worked for a business located there.

9. Based upon information and belief, I did not communicate with anyone in Dublin, Ohio on or about June 2, 2026. If Plaintiff were to identify this person, I could be more definitive.

Further Affiant Sayeth Not

James L. Betzold

STATE OF MICHIGAN )
) ss.
COUNTY OF OTTAWA )

Subscribed and sworn to before me
On this 24 day of August, 2026.

Notary Public
Acting in Ottawa County
My Commission Expires: 04-14-2031
4906-6902-0362, v. 1

ERIKA MENDOZA
NOTARY PUBLIC - MICHIGAN
OTTAWA COUNTY
ACTING IN THE COUNTY OF Ottawa
MY COMMISSION EXPIRES 04-14-2031

# EXHIBIT 6

| | |
|---|---|
| Archived: | Monday, August 24, 2026 9:12:03 AM |
| From: | David Saperstein |
| Sent: | Tue, 14 Jul 2026 13:31:45 |
| To: | dbutler@taftlaw.com Lee, Heather A. |
| Cc: | Courtney E. O'Hare |
| Subject: | Summary of Meet and Confer, Lisinski Law v Overmyer |
| Importance: | Normal |
| Sensitivity: | None |

---

Dear Mr. Butler and Ms. Lee,

Thank you for this morning's meet and confer. Please allow this to confirm our conversation that you will be amending the Complaint and filing the Amended Complaint this week. My client's new date to file a first responsive pleading will run from that date. Because my client's first responsive pleading is due on Monday, July 20, 2026, please advise if you will not be filing the Amended Complaint by that date.

As we discussed, some of my concerns (in addition to the merits) are that the Complaint does not identify conduct of Mr. Betzold specifically. Under *Calder*, each Defendant's conduct must be assessed individually for purposes of personal jurisdiction. I am also concerned that the allegations against Mr. Betzold appear to find fault with him for conducting a review of a file to determine whether a lawyer committed ethical violations. As it currently reads, the Complaint could be construed to interfere with regulatory authorities' ability to investigate and regulate the conduct of licensed attorneys. Hopefully, the Amended Complaint will be more clear that that is not what your client is doing.

I look forward to working with both of you. In what is undoubtedly high stakes litigation, I hope that our respective professional efforts can serve to focus our efforts and the court's efforts on the appropriate factual and legal issues.

**David Saperstein**
Shareholder

One Towne Square
Fifth Floor
Southfield MI 48076 (Metro Detroit)
Receptionist (248) 354-4030

D:(248) 827-1885
C:(248) 739-0097
F:(248) 359-6185
dsaperstein@maddinhauser.com
www.maddinhauser.com
vcard

---

*This electronic message and all contents contain information from the law firm of Maddin, Hauser, Roth & Heller, P.C. which may be privileged, confidential or otherwise protected from disclosure. The information is intended to be for the addressee only. If you are not the addressee, any disclosure, copy, distribution or use of the contents of this message is prohibited. If you have received this electronic message in error, please notify us immediately and destroy the original message and all copies.*